# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

AKH COMPANY, INC.,            )
                                   )
             Plaintiff,      )
                                   )      Case No. 13-2003-JAR-KGG
v.                           )
                                   )
UNIVERSAL UNDERWRITERS   )
INSURANCE COMPANY,        )
                                   )
            Defendant,     )
_____ )

## ORDER ON DEFENDANT'S MOTION TO COMPEL

Now before the Court is Defendant's "Motion to Compel Sufficient Written Responses and Production of Documents." (Doc. 123.) For the reasons set forth below, the Court **GRANTS** this motion.

## I.   GENERAL BACKGROUND

### A.   Factual Background and Claims.

The facts of the case were summarized by District Court in its Order (Doc. 66) denying Defendant's motion to transfer venue, which stated in relevant part:

> This is an insurance coverage dispute filed by AKH Company, Inc. ("AKH") against Universal Underwriters Insurance Company ("UUIC"), arising out of a trademark infringement action against AKH which UUIC defended and settled under a reservation of rights. AKH is a California corporation with its principal place

of business in California.  It sells and installs tires through its retail garages and internet website under the name "Discount Tire Centers."  In May of 2010, The Reinalt-Thomas Corporation dba Discount Tire filed a civil action against AKH in the District of Arizona, alleging that AKH infringed upon and diluted its trademark under state and federal law.  AKH in turn filed its own civil action against Reinalt-Thomas in the Central District of California and successfully moved to transfer venue of the first action to the Central District of California.  The two lawsuits were consolidated ("the R-T lawsuits") and ultimately settled in December of 2012.  UUIC insured AKH under a series of annual liability insurance policies from 2007 to 2013.  In December of 2011, AKH notified UUIC of the R-T lawsuits and tendered the claims against AKH for a defense. UUIC accepted AKH's tender of defense of the R-T lawsuit under a reservation of rights.

In this case, AKH seeks declaratory relief that UUIC breached its duties to defend, settle, and act fairly and in good faith. UUIC brings counterclaims for declaratory relief and breach of contract arising out of its defense and settlement of the R-T lawsuits.[1]

(Doc. 66, at 1-2.)

## B.    Nature of the Motion to Compel.

Defendant brings the present motion arguing that Plaintiff "has refused to provide critical facts that relate to the very heart of this lawsuit."  (Doc. 124,

---

[1]  Hereinafter, Plaintiff AKH Company, Inc. shall be referred to as "Plaintiff" or "AKH."  Defendant Universal Underwriters Insurance Company shall be referred to as "Defendant" or "Universal."  Reinalt-Thomas shall be referred to as "RT" and the underlying lawsuit between it and Plaintiff shall be referred to as the "RT litigation."

sealed, at 6.)  Defendant contends that it took Plaintiff "over four months to

provide partial written responses and to produce some documents" in response to

the underlying discovery requests.  (*Id.*)  Defendant further contends that Plaintiff

"produced 185 pages of privilege logs, identifying approximately 3,500 documents

(more than those actually produced!) as allegedly attorney-client privileged or

work product communications withheld from production."  (*Id.*)  Defendant

contends that even if these documents are in fact privileged, they should be

produced under the crime-fraud exception to the attorney-client privilege.  This

portion of Defendant's motion, including the relevant evidence and factual

allegations, is discussed in Section III of this Order, *infra*.

Defendant also complains about various other "run of the mill" objections

Plaintiff raised in response to Defendant's discovery requests.  These objections,

which Plaintiff virtually ignored in its responsive brief, are discussed in Section II,

*infra*.

## II.   <u>GENERAL DISCOVERY OBJECTIONS.</u>

In response to Defendant's discovery requests, Plaintiff raised various

standard objections which, for various reasons, Defendant argues are improper.

The Court will address each of these objections in turn.

### A.   **"Materiality" versus "Relevance."**

Defendant contends that in response to its discovery requests, Plaintiff objects, in part, that the requests seek documents "which are not material." (Doc. 124, sealed, at 15.) Defendant argues that this objection "wholly ignores that the standard for permissible discovery is that it be relevant to a party's claim or defense, not that it be 'material.'" (*Id*., at 16.)

Plaintiff has not addressed this issue in its responsive brief. As such, the objection is waived. ***Sonnino v. Univ. of Kansas Hosp. Auth***., 221 F.R.D. 661, 670–71 (D.Kan.2004) (holding that a party fails to meet its burden to support its objections when it fails to address those objections in response to a motion to compel, leaving the Court "without any basis to determine whether the objections are valid and applicable in light of the particular circumstances of the case"); ***Cooper v. Old Dominion Freight Line, Inc.***, No. 09–2441–JAR, 2011 WL 251447, at *2 (D.Kan. Jan.25, 2011) (holding that a discovery objection not relied upon in response to a motion to compel is waived). The Court will, however, also address the substantive merits of the objection.

Fed.R.Civ.P. 26(b) states that "[p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party . . . Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." As such,

4

the requested information must be both nonprivileged and relevant to be discoverable.

"'Discovery relevance is minimal relevance,' which means it is possible and reasonably calculated that the request will lead to the discovery of admissible evidence." ***Teichgraeber v. Memorial Union Corp. of Emporia State University***, 932 F.Supp. 1263, 1265 (D. Kan. 1996) (internal citation omitted).  "Relevance is broadly construed at the discovery stage of the litigation and a request for discovery should be considered relevant if there is any possibility the information sought may be relevant to the subject matter of the action." ***Smith v. MCI Telecommunications Corp.***, 137 F.R.D. 25, 27 (D.Kan.1991).  Stated another way, "discovery should ordinarily be allowed unless it is clear that the information sought can have no possible bearing on the subject matter of the action." ***Snowden By and Through Victor v. Connaught Lab.***, 137 F.R.D. 325, 341 (D.Kan.1991), appeal denied, 1991 WL 60514 (D.Kan. Mar. 29, 1991).

This differs substantially from the definition of "material." Typically, a fact is considered "material" if "proof of that fact would have effect on establishing or refuting one of essential elements of a cause of action or defense asserted by the parties, and would necessarily affect [the] application of [an] appropriate principle of law to the rights and obligations of the parties." **BLACK'S LAW DICTIONARY**,

977 (6th ed. 199).  Clearly, this is a much higher standard than whether the

information has the requisite discovery relevance.  Plaintiff's objection is

substantively **overruled**.  Plaintiff is directed to provide supplemental responses

without this objection.

### B.    Vagueness.

Defendant next argues that Plaintiff has objected to "all but one" of

Defendant's discovery requests

> on the grounds that the requests contain terms such as
> 'EMBODY,' 'COMMUNICATIONS,' 'RELATING TO'
> and/or 'RELATED' that are 'vague and ambiguous' so as
> to render the requests so broad as to potentially include
> all documents in [Plaintiff's] possession and make it
> impossible for [Plaintiff] to determine exactly what
> documents are responsive.

(Doc. 124, sealed, at 17.)  Defendant continues that the objections are "meritless"

and the terms "should be construed in their ordinary meaning based on common

sense."  (*Id*.)

Plaintiff again chooses not to address this issue in its responsive brief.  As

such, the objection is waived.  ***Sonnino***, 221 F.R.D. at 670–71; ***Cooper*** 2011 WL

251447, at *2.  The Court will again, however, address the substantive merits of

this objection.

Courts look "with disfavor on conclusory or boilerplate objections that

6

discovery requests are irrelevant, immaterial, unduly burdensome, or overly broad." *Id*., 650. "Unless a request is overly broad, irrelevant, or unduly burdensome on its face, the party asserting the objection has the duty to support its objections." *Sonnino*, 221 F.R.D. 661, at n.36 (D.Kan.2004) (citing *Hammond v. Lowe's Home Ctrs., Inc*., 216 F.R.D. 666, 670 (D.Kan. 2003)); *Cont'l Ill. Nat'l Bank & Trust Co. of Chicago v. Caton*, 136 F.R.D. 682, 685 (D. Kan. 1991) (stating that a party resisting a discovery request based on relevancy grounds bears the burden of explaining how "each discovery request is irrelevant, not reasonably calculated to the discovery of admissible evidence, or burdensome"). Thus, "the objecting party must specifically show in its response to the motion to compel, despite the broad and liberal construction afforded by the federal discovery rules, how each request for production or interrogatory is objectionable." *Sonnino*, 221 F.R.D. at 670–71 (internal citation omitted).

The Court finds that the terms "embody," "communications," "relating to," and "related" are not *per se* vague and ambiguous. Plaintiff can, and should, employ the ordinary, common sense definitions of these words in the context of the discovery requests at issue. Plaintiff's objections are substantively **overruled**. Plaintiff is directed to provide supplemental responses without these objections.

    **C.    Temporal Limitation.**

7

Plaintiff also objects that "all but one" of Defendant's requests are overbroad for failure to be limited to a particular time period. (Doc. 124, sealed, at 17.) The Court finds that Defendant has adequately limited the time frame for the various discovery requests and **overrules** Plaintiff's objection.

### D.   Identification of Produced Documents.

Defendant next argues that Plaintiff did not comply with the requirements of Fed.R.Civ.P. 34(b)(2)(E), which provides that "[a] party must produce documents as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the request." Defendant argues that Plaintiff has engaged in a document "dump," "'deliberately [mixing] critical documents with others in the hope of obscuring significance.'" (Doc. 124, sealed, at 18 (citing *S.E.C. v. Collins & Aikman Corp*, 256 F.R.D. 403, 409 (S.D.N.Y. 2009).) Defendant contends that the documents should be produced again with proper organization and indexing "so that they are organized to correspond to the [specific] document requests." (*Id.*)

Because Plaintiff fails to address this issue in its responsive brief, the Court grants this portion of Defendant's motion as uncontested. Plaintiff is instructed to reproduce the documents at issue with sufficient indexing and organization so as to indicate which documents produced correspond to which particular discovery

8

requests.

### E.   Sufficiency of Privilege Log.

Defendant argues that the information contained in Plaintiff's privilege log is insufficient to support an assertion of the attorney-client privilege or work product doctrine for 15-20% of the documents listed on Plaintiff's 146-page privilege log.  (Doc. 124, sealed, at 19.)  Pursuant to the Federal Rules of Civil Procedure,

> [w]hen a party withholds information otherwise discoverable by claiming that the information is privileged or subject to protection as trial-preparation material, the party must:
>
> (I)   expressly make the claim; and
> (ii)  describe the nature of the documents, communications, or tangible things not produced or disclosed – and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim.

Fed.R.Civ.P. 26(b)(5); *see also **Kear v. Kohl's Dept. Stores, Inc**.*, No. 12-1235-JAR-KGG, 2013 WL 3088922 (D.Kan. June 18, 2013) (citation omitted) (stating that "[a] privilege log must provide sufficient information to allow the other party assess the claimed to privilege.").

Defendant has, however, provided only certain "examples" of entries in the voluminous privilege log that it finds questionable.  (*See* Doc. 124, sealed, at 20;

9

Doc. 124-21, sealed, at 3.)  It is not the Court's province to engage in a line-by-line review of the privilege log at issue and attempt to surmise which entries Defendant may or may not have wanted to Court to consider in the present motion as improper applications of the attorney-client privilege or work product doctrine.

As to the three examples listed on page 15 of Defendant's brief, the Court does not find the privilege log entries to be facially improper.  The first two examples involve communications between Plaintiff's officers regarding settlement issues.

> Organizational clients and business entities often are personified by a number of employees.  In preparation for, or in the midst of, consultations with an attorney, employees of the client will often consult one another to ensure that the attorney's advice is based on full knowledge of all relevant facts.

*Williams v. Sprint/United Management Co.*, No. 03-2200-JWL-DJW, 2006 WL 266599, *3 (D. Kan. Feb. 1, 2006).  The Court finds these two entries to sufficiently describe examples of "confidential information gathered for the dominant purpose of facilitating the attorney's efforts to provide services to the client."  *Id.*[2]

---

[2]  Even though the Court holds the privilege log to be sufficient, Defendant will still be able to see the documents to the extent it establishes a *prima facie* case sufficient to invoke the crime-fraud exception to the attorney-client privilege, discussed in § III, *infra*.

The third and final example relates to five entries in which the recipients' initials in the log are cut off.  (Doc. 124, sealed, at 20.)  Plaintiff is instructed to provide Defendant with revised copy of the privilege log with this information intact and legible.

## III.   ATTORNEY-CLIENT PRIVILEGE & AND THE CRIME-FRAUD EXCEPTION.

As referenced above, Defendant also argues that even if communications withheld by Plaintiff are found to be privileged, "both Kansas and California law recognize an exception to the attorney-client privilege where evidence demonstrates that a crime or fraud was committed."  (Doc. 124, sealed, at 22.)  The Court will thus examine the applicable legal standard and apply it to the evidence presented by Defendant.

### A.   Applicability of Privilege to Documents Regarding Settlement.

Defendant contends that although Plaintiff "shut [Defendant] completely out of the settlement process," Defendant's role as "defending insurer" gives it the "absolute right to participate in the settlement negotiations that resolved the consolidated underlying lawsuits."  (Doc. 124, sealed, at 21.)  Plaintiff responds that "[t]here is no question in this case that Paul Hastings [law firm] was acting as

independent counsel" for Plaintiff,[3] thus shielding from discovery its communications with that law firm under the attorney-client privilege. (Doc. 136, at 10.) Defendant argues that "Paul Hastings' status as either 'appointed' defense counsel or 'independent counsel' does not matter, because under either California or Kansas law, defending insurer had an absolute right to participate in the settlement negotiations that resolved the consolidated underlying actions." (Doc. 124, sealed, at 21.)

The policy at issue states that "[e]ach INSURED must cooperate and assist US in the investigation, settlement, defense, enforcement of contribution or indemnification. The INSURED may not, except at their own expense, make any offer or payment, assume any obligation, or incur any expenses unless otherwise permitted in this Coverage Part." (*Id.* (capitalization in original).) Defendant complains that Plaintiff "never provided [Defendant] the opportunity to exercise its duty and right to participate in settlement negations" in the underlying lawsuit, failed to inform Defendant of negotiations occurring the in the fall of 2012, and that Plaintiff had already reached a settlement before conveying RT's settlement

---

[3] In the Court's estimation, Plaintiff has created at least some question regarding this issue by alleging in its Complaint that Defendant "breached its duty of defense by . . . not providing [Plaintiff] with independent counsel." (Doc. 1, at ¶ 51.) The Complaint continues that Defendant "wrongfully failed to provide independent counsel." (*Id.*, at ¶ 77.)

demand to Defendant.[4]  (*Id*., at 21-22.)

The Court finds that the status of the Paul Hastings firm was created by

agreement in the February 29, 2012, correspondence from Defendant to Plaintiff.

(Doc. 32-9, at 35-41.)  In that letter, Defendant stated that it "is willing to pay for

AKH's choice of counsel instead of assigning provided that AKH's choice of

counsel agrees to abide by the terms of California Civil Code section 2860 and

complies with Universal's defense counsel guidelines and billing rates . . . ."[5]  (*Id*.,

at 35.)  That statute

> requires an insurance carrier to provide independent
> counsel to the insured when a conflict of interests exists
> between the insured and the carrier.  This independent
> counsel is often called *Cumis* counsel because § 2860
> codified the substantive elements of ***San Diego Navy***
> ***Federal Credit Union v. Cumis Ins. Society, Inc.***, 162
> Cal.App.3d 358, 208 Cal.Rptr. 494 (1984).  *See **First***
> ***Pacific Networks, Inc. v. Atlantic Mutual Ins. Co.***, 163
> F.R.D. 574, 576 n. 1 (N.D.Cal. 1995).  Section 2860,
> however, also protects the interest of the carrier. Thus,
> the statute provides that
>
> > it shall be the duty of [*Cumis*] counsel

---

[4]  As discussed *infra*, Defendant also contends that "neither [Plaintiff] nor its counsel Paul Hastings, whom [Defendant] was paying to defend the RT Lawsuit, never informed [Defendant] that Paul Hastings had a 25% contingency interest in the ultimate settlement."  (Doc. 124, sealed, at 22 (emphasis in original).)

[5]  The parties apparently operated under this agreement, evidencing the acceptance of these terms by Plaintiff.  This agreement between the parties obviates the Court's need to decide the choice of law as to this issue.

> and the insured to disclose to the insurer
> all information concerning the action
> except privileged materials relevant to
> coverage disputes, and timely to inform
> and consult with the insurer on all
> matters related to the action . . . .  Any
> information disclosed by the insured or
> by independent counsel is not a waiver
> of the privilege as to any other party.
>
> Cal. Civil Code § 2860(d).  However, "[t]hese
> obligations are strictly of an informational character, and
> arise only because of the unique three-cornered
> arrangement that carriers create when they agree to
> defend only under a reservations of rights."  *First
> Pacific*, 163 F.R.D. at 579 (citing *Assurance Co. of
> America v. Haven*, 32 Cal.App.4th 78, 89, 38
> Cal.Rptr.2d 25 (1995)).  Section 2860 does not create an
> attorney-client relationship between *Cumis* counsel and
> the carrier.  *Id*.; *Assurance*, 32 Cal.App.4th at 90, 38
> Cal.Rptr.2d 25.

*San Gabriel Basin Water Quality Authority v. Aerojet-General Corp.*, 105

F.Supp.2d 1095, 1101 (C.D. Cal. 2000).    Under the statutory agreement, "the

insured and its independent counsel retain fully the right to communicate between

themselves in private – and to shield those communications from the carrier."  *Id*.

(citing *First Pacific*, 163 F.R.D. at 580).

   Thus, Plaintiff and its counsel have a statutory duty to provide Defendant

with any and all information regarding this case – including about settlement –

other than information relating to coverage disputes.  Because this duty is

informational only, however, Plaintiff may still apply the attorney-client privilege to the underlying communications it had with its counsel on any issue and specific communications, generally, need not be produced.  As discussed below, however, Defendant argues that the crime-fraud exception to the attorney-client privilege mandates the production of the requested information.

### C.      The Crime-Fraud Exception.

Defendant asks the Court to "conduct an *in camera* review of a sampling of [Plaintiff's] documents withheld from production, to determine if they should not be shielded from disclosure because they were made in furtherance of a crime, fraud or other misconduct."  (Doc. 124, sealed, at 22-23 (emphasis removed).) Defendant also seeks "all communications regarding fee agreements between [Plaintiff] and its attorneys at Paul Hastings [litigating] and Gauntlett & Associates [coverage] so that it can see how/whether both counsel had a pecuniary interest in the settlement." (*Id.*, at 23.)  Plaintiff argues that Defendant's motion is "plainly lacking in the evidentiary showing needed to substantiate any such crime-fraud exception, e.g. *a prima facie showing that a crime-fraud was committed*."  (Doc. 136, at 12 (emphasis in original).)

As the parties acknowledge, there remains an issue as to the choice of law between California law and Kansas law in this case.  As such, the Court will

analyze the crime-fraud exception under the law of both jurisdictions.

### 1.     California law.

Under California law,

> [t]o invoke the crime-fraud exception, the proponent
> must make a *prima facie* showing that the services of the
> attorney were sought or obtained to aid someone in
> committing a crime or fraud.  (***BP Alaska Exploration,
> Inc. v. Superior Court*** (1988) 199 Cal.App.3d 1240,
> 1262, 245 Cal.Rptr. 682.)  'Evidence Code section 956
> does not require a completed crime or fraud.  It applies to
> attorney communications sought to enable the client to
> plan to commit a fraud, whether the fraud is successful or
> not.'  (*Ibid*.; *see also* ***Travelers Ins. Companies v.
> Superior Court*** (1983) 143 Cal.App.3d 436, 446, 191
> Cal.Rptr. 871 [communication must be ''made in
> contemplation of crime'' for exception to apply].)  '[I]t is
> the intent of the client upon which attention must be
> focused and not that of the lawyers.'  (***State Farm &
> Casualty Co. v. Superior Court*** (1997) 54 Cal.App.4th
> 625, 645, 62 Cal.Rptr.2d 834.)

***Favila v. Katten Muchin Rosenman LP***, 188 Cal.App.4th 189, 220, 115

Cal.Rptr.3d 274 (Cal.App. 2 Dist. 2010).

This *prima facie* standard of proof was established in ***BP Alaska***

***Exploration v. Superior Court***, 199 Cal.App.3d 1240, 245 Cal.Rptr. 682, 696–97,

and was adopted by the Ninth Circuit in ***In re Grand Jury Proceedings***, 87 F.3d

377, 380 (9th Cir.1996).  The ***In re Grand Jury*** case held that a party seeking to

invoke this exception to the attorney-client privilege must make a *prima facie*

showing that "the communications were in furtherance of an intended or present illegality . . . and that there is some relationship between the communications and the illegality." *Id*. (quoting *United States v. Laurins*, 857 F.2d 529, 540 (9th Cir.1988), *cert. denied*, 492 U.S. 906, 109 S.Ct. 3215, 106 L.Ed.2d 565 (1989)). The *In re Grand Jury* court also held:

> [t]o trigger the crime-fraud exception, the government must establish that 'the client was engaged in or planning a criminal or fraudulent scheme when it sought the advice of counsel to further the scheme.' *In re Sealed Case*, 754 F.2d at 399 (citations omitted).  The government is not obliged to come forward with proof sufficient to establish the essential elements of a crime or fraud beyond a reasonable doubt, *United States v. Friedman*, 445 F.2d 1076, 1086 (9th Cir.), *cert. denied*, 404 U.S. 958, 92 S.Ct. 326, 30 L.Ed.2d 275 (1971), since the crime-fraud exception does not require a completed crime or fraud but only that the client have consulted the attorney in an effort to complete one.  *In re Grand Jury Subpoena Duces Tecum (Marc Rich & Co., A.G. v. U.S.)*, 731 F.2d 1032, 1039 (2d Cir.1984).  On the other hand, **it isn't enough for the government merely to allege that it has a sneaking suspicion the client was engaging in or intending to engage in a crime or fraud when it consulted the attorney.  A threshold that low could discourage many would-be clients from consulting an attorney about entirely legitimate legal dilemmas.  Rather, the district court must find 'reasonable cause to believe' that the attorney's services were 'utilized . . . in furtherance of the ongoing unlawful scheme.'**

*In re Grand Jury Proceedings*, 867 F.2d at 541 (emphasis added).

### 2.    Kansas law.

For instruction on the Kansas approach to the crime-fraud exception, the

Court turns to the opinion of ***Berroth v. Kansas Farm Bureau Mutual Ins. Co.,***

***Inc.***, 205 F.R.D. 586 (D. Kan. 2002).  The ***Berroth*** court held

> [u]nder Kansas law, the attorney-client privilege does not
> extend 'to a communication if the judge finds that
> sufficient evidence, aside from the communication, has
> been introduced to warrant a finding that the legal service
> was sought or obtained in order to enable or aid the
> commission or planning of a crime or a tort.'  K.S.A.
> 60–426(b)(1).  'Sufficient evidence' for purposes of the
> crime-fraud exception is 'that which constitutes a *prima
> facie* case.'  ***Burton v. R.J. Reynolds Tobacco Co.***, 177
> F.R.D. 491, 501 (D.Kan.1997) (citing ***Wallace,
> Saunders, Austin, Brown & Enochs, Chtd. v. Louisburg
> Grain Co.***, 250 Kan. 54, 61, 824 P.2d 933, 939 (1992)).
> A *prima facie* case consists of 'evidence which, if left
> unexplained or uncontradicted, would be sufficient to
> carry the case to the jury and sustain a verdict in favor of
> the plaintiff on the issue it supports.'  ***Wallace,
> Saunders***, 250 Kan. at 61, 824 P.2d at 939 (quotation
> omitted).

*Id*., at 589.  ***Berroth*** addressed the issue under federal law as well, holding that the

> 'attorney-client privilege does not apply where the client
> consults an attorney to further a crime or fraud.'  ***Motley***,
> 71 F.3d at 1551 (quotation omitted).  The party claiming
> the exception applies 'must present *prima facie* evidence
> that the allegation . . . has some foundation in fact.'  *Id*.
> The trial court has discretion to determine whether the
> party has established a *prima facie* case, *id*., but it is
> unclear what, precisely, constitutes a *prima facie* case for
> establishing the crime-fraud exception under federal law.

> *United States v. Zolin*, 491 U.S. 554, 563–64 n. 7, 109
> S.Ct. 2619, 105 L.Ed.2d 469 (1989) ('The quantum of
> proof . . . remains . . . subject to question').

*Id*.

**Berroth** relied on the case of ***In re Grand Jury Subpoenas***, 144 F.3d 653,

660 (10th Cir. 1998), which analyzed how other circuits "have attempted to define

precisely what the prima facie standard requires."  *Id*. (citing ***In re Richard Roe,***

***Inc.***, 68 F.3d 38, 40 (2d Cir.1995) (probable cause to believe a crime or fraud has

been committed); ***Haines v. Liggett Group, Inc.***, 975 F.2d 81, 95–96 (3d Cir.1992)

(evidence that if believed by the fact finder would be sufficient to support a finding

that the elements of the crime-fraud exception were met); ***In re International Sys.***

***& Controls Corp. Sec. Lit.***, 693 F.2d 1235, 1242 (5th Cir.1982) (evidence such as

will suffice until contradicted and overcome by other evidence); ***United States v.***

***Davis***, 1 F.3d 606, 609 (7th Cir.1993) (evidence presented by the party seeking

application of the exception is sufficient to require the party asserting the privilege

to come forward with its own evidence to support the privilege); ***In re Grand Jury***

***Proceedings (Appeal of Corporation)***, 87 F.3d 377, 381 (9th Cir.1996) (reasonable

cause to believe attorney was used in furtherance of ongoing scheme); ***In re Grand***

***Jury Investigation (Schroeder)***, 842 F.2d 1223, 1226 (11th Cir.1987) (evidence

that if believed by the trier of fact would establish the elements of some violation

19

that was ongoing or about to be committed); *In re Sealed Case*, 107 F.3d 46, 50

(D.C.Cir.1997) (evidence that if believed by the trier of fact would establish the

elements of an ongoing or imminent crime or fraud).)  *Berroth* also acknowledged

that "the Tenth Circuit has not yet articulated its precise standard for what is

required to establish a *prima facie* case under the crime-fraud exception."  *Id.*, at

589-590.

Given this context, the *Berroth* court was

> guided by the principle that, at a bare minimum, **before
> the court even has an obligation to consider whether
> to conduct an *in camera* review of the privileged
> material, the party invoking the crime-fraud
> exception must make a threshold showing of a factual
> basis that is 'adequate to support a good faith belief
> by a reasonable person that in camera review of the
> materials may reveal evidence to establish the claim
> that the crime-fraud exception applies.'** *Zolin*, 491
> U.S. at 572, 109 S.Ct. 2619 (internal citations and
> quotations omitted); *accord* ***Burton v. R.J. Reynolds
> Tobacco Co.***, 167 F.R.D. 134, 141 (D.Kan.1996) (citing
> ***Zolin***).

*Id.* (emphasis added).  The Court finds this standard to be consistent with both

California and Kansas law and will apply it to the matter at bar.

**D.    Establishing a *Prima Facie* Case of Fraud.**

Defendant requests that the Court conduct an *in camera* inspection "of a

sampling of [Plaintiff's] documents withheld from production, to determine if they

should not be shielded from disclosure because they were made in furtherance of a crime, fraud or other misconduct." (Doc. 124, sealed, at 22-23.) Defendant contends that it "has a good faith belief that based on the documents it has received in discovery, coupled with those it believes exist and were improperly withheld from [Defendant] during its defense of [Plaintiff] (and now in discovery in this coverage action), it will demonstrate by a preponderance of evidence that [Plaintiff] engaged in a scheme to commit fraud against [Defendant]." (*Id*., at 26.) Relying on ***Zolin****, supra*, Defendant argues that "[t]he United States Supreme Court has specifically held that it is permissible for a court to conduct an *in camera* review of the allegedly privileged documents to determine whether the crime-fraud exception applies to such documents, and order any subsequent disclosures as appropriate." (Doc. 124, sealed, at 26.) This is an incorrect statement of the law.

As an initial matter, Defendant cannot meet its burden with "beliefs" and conclusory statements. It must set forth a factual basis to establish the *prima facie* case. Documents Defendant "believes exist" are irrelevant to the analysis before the Court. ***Zolin*** holds that

> Before engaging in *in camera* review to determine the applicability of  the crime-fraud exception, 'the judge should require a showing of a factual basis adequate to support a good faith belief by a reasonable person,' ***Caldwell v. District Court***, 644 P.2d 26, 33 (Colo.1982), that *in camera* review of the materials may reveal

21

> evidence to establish the claim that the crime-fraud
> exception applies.

49 U.S. at 572, 109 S.Ct. at 2631.  In other words, a court will not order an *in camera* inspection until <u>after</u> the requesting party meets the *prima facie* standard with a factual basis.  The Court will not, as Defendant suggests, engage in an *in camera* inspection of a sampling of Plaintiff's withheld documents in an effort by the Court to compile evidence that would allow Defendant to establish a *prima facie* case, that would then warrant a review of <u>all</u> documents.  The approach suggested by Defendant is inconsistent with California, Kansas, and federal law, discussed *supra*.

As such, the Court will analyze only the evidence presented in Defendant's brief to determine whether Defendant has established a *prima facie* showing that the fraud-crime exception to the attorney-client privilege should be applied. "Actionable fraud may be based upon false representations made as to existing and material fact . . . or upon a suppression of facts which the party is under a legal or equitable obligation to communicate and in respect of which he could not be innocently silent . . . ." ***DuShane v. Union Nat. Bank***, 223 Kan. 775, 759, 576 P.2d 674, 678 (1978); *see also **Hasso v. Hapke***, ___ Cal.Rptr.3d ___, No. G047495, G047588, 2014 WL 2768837 (Cal.Appp. 4 Dist. June 19, 2014).  If the evidence presented by Defendant establishes a *prima facie* case of fraud by

22

Plaintiff based on these elements, only then will the Court order an *in camera* inspection of documents withheld pursuant to the attorney-client privilege.

### E.    Facts Alleged Regarding RT Litigation Settlement Discussions.

Defendant contends that Plaintiff and RT began settlement negotiations after their failed mediation in September 2012.  Defendant also contends that it was not informed of the negotiations, in violation of Defendant's rights under Plaintiff's insurance policy, until approximately two months later.  For purposes of this motion, the Court will accept both allegations as true.

On November 14, 2012, Plaintiff received a $20 million settlement demand directly from RT.  (Doc. 124-24, sealed, at 20.)  The demand referenced "policy limits" exposure under Plaintiff's underlying insurance policy with Defendant. (*Id.*)  Defendant contends – and Plaintiff apparently does not contradict – that this letter was never communicated to Defendant.  (Doc. 124, sealed, at 30.)

On November 20, 2012, Plaintiff's coverage counsel sent correspondence to Defendant (Doc. 124-24, sealed, at 23-34) discussing a different demand letter from RT's counsel dated November 19, 2012, which contained a settlement demand of $20 million (*Id.*, at 41-42).[6]   A similar letter, dated November 19, 2012,

_____

[6]  The firm of Gauntlett & Associates represented Plaintiff on issues regarding coverage under Plaintiff's insurance policy with Defendant.  This firm, and the lawyers working there, will be collectively referred to as "Plaintiff's coverage counsel."

was e-mailed to Defendant by Plaintiff's litigating counsel.[7]  (*Id.*, at 36-39.)  Both letters mention the $20 million settlement demand from RT.  (*Id.*, at 26, 39.)  The former letter discusses the tax implications and benefit of having the settlement finalized by the end of that calendar year and requests that Defendant authorize settlement for $15 million.  (*Id.*, at 25, 34.)  The latter later states that RT's $20 million demand "is a reasonable calculation of what a jury might determine" and opines that "settlement is reasonable and the preferred alternative to trial in this case."  (*Id.*, at 39.)

The underlying settlement demand letter from RT's attorney specifically references the mediation in which the parties participated in September 2012.[8]  (*Id.*, at 41-42.)  RT's counsel also noted that Plaintiff "took the position during settlement negotiations that its exposure to liability for these claims provided significant consideration for offsetting potential damages associated therewith to bring [Plaintiff] to its final settlement number."  (*Id.*)  There is no indication whether RT is referring to Plaintiff's position during negotiations occurring at the mediation or in the subsequent two months.

---

[7]   The Paul Hastings firm represented Plaintiff in the underlying RT litigation. This firm, and the lawyers working there, will be collectively referred to as "Plaintiff's litigating counsel."

[8]  The Court is aware of no evidence discussing whether Defendant participated in and/or had a representative at this mediation.

A draft settlement agreement was sent to Plaintiff's litigating counsel by RT's counsel on November 27, 2012.  (Doc. 124-24, at 63-79.)  This draft agreement includes an amount of $8 million to be paid by RT to Plaintiff, a portion of which would be in exchange for Plaintiff's "transfer of 'discounttires.com' domain name and any rights [Plaintiff] may have acquired in the DISCOUNTTIRES.COM trademark . . . ."  (*Id.*, at 66 (capitalization in original).)

The next day, November 28, 2012, Plaintiff's coverage counsel sent correspondence (Doc. 124-24, sealed, at 84-85) to Defendant's counsel[9] inquiring as to the status of Defendant's response to Plaintiff's counsel's November 20, 2012, letter (*id.*, at 25-34) discussing RT's $20 million settlement demand.   The November 28th letter reminds Defendant of the recommendation by Plaintiff's coverage counsel to settle the case for $15 million and "respectfully insist[ed]" that, within two days (November 30, 2012), Defendant provide a "complete substantive response to our correspondence, authorize the settlement on the terms communicated and confirm that [Defendant] will honor its policy obligations by paying all sums that [Plaintiff] is required to pay to effectuate settlement."  (*Id.*, at 84-85.)

---

[9]  Defendant retained the firm of Sinnott, Puebla, Campagne & Curet, referred to herein as "Defendant's counsel."

The settlement request from Plaintiff's coverage counsel was slashed to $5 million, within the policy limits Defendant "now acknowledges," per correspondence dated November 30, 2012. (*Id.*, at 87-90.)  A revised draft settlement agreement submitted by Plaintiff's litigating counsel to RT's counsel on November 30, 2012, removed the $8 million and left blank the amount RT was to pay Plaintiff to resolve the underlying litigation.  (Doc. 124-24, at 94, 116.)

In an e-mail dated November 30, 2012, Plaintiff's litigating counsel contacted Defendant regarding Defendant's wish for a conference call discussing RT's settlement demand to Plaintiff.  (Doc. 124-24, at 132.)  Plaintiff's counsel stated that "settlement discussions with [RT] are quite fragile and time-sensitive, so we want to try and keep the momentum going to see if a final resolution can be reached in the next few days."  (*Id.*)  Defendant responded to Plaintiff's litigation counsel, stating

> [b]asically I would like to discuss why you believe the $20 million demand [from RT] is reasonable.  I have asked for and received evaluations of this case and have never been advised that it was your firm's belief that this case had a value of $20 million.  In [counsel's] update of 9/4/12 she states that [Plaintiff's] experts were 'strong' each punching significant holes in the theories of RT's experts.'  IT was my belief that the case was defensible.  In your 11/19/12 letter you now say that RT potentially has a very strong case for liability against [Plaintiff].  Are you now saying that [Plaintiff] did infringe on RT's Trademark and that the same was intentional?

> I don't see that you provided any reason for the
> change of evaluation or exposure.  It appears that the
> reasons for your recommendation were all known when
> your firm first provided its opinions and evaluations to
> this company yet were left out of the evaluations.

(*Id.*, at 134.)  Defendant also inquired as to when RT first made its $20 million

settlement demand.  (*Id.*, at 134.)  Plaintiff's litigating counsel responded to

Defendant by correspondence dated December 4, 2012, that his evaluation of the

case "changed as a result of [the] rulings on the parties' motions for summary

judgment/adjudication."  (Doc. 124-24, sealed, at 140.)  Counsel reiterated its

request that Defendant extend $5 million in settlement authority to resolve the

litigation with RT.  (*Id.*, at 142-43.)  Defendant was given no response as to when

RT first made the $20 million demand.

Plaintiff's coverage counsel sent Defendant correspondence two days later

on December 6, 2012, imploring that it was "imperative" for Defendant to "make

an offer to settle [the RT] claims against [Plaintiff] this week."  (Doc. 124-24,

sealed, at 145.)  While contending more coverage was available, Plaintiff's

coverage counsel mentioned "at least $5 million of coverage is available under

[Defendant's] policies" and demanded that Defendant "must come forth with that

$5 million figure **immediately** to resolve [the RT litigation], before settlement

opportunities die on the table and before trial is nigh."  (*Id.*, (emphasis in

original).)  This was followed by additional correspondence from Plaintiff's coverage counsel on December 7, 2012, stating "[t]here is no reason to not extend – first thing next week – settlement authority of a least $5 million, the coverage you acknowledged in your November 29, 2012 letter.  Further delay will jeopardize prospects for comprehensive settlement."  (Doc. 124-24, sealed, at 149.)

Defendant's counsel sent correspondence to Plaintiff's coverage counsel on December 11, 2012, acknowledging coverage counsel's "significantly revised analysis of the 'reasonableness' of RT's settlement demand . . . on 12/4/12."  (Doc. 124-24, sealed, at 152.)  Defendant's counsel stated that "the amount of RT's settlement demand and the urgency to respond to it <u>did</u> come as a complete surprise" to Defendant.  (*Id.*)  After stating that Defendant is "permitted to participate in settlement discussions," defense counsel also expressed concern that Plaintiff and RT had "apparently been involved in principal-to-principal settlement discussions since the mediation, and [Plaintiff] never apprised [Defendant] of this fact."  (*Id.*)  Defense counsel stated that Defendant "only learned of the ongoing settlement discussions based on its reading of RT's settlement demand, forwarded with your 11/20/12 letter."  (*Id.*)  Defendant again requested that it "be advised of the entirety of the settlement terms being discussed, including <u>all</u> non-monetary

terms." (*Id*.)

Plaintiff's coverage counsel responded that same day, arguing it was "improper" for Defendant to see draft settlement terms that involve "distinct business issues outside the scope of an insurer's defense or indemnity coverage, particularly when that insurer has disavowed its obligation to assist in the prosecution of affirmative causes against the claimant." (Doc. 124-24, sealed, at 155.) Counsel also mentioned that Plaintiff was awaiting Defendant's "extension of authority to finalize any agreement." (*Id*., at 156.) Coverage counsel questioned why Defendant "has not explained why it has continued to delay even while mindful that this delay may prevent settlement" even though Defendant received the most recent settlement demand offer "twenty two days ago." (*Id*.) Coverage counsel also informs Defendant that because "no money has yet been offered regarding [RT's] claims, you can have no legitimate objection to the continued exploration of this settlement opportunity." (*Id*., at 160.)

Also on December 11, 2012, Plaintiff's litigating counsel e-mailed RT's attorney asking when he "might expect to see your proposed revisions to the settlement agreements." (Doc. 124-24, at 162.) He was "hoping" the agreements can be finalized in the next week because he was scheduled to be out of town the following week. (*Id*.)

The next day, December 12, 2012, Plaintiff's coverage counsel sent a letter to Defendant's coverage counsel stating that "RT demands this matter be resolved by the close of business tomorrow or any proposal to settle RT's action against Plaintiff will be withdrawn and the matter will proceed to trial, in order to facilitate year end consummation of the proposed settlement terms's conditions." (Doc. 124-24, at 169.) Plaintiff's coverage counsel states that "no lesser sum" than $5 million "will suffice." (*Id*.)

The Court is aware of no evidence that RT in fact drew such proverbial line in the sand as to the timing of any resolution. To the contrary, also on December 12, 2012, RT's counsel sent an e-mail to Plaintiff's counsel attaching RT's revisions to the most recent settlement agreement. (Doc. 124-24, sealed, at 165.) The Court notes that this e-mail from RT's counsel (*id*.) does not express the same urgency to settle by a certain date that Plaintiff's coverage counsel attributes to RT in coverage counsel's December 12 letter to defense counsel (*id*., at 169). Rather, RT's email to Plaintiff states that

> all of the proposed terms remain conditional upon the parties' agreement on the payment terms, which we are still waiting to hear from you on. We understand you are still waiting to hear from [Defendant] and just ask that you relay the proposed payment terms to us as soon as possible so that we can continue to diligently work on the settlement.

(Doc. 124-24, sealed, at 165.)

By correspondence dated December 17, 2012, Plaintiff's coverage counsel confirms that Defendant extended $5 million of authority to settle RT's claims against Defendant.  (Doc. 124-24, sealed, at 172.)  Plaintiff's coverage counsel attests that

> [p]rior to your extension of $5 million in authority, no monetary figure was referenced in the parties proposals, and at no time had the parties agreed on any amount to be paid.[10]  As they addressed various business issues (of no concern to [Defendant]) which the parties have been discussing, there was no point in forwarding to [Defendant] unconsummated drafts.  We are now negotiating a dollar figure with [RT] and believe we can settle if we can secure $5 million for [Defendant] well in advance of year's end.

(*Id*.)  Plaintiff's coverage counsel notes that "if a settlement for $5 million is achieved, it will be due to [Plaintiff's] surrender of valuable interests in addition to [Defendant's] cash contribution."  (*Id*., at 173.)

On December 18, 2012, Plaintiff's coverage counsel e-mailed a draft settlement agreement to RT's attorneys "suggesting some revisions that will hopefully satisfy the concerns regarding insurance which we discussed earlier

---

[10]  As stated above, however, a draft settlement agreement was sent to Plaintiff's counsel by RT's counsel on November 27, 2012.  (Doc. 124-24, at 63-79.)  This draft agreement includes an amount of $8 million to be paid by RT to Plaintiff.  (*Id*., at 66.)  This $8 million was specifically removed by Plaintiff's litigating counsel in the November 30, 2012, draft.  (*Id*., at 116.)

today."[11]  (Doc. 124-24, sealed, at 175.)  Counsel at Gallagher & Kennedy

responded that

> [t]he **revisions you made to the draft of the RT
> Agreement do not satisfy the concerns** we raised with
> you and David in our call yesterday afternoon.  The
> proposed course of action was for the insurance company
> [Defendant] to write a check to [Plaintiff] directly, with
> **language in the agreement that put the carrier on
> notice that although the payment would resolve and
> extinguish the claims asserted by RT against
> [Plaintiff], it was part and parcel of a global
> resolution, which would include business concessions
> by [Plaintiff] and the payment of monetary
> compensation by RT to [Plaintiff]**.  We understood that
> your office was awaiting confirmation, expected
> tomorrow, that the carrier would accept that settlement
> structure.  **The revised language you propose
> contemplates the carrier sending a check for $5
> million to "a payee designated by RT."**  Presumably,
> this designee would be [a Plaintiff] affiliated entity.
> Alternatively, you may be proposing that the designee is,
> in fact, an RT entity, which we assume would then
> contemplate a $13 million payment by RT to [Plaintiff].
> **This is the structure which we told you yesterday was
> unacceptable to RT.**  Finally, **the language you added
> to the "Whereas" clause on p. 2 exacerbates the
> problem instead of putting the carrier on notice that
> its payment is, in fact, part and parcel of a**

---

[11]  The email was sent to counsel at the Ballard Spahr firm, which the Court is
aware represented RT, as well as counsel at the firm of Gallagher & Kennedy, P.A.  The
Court surmises that Gallagher & Kennedy also represented RT, but cannot be certain
from the information presented.  Regardless, counsel at Gallagher & Kennedy was
involved in finalizing the RT litigation settlement agreements and, as noted *infra*,
expressed reservations about representations Plaintiff was making to Defendant's counsel
in regard to that settlement.

> **comprehensive settlement of all of the claims asserted
> by both parties in the consolidated action**.

(Doc. 124-24, sealed, at 188 (emphasis added).)

## F.    Application of Facts Presented to Allegations Made.

Defendant argues that Plaintiff's "knowledge that it reached a settlement with RT for $8 million, and/or that its counsel had a 25% contingency reward in the net settlement to [Plaintiff], and its failure to inform [Defendant] of the fact that it was in settlement discussions for some two months, and that it settled with RT before [Defendant] agreed to offer its policy limits in settlement, amply justifies an in camera review of [Plaintiff's] allegedly privileged communications." (Doc. 124, sealed, at 27.)  Defendant enumerates various communications it had with Plaintiff and/or its counsel (*id.*, at 27-46) in an effort to "demonstrate that [Plaintiff] likely reached a settlement with RT weeks before Universal agreed to make its $5 million policy limits available for settlement . . . ." (*Id.*, at 47.) Defendant continues that "[i]n other words, it appears that [Plaintiff] knew it had already settled both lawsuits for $8 million, yet sought to omit/conceal the details of that settlement from Universal so that it could obtain an additional $5 million from Universal." (*Id.*)  Defendant does not, however, expend much, if any, effort analyzing or explaining how these listed communications specifically support this argument.

33

The Court will, however, analyze the facts presented in Defendant's brief to determine whether there is sufficient evidence to meet a *prima facie* case of criminal or fraudulent activity.  As stated above, Defendant contends that Plaintiff's factual omissions and/or misrepresentations fall under the following categories:  1) Plaintiff's alleged failure to inform Defendant of the 25% contingency reward to Plaintiff's counsel in the net settlement to Plaintiff; 2) Plaintiff's alleged failure to inform Universal that it was in settlement discussions with RT for some two months following the unsuccessful mediation of the RT litigation; 3) Plaintiff's alleged failure to inform Defendant that it reached a settlement agreement with RT in which RT would pay Plaintiff $8 million, essentially funded in party by Defendant; and 4) Plaintiff's alleged settlement with RT before Defendant agreed to offer its policy limits in settlement.

### 1.    Plaintiff's failure to inform Defendant that Plaintiff's counsel had a 25% contingency reward in the net settlement to AKH.

There is evidence that at some point before July 5, 2011, a contingency agreement existed between Plaintiff and its litigating counsel in which counsel agreed to discount its hourly fee "on condition that our contingency recovery on the back end remain at 25%." (Doc. 124-23, sealed, at 1.)  It is uncontested, however, that Defendant was aware of the existence of the contingency agreement no later than January 26, 2012,

when litigating counsel informed Defendant's claims handler that "he had entered into an agreement with [Plaintiff] regarding a partial contingency, which reduced his hourly rate to $600 per hour."  (Doc. 32-9, at 3, 18.)

Although this is, at a minimum, more than six months *after* the contingency agreement was created, it is also almost an entire year before the settlement was finalized in the RT litigation.  As such, even assuming Plaintiff should have informed Defendant of the contingency agreement by an earlier date or in some other manner, the fact remains that Defendant was aware of the contingency fee sufficiently in advance of the finalized settlement.  Although not fraudulent in and of itself, this fact does suggest motivation for participation in the fraud described in subsection 3, *infra*.

### 2.    Plaintiff's failure to inform Universal that it was in settlement discussions with RT for some two months.

Defendant complains that, following the unsuccessful mediation of the RT litigation, Plaintiff and representatives of RT engaged in settlement discussions for approximately two months before Defendant was made aware of such discussions. The mediation occurred in September 2012.  (Doc. 124-24, sealed, at 41-42.) Defendant was aware of the continued settlement negotiations no later than November 19, 2012 – approximately two months after the failed mediation and approximately a month before the finalized settlement of the RT litigation.  (Doc. 124-24, sealed, at 25-34, 36-39.)

35

The Court acknowledges that Plaintiff had a contractual duty to Defendant to cooperate and assist Defendant "in the investigation, settlement, defense, enforcement of contribution or indemnification." (Doc. 124, sealed, at 21.) The Court also acknowledges that the insurance contract also prohibited Plaintiff, except at its own expense, from "mak[ing] any offer or payment, assum[ing] any obligation . . . ." (*Id.*)

In addition to defending the RT lawsuit, Plaintiff was also prosecuting claims against RT with which Defendant, by choice, was not involved. It is undisputed that the final resolution of these claims would be intertwined. Further, information regarding settlement of Plaintiff's claims against RT would certainly be relevant to Defendant's analysis of any settlement of RT's claims against Plaintiff. Even so, under circumstances (involving claims not entirely covered by the insurance policy at issue), the Court finds that Plaintiff's post-mediation settlement discussions with RT without input from Defendant do not provide evidence supporting a *prima facie* case under the crime-fraud exception to the attorney-client privilege.

   **3.    Plaintiff's failure to timely inform Defendant of an $8 expected million payment from RT which was to be partially funded by Defendant and Plaintiff's alleged settlement with RT before Universal agreed to offer its policy limits.**

The Court will address these final two allegations together.  In support of

these allegations, Defendant argues that

> [t]he documents [it] seeks pursuant  to the crime-fraud
> exception to the attorney-client privilege are identified on
> [Plaintiff's] privilege log as communications involving
> [Plaintiff] personnel . . . and [Plaintiff's] counsel
> attorneys . . . .  These communications concern
> 'settlement' or 'draft settlement agreement(s)' or
> 'finalization of settlement agreements,' for all dates that
> precede [Plaintiff's] communication to Universal on
> November 20, 2012 of RT's alleged settlement demand
> of November 19, 2012 to [Plaintiff]. They also include
> those communications made through [Defendant's]
> payment of $5 million, sent to [Plaintiff's] attorney . . .
> on December 31, 2012.
>
> [Plaintiff's] description of these communications
> and the dates of these communications demonstrate that it
> likely reached a settlement with RT weeks before
> [Defendant] agreed to make its $5 million policy limits
> available for settlement on December 13, 2012.  In other
> words, it appears that [Plaintiff] knew that it had already
> settled both lawsuits for $8 million, yet sought to
> omit/conceal the details of that settlement from
> [Defendant] so that it could obtain an additional $5
> million from [Defendant.]  Otherwise, the documents
> would expose the arrangement between [Plaintiff] and
> RT that allowed [Plaintiff] to pocket the $5 million
> [Defendant] policy limits.

(Doc. 124, sealed, at 46-48)

Plaintiff continues that "[a]bsent the required evidentiary showing, and with

a motion premised heavily upon what is allegedly possible and not what is proven

by competent evidence, the motion does not meet the required showing" of a *prima*

37

*facie* case under the crime-fraud exception.  (Doc. 136, at 12 (emphasis in original).)  Plaintiff asks, "Can [Defendant] extrapolate from the fact that there was a history of varying prior settlement demands or offers, or a prior draft settlement agreement for a different amount, that there was a prior undisclosed settlement, even if none of the prior offers were accepted?"  (*Id*., at 13.)  Plaintiff continues,

> Moreover, here, the evidence as addressed in this Opposition shows that [Defendant], through its in house and outside coverage counsel, knew and reviewed the details of the settlement, including the settlement agreements and the escrow agreement.  Incidentally, the motion itself is silent as to this point. In other words, the claim that [Defendant] did not know about the terms of the settlement agreements or the escrow or payments of money by each party to settle their respective claims is simply inaccurate.  [Defendant] simply saying that it knew nothing about the settlements, or was barred from reviewing them, is not enough, especially when its counsel is in the email chain showing that it reviewed and edited the settlement agreements.

(*Id*., at 14.)

Plaintiff's argument misrepresents Defendant's concerns.  Defendant did not get an opportunity to review and edit the underlying settlement agreement until mid to late November, 2012.  By that point, or contemporaneously therewith, Defendant was under <u>significant</u> pressure from Plaintiff's litigating counsel and Plaintiff's coverage counsel to approve the settlement terms as soon as possible – even though communications involving RT's counsel do not necessarily evidence

the same urgency Plaintiff's counsel was attributing to RT.

As discussed above, on December 11, 2012, Plaintiff's litigating counsel e-mailed RT's attorney asking when he "might expect to see your proposed revisions to the settlement agreements." (Doc. 124-24, at 162.) He was "hoping" the agreements can be finalized in the next week because he was scheduled to be out of town the following week. (*Id*.) The next day, Plaintiff's coverage counsel sent a letter to Defendant's coverage counsel stating that "RT demands this matter be resolved by the close of business tomorrow or any proposal to settle RT's action against Plaintiff will be withdrawn and the matter will proceed to trial, in order to facilitate year end consummation of the proposed settlement terms's conditions." (Doc. 124-24, at 169.)

Defendant was not included in settlement negotiations between Plaintiff and RT. Considering Plaintiff had claims against RT that were not covered by insurance, the Court acknowledges that Plaintiff had arguably legitimate reasons to continue negotiating with RT without Defendant's involvement. As stated in § F. 2. above, however, the Court finds that information regarding settlement of Plaintiff's claims against RT would certainly be relevant to Defendant's analysis of any settlement of RT's claims against Plaintiff. An intentional concealment of this arrangement by Plaintiff would be fraudulent.

Some evidence appears to indicate that Plaintiff was actively attempting to mislead Defendant about the universal settlement with RT – in particular the fact that Plaintiff would ultimately receive the $5 million Defendant was paying under Plaintiff's insurance policy to settle RT's claims against Plaintiff.  As outlined in the factual background, *supra*, Plaintiff's coverage counsel e-mailed a draft settlement agreement to RT's attorneys on December 18, 2012, "suggesting some revisions that will hopefully satisfy the concerns regarding insurance which we discussed earlier today."  (Doc. 124-24, sealed, at 175.)  Counsel at Gallagher & Kennedy responded that

> [t]he **revisions [Plaintiff's coverage counsel] made to the draft of the RT Agreement do not satisfy the concerns** we raised with you and David in our call yesterday afternoon.  The proposed course of action was for the insurance company [Defendant] to write a check to [Plaintiff] directly, with **language in the agreement that put the carrier on  notice that although the payment would resolve and extinguish the claims asserted by RT against [Plaintiff], it was part and parcel of a global resolution, which would include business concessions by [Plaintiff] and the payment of monetary compensation by RT to [Plaintiff]**.   . . . **The revised language you propose contemplates the carrier sending a check for $5 million to "a payee designated by RT."**  Presumably, this designee would be [a Plaintiff] affiliated entity. Alternatively, you may be proposing that the designee is, in fact, an RT entity, which we assume would then contemplate a $13 million payment by RT to [Plaintiff]. **This is the structure**

40

> **which we told you yesterday was unacceptable to RT**.
> Finally, **the language you added to the "Whereas"
> clause on p. 2 exacerbates the problem instead of
> putting the carrier on notice that its payment is, in
> fact, part and parcel of a comprehensive settlement of
> all of the claims asserted by both parties in the
> consolidated action**.

(Doc. 124-24, sealed, at 188 (emphasis added).)  This suggests that Plaintiff was

actively attempting to conceal aspects of its settlement with RT – namely, that the

$5 million settlement payment from Defendant to RT was, in fact, going to be paid

by RT back to Plaintiff.

Additionally, the November 28, 2012, correspondence to Defendant from

Plaintiff's coverage counsel which inquires as to the status of Defendant's response

to Plaintiff's counsel's November 20, 2012, letter discussing RT's $20 million

settlement demand supports Defendant's claim.  (*Id.*, at 84-85.)  The November

28th letter reminds Defendant of coverage counsel's recommendation to settle the

case for $15 million.  Coverage counsel "respectfully insist[ed]" that Defendant

authorize a settlement for $15 million within 2 days.  (*Id.*, at 85.)  This seems

questionable in light of the reference to an $8 million payment to Plaintiff in the

draft settlement agreement Plaintiff's litigating counsel received from RT the day

before on November 27, 2012 (*id.*, at 63, 66) – especially considering that $8

million reference was removed by Plaintiff's litigating counsel in its November 30,

2012, settlement agreement draft (*id*., at 92, 116).

Further, defense counsel's December 11, 2012, correspondence expressed concern that Defendant "only learned of the ongoing settlement discussions" between Plaintiff and RT "based on [Defendant's] reading of RT's settlement demand, forwarded with your 11/20/12 letter."  (Doc. 124-24, sealed, at 152.) Defendant again requested it "be advised of the entirety of the settlement terms being discussed, including <u>all</u> non-monetary terms."  (*Id*.)  Plaintiff's coverage counsel's immediate response was that it was "improper" for Defendant to see draft settlement terms that involve "distinct business issues outside the scope of an insurer's defense or indemnity coverage, particularly when that insurer has disavowed its obligation to assist in the prosecution of affirmative causes against the claimant."  (*Id*., at 155.)  Coverage counsel also informed Defendant that because "**no money has yet been offered regarding [RT's] claims, you can have no legitimate objection to the continued exploration of this settlement opportunity**."  (*Id*., at 160 (emphasis added).)  This would seem to contradict the $8 million that was initially included in – and subsequently removed by Plaintiff's coverage counsel from – the draft settlement agreement, discussed above.  (*See id*., at 66, 92, 116.)

These facts, taken as a whole, establish a *prima facie* case sufficient to

42

invoke the crime-fraud exception to the attorney-client privilege – false

representations made by Plaintiff as to a material fact or the suppression of facts

which Plaintiff was under a legal or equitable obligation to communicate and "in

respect of which [it] could not be innocently silent . . . ." ***DuShane v. Union Nat.***

***Bank***, 223 Kan. at 759, 576 P.2d at 678.[12]  The Court must now fashion the

appropriate remedy and parameters for the document production being ordered

from Plaintiff.

### F.     Procedure for Production.

Plaintiff shall provide to the Court for *in camera* inspection all

communications between itself and counsel (whether coverage counsel or litigating

counsel) that were withheld on the basis of the attorney-client privilege or work

product doctrine that occurred from the completion of the unsuccessful mediation

in September 2012 until Defendant received the final draft of the settlement

agreement with RT in December 2012.  The documents shall be delivered to the

Court within **thirty (30) days of the date of this Order** in both a hard copy as

well as by searchable PDF form (saved in individual pages).  The Court will

review the communications for evidence of an intent by Plaintiff to conceal

---

[12]  The Court does not suggest that these facts establish fraud.  Rather, standing alone and unrebutted, they would create a *prima facie* case of fraud.

material elements of the negotiations or settlement from Defendant.

To the extent Plaintiff has withheld any communications with, or documents shared with, RT at any time on the basis of the attorney-client privilege or work product doctrine, such documents shall be produced to Defendant as no privilege applies to documents shared with a third party. The documents shall be delivered to Defendant within **thirty (30) days of the date of this Order** in both a hard copy as well as by searchable PDF form (saved in individual pages).

**IT IS THEREFORE ORDERED** that Defendant's Motion to Compel Production of Documents (Doc. 123) is **GRANTED** as more fully set forth herein.

**IT IS SO ORDERED**.

Dated at Wichita, Kansas, on this 3rd day of July, 2014.

  s/ KENNETH G. GALE
KENNETH G. GALE
United States Magistrate Judge