## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

AKH COMPANY, INC.,          )
                                   )
        Plaintiff/Counter-Defendant,   )
                                   )
v.                                )     Case No. 13-2003-JAR-KGG
                                 )
UNIVERSAL UNDERWRITERS    )
INSURANCE COMPANY,        )
                                 )
        Defendant/Counter-Claimant.   )
_____ )

### MEMORANDUM & ORDER ON MOTION FOR SANCTIONS

Now before the Court is Defendant's "Motion for Sanctions."  (Doc. 478.)
Having reviewed the submissions of the parties and the attachments thereto, the
Court **GRANTS in part** and **DENIES in part** Defendant's Motion.

### BACKGROUND

The above-captioned matter is a declaratory judgment action based on a
dispute concerning insurance coverage and the settlement of a trademark dispute
involving Plaintiff AKH and a third party. (*See* Doc. 1; Doc. 75, sealed, at 5-6
(underlying litigation hereinafter referred to as "RT litigation" or "RT case").)  The
RT litigation occurred in California.  During the RT litigation, Defendant paid for
the defense and settlement of claims against Plaintiff, which was both a defendant
and the claimant in that case.  The parties disagree concerning duties owned to

each other arising out of that litigation.  The claims in this case exceed five million dollars.

The present case has a complicated procedural history involving <u>nine</u> motions to compel granted in favor of Defendant and three previous awards of sanctions against Plaintiff's counsel amounting to approximately $60,000.  (*See e.g.*, Docs. 371, 375, 429, 492, 494 (text entry adopting Joint Stipulation on sanctions); *see also* Doc. 479, at 6-7).)  The factual and procedural background of this case has been summarized multiple times in the context of this Court resolving "an inordinate number of increasingly contentious discovery disputes."  (Doc. 429, at 1-2.)  Factual summaries incorporated herein by reference include those contained in the Order denying Gauntlett's Motion to Reconsider this Court's Order on Defendant's Motion to Compel (Doc. 339), the District Court's Memorandum and Order on Plaintiff's Objection to Order and Report & Recommendation on Renewed Motion for Sanctions (Doc. 400), and this Court's Order on Defendant's Motion to Compel Discovery and for Sanctions (Doc. 429).

Defendant brings the current motion seeking sanctions for alleged misconduct by Plaintiff's counsel during depositions and destruction of documents. (*See generally* Docs. 478, 479.)  According to Defendant, shortly after Plaintiff filed the present lawsuit,

> [Plaintiff's] owners, Hratch and Andy Andonian, began
> implementing a plan to move all assets out of the
> company.  By the end of 2013, millions of dollars in
> [Plaintiff's] assets had been transferred to other
> companies owned by Hratch and Andy Andonian or to
> their own personal bank accounts.  As a result, by the
> following year, [Plaintiff] had no assets nor revenue and,
> unbeknownst to [Defendant], existed solely for the
> purpose of this lawsuit (with the legal expenses being
> paid through transfers of funds to the company by the
> owners).  Consistent with that plan, [Plaintiff] and its
> counsel provided vague and inconsistent discovery
> responses about [Plaintiff's] financial picture.

(Doc. 479, at 4.)  Defendant states that it has filed the present motion, not in an

effort to expand the scope of discovery, but instead

> to highlight for the Court  that [Plaintiff] has still failed to
> comply with existing Orders of production, that
> [Plaintiff] has engaged in misconduct with regard to the
> deposition of [Plaintiff's representative(s)], and that
> [Plaintiff' has concealed or destroyed documents that
> have since been produced by [Plaintiff's] own agents
> (begging the question of why [Plaintiff] claimed to be
> unable to produce those documents).

(*Id*., at 5.)

## ANALYSIS AND ORDER

### A.    Standards for Discovery and Sanctions.

The Federal Rules of Civil Procedure give the court "ample tools to deal

with a recalcitrant litigant."  ***Jones v. Thompson***, 996 F.2d 261, 264 (10th

Cir.1993).  Whether or not to impose sanctions addresses the discretion of the

court.  *See **National Hockey League v. Metropolitan Hockey Club, Inc.***, 427 U.S. 639, 642, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976).  The Court's discretion allows it to "use sanctions where necessary to insure . . . that lawyers and parties refrain from contumacious behavior . . . [and] that they fulfill their high duty to insure the expeditious and sound management of the preparation of cases for trial."  ***Baker v. Rivair Flying Service, Inc.***, 744 F.2d 1438, 1440 (10th Cir. 1984).

"In considering the imposition of sanctions, the court must consider on a case-by-case basis whether a party's failure was substantially justified or whether other circumstances make the imposition of sanctions inappropriate."  ***United States v. A & P Arora, Ltd.***, No. 92–2185–KHV, 1993 WL 461914, at *2 (D. Kan. Oct. 29, 1993), aff'd, 46 F.3d 1152, 1995 WL 18276 (10th Cir.1995).  The specific, alleged tactics employed by Plaintiff that are the subject of Defendant's motion will be discussed in turn.

**B.    Deposition Misconduct.**

**1.    Failure to prepare witnesses.**

Plaintiff designated Hratch Andonian and Sergio Andonian as witnesses in response to Defendant's 30(b)(6) notice.  (Doc. 479-1.)  The notice sought witness(es) on the following topics:

- Plaintiff's corporate structure, internal management, teams, and employees, including employees'

4

responsibilities, employees' compensation;

- Plaintiff's "web presence and the advertising and sale of tires or wheels over the internet, including but not limited to its use, ownership, design, or awareness of" discounttires.com and DTCmotorsports.com," and other domain names used by Plaintiff to advertise or sell over the internet;

- Documents produced Plaintiff, Gauntlett, or Paul Hastings pursuant to Court Orders from in this case "regarding the crime-fraud exception to the attorney-client privilege and/or work product doctrine";

- Plaintiff's "financial status, tax returns, loans, bank accounts and statements, corporate credit cards, loans, financial transactions, net worth, profits, losses, revenue, expenses, and other information bearing on a potential punitive damages award, since the time of the Settlement until the present time";

- The basis for Plaintiff's claim for damages;

- The basis for Plaintiff's responses to certain, specific discovery served in this litigation.

(Doc. 479-1, at 8-9.)  The topics were those that Plaintiff either agreed to or was ordered to provide a witness by this Court.  (*Id.*, at n.1.)

It is uncontroverted that both Hratch Andonian and Sergio Andonian testified that they did little or nothing to prepare for the depositions.  Hratch Andonian stated he met with counsel for approximately 30 minutes but did not review any documents or his prior deposition transcript.  (Doc. 479-2, at 18-19.)

Sergio Andonian stated he did "[n]othing much" to prepare for his deposition. (Doc. 479-3, at 19.)  More specifically, he testified that he had a 5 minute call with lead counsel, did not meet with local counsel, did not review documents, and did not speak with or interview any employees.  (*Id*., at 19-20, 45.)

Plaintiff now contends, however, that "[n]either witness accurately or completely described their preparation when asked about it during the deposition." (*See* Doc. 486, at 21; *see also* 486-5, Chorbajian Decl. ¶ 4, 486-3, H. Andonian Decl. ¶ 10.)  Rather, Plaintiff contends that "[l]eading up to the deposition, Mr. Chorbajian provided the witnesses with documents and deposition transcripts to review, met with the witnesses on multiple occasions, and regularly communicated with the witnesses about the case and their testimony."  (Doc. 486, at 21; *see also* Doc. 486-5 at ¶ 4-6; 486-3 at ¶¶ 5, 6, 8, 9.)

The Court is not persuaded by Plaintiff's attempt to re-write the deposition testimony of its witnesses.  *Cf. Rios v. Bigler*, 67 F.3d 1543, 1551 (10th Cir.1995) (holding that where an affidavit attempts to create a sham fact issue by contradicting sworn deposition testimony, it may be properly disregarded by the court).  The Court is also unmoved by Plaintiff's offer to make Hratch Andonian available to testify again if Defendant "would agree to provide the specific questions in advance so that counsel could enure Mr. Andonian was fully prepared

to answer them." (Doc. 486, at 21.) Defendants are free to choose the manner and type of discovery they propound. *White v. Union Pac. R.R. Co.*, No. 09-1407-EFM-KGG, 2011 WL 721550, at *2 (D.Kan. Feb. 22, 2011). Further, Defendant is not required to spoon-feed specific deposition questions to Plaintiff so that Plaintiff's counsel may help the proffered witnesses provide rehearsed responses. *See Garcia v. Pueblo Country Club*, 299 F.3d 1233, n.5 (10th Cir.2002) (holding that "[a] deposition is not a take home examination").

Based on the portions of the deposition transcripts submitted (as well as the apparently length of the depositions), the Court surmises that the witnesses at issue provided a significant amount of useful information in response to Defendant's deposition queries. Even so, no witness, no matter how well prepared, can be expected to have answers to every question potentially posed by opposing counsel. According to Defendant, however, the deponents were "unable to provide answers to several questions that could have been determined with a reasonable investigation," relating to the basis for Plaintiff's damage claim, Plaintiff's finances, and Plaintiff's use of the internet as a sales tool. (Doc. 479, at 9-12.)

Defendant contends Plaintiff's approach "violated its obligations to provide knowledgeable witnesses to testify on the company's behalf." (*Id.*, at 9.) This District has held that "[p]roducing an unprepared witness for a 30(b)(6) deposition

7

is ''tantamount to a failure to appear' at a deposition' and constitutes sanctionable

conduct." (*Id*., quoting *Starlight Int'l, Inc. v. Herlihy*, 186 F.R.D. 626, 639 (D.

Kan. 1999) (quoting *United States v. Taylor*, 166 F.R.D. 356, 363 (M.D. N.C.).)

The Court will thus review the specific areas of questioning about which

Defendant complains in an effort to determine whether Plaintiff identified the

proper witnesses – and sufficiently prepared them – to respond to topics

enumerated in the 30(b)(6) subpoenas.

### a.   Basis for Plaintiff's damages.

It is undisputed that Plaintiff had sufficient notice that a proffered witness

would need to testify regarding the categories of its damages.  Plaintiff represented

to Defendant that fact witness testimony regarding damages would be unnecessary

because Plaintiff would rely on its expert for this.  (Doc. 479, at 10; *see also* Doc.

479-4, at 3-4.)  Defendant explained to Plaintiff that if Plaintiff's "expert testimony

was stricken for any reason, [Defendant] would object to [Plaintiff's] efforts to

offer fact witness testimony on the categories of [Plaintiff's] damages if it refused

to provide deposition testimony on the same."  (Doc. 479, at 10.)

Thereafter, Plaintiff proffered Hratch Andonian to testify regarding this

subject.  According to Defendant, the witness "was unprepared to provide that

information, instead directing [Defendant] on a run-around, back to [Plaintiff's]

expert." (Doc. 479, at 10.)  The following deposition exchange is illustrative of

Defendant's concerns:

> Q. Are you claiming that Universal owes AKH the $XX[1]
> contingency payment that it paid to Paul Hastings or not?
>
> A. I'm not right now in position to answer that question
> because I -- you have been with the attorneys in
> conversation as to what our claims are and what your
> claims are.  So for me to step into the middle of this right
> now is -- it's not a -- I wouldn't be -- that's why I'm
> hesitating to give you an answer because it's kind of --
> settlement or some kind of conversation has been already
> going on between the -- you as an attorney and our
> attorneys. Isn't that --
>
> Q. Well, yes, but as the witness for AKH, we have a right
> to learn from you exactly what damages you're claiming
> from Universal and the basis for those claims.  And so
> what I'm trying to figure out is whether AKH's position is
> that Universal should have paid the $XX contingency
> payment and, therefore, owes that money to AKH in this
> litigation.
>
> A. So I'm saying I'm not prepared right now to tell you
> what our claim is or AKH's claim is going to be.  I'm not
> in a position right now if I don't have all the whole
> picture in front of me.
>
> ***
>
> Q. One of your experts is Andre Jardini.  He lays out the
> basis in support for the attorneys' fees claim that you just
> -- you and I just talked about a little bit.  Are you aware

---

[1] Amount redacted in deposition transcript submitted to Court.

whether AKH has any other evidence to support its claim
other than that identified by Mr. Jardini?

A. I can't answer that. I have no -- nothing to go by right
now.

Q. So you don't know?

A. No.

(Doc. 479-2, at 264-65 (emphasis added).)

Defendant argues that it is "unacceptable" that Plaintiff "claims to be unable
to quantify the damages" it seeks "[a]t this late stage of the litigation . . . ." (Doc.
479, at 11.) Defendant contends that sanctions are necessary because it should not
be "forced" to defendant at trial against a "nebulous" claim for damages. (*Id.*)

The Court finds, however, that Plaintiff's damage claim is not "nebulous,"
despite the uncertainty of the witness testimony. Plaintiff has indicated it intends
to rely on expert testimony regarding damages. (Doc. 486, at 20.) That expert has
submitted a report and has been deposed by Defendant. (*Id.*)

As stated above, Defendant warned that if Plaintiff refused to provide fact
witness deposition testimony on damages, Defendant would object to efforts by
Plaintiff to offer fact witness testimony at trial on the subject if the expert
testimony was stricken for any reason. (Doc. 479, at 10.) In response, Plaintiff
submitted Hratch Andonian for deposition on this subject. Plaintiff prepared Mr.

Andonian, or chose not to prepare him, as it saw fit.  Should Plaintiff need to rely on the deposition testimony provided by Mr. Andonian, it will rise or fall on the merits and sufficiency of the testimony provided.  In other words, to whatever degree Plaintiff has failed to provide sufficient factual witness testimony regarding damages, Plaintiff runs the risk of being unable to support claims for such damages at trial if its expert is stricken.  Plaintiff was free to make this tactical choice and has not acted in a sanctionable manner.  The risk Plaintiff faces is sanction enough.  Defendant's motion is **DENIED** in regard to deposition testimony regarding damages.

### b.    Plaintiff's finances.

Defendant also sought factual witness testimony regarding Plaintiff's "financial status, tax returns, loans, bank accounts and statements, corporate credit cards, loans, financial transactions, net worth, profits, losses, revenue, expenses, and other information bearing on a potential punitive damages award, since the time of the Settlement until the present time."  (Doc. 479-1, at 9.)  This topic was revised by Defendant to comply with a prior Order by the undersigned Magistrate Judge granting in part a motion to compel filed by Defendant.  (*See* Doc. 451.)

Prior to the deposition, Plaintiff's counsel specifically assured Defendant

11

that "[a]ny additional concerns you may have regarding . . . how AKH managed its

finances can be properly addressed at Hratch Andonian's deposition." (Doc. 479-

5, at 2.) According to Defendant, however, Hratch Andonian had not reviewed tax

returns in 6 to 8 months at the time of his deposition. (Doc. 479, at 11-12.)

Defendant also contends he was unable to answer basic questions, including

whether Plaintiff

> had completed its production of documents, whether [it]
> had any financial statements prepared on its behalf after
> 2011, what legal settlements were reflected in [its] tax
> returns, why wires of funds were being made to . . .
> individuals, and details of the sales of assets among the
> various entities he owned, all critical to the valuation of
> [Plaintiff] and, thus, the punitive damages claim.

(*Id*., at 12; *see also* Doc. 479-2, at 37, 74, 76, 82-85, 92-93, 100-101.) On several

occasions during the deposition, Hratch Andonian stated that he was not a CPA

and/or that the question would need to be posed to a CPA. (*See* Doc. 479-2, at 37,

74, 76, 82-85, 92-93, 100-101, 115-116, 124.)

Plaintiff, on the other hand, contends that Defendant's expectations for the

deposition were unrealistic. Plaintiff argues that Defendant asked Hratch

Andonian

> to testify with the expertise of an accountant and to
> answer all their questions about AKH's financial
> condition, tax reporting, and banking records, no matter
> how obscure, remote, or complex. Universal badgered

12

> Mr. Andonian about individual line items on tax returns
> and bank statements that covered multiple years and
> thousands of transactions. (See, e.g., Exh. E, AKH Dep.
> at 69:25-70:4, 71:20-74:13, 75:14-22, 84:23-25,
> 104:3-19) No reasonable investigation could have
> prepared him to answer such questions unless he actually
> knew the questions in advance.  Even though Mr.
> Andonian is not an accountant and therefore reasonably
> deferred to AKH's accountants on certain details, (see,
> e.g., id. at 85:23-25,410:2-411:17), Universal's lawyers
> openly criticized him for not having an accountant's
> expertise:  'I can read the tax returns on my own.  And so
> if your position is that you don't know anything else
> about the information other than what is in the tax
> returns, then it may be that we have to . . . go back to
> your accountant . . . .'  (*Id*. at 85:8-14)  That the
> accountants eventually gave depositions does not mean
> that Mr. Andonian failed to discharge his duties as
> AKH's Rule 30(b)(6) witness.

(Doc. 486, at 18-19.)  Plaintiff also argues that the topics on Defendant's

deposition notice "were extremely broad and did not identify any line items that

[Defendant] intended to cover with respect to [Plaintiff's] tax returns and bank

statements."  (*Id*., at n.5.)

Some of the issues raised in the present motion, as well as one previous

ruling by the undersigned Magistrate Judge (Doc. 374), evince an on-going effort

by Plaintiff to obstruct discovery of its financial status.  The discovery of

Plaintiff's available assets against which to enforce a potential judgment is of

understandable interest to Defendant, but not relevant to the substantive issues for

trial. However, if Defendant prevails in proving its entitlement to an award of punitive damages, the financial status of Plaintiff may be relevant at trial to a determination of the amount of such an award. ***Mansourian v. Regents of the Univ. of Calif.***, No. 03-2591-FCD-EFB, 2011 WL 98814, at *1 (E.D. Cal. Jan. 12, 2011) (holding that "evidence of the financial status and worth" of a party against whom punitive damages are sought is relevant to the punitive damages claim, "including the reasonableness of a punitive damage award").

Discovery into this issue, however, has become the proverbial "tail wagging the dog" in this case. Sanctions are appropriate – and an appropriate sanction should be one which will allow the parties to move past this issue towards resolution of the merits of this case.

Therefore, the undersigned Magistrate Judge **GRANTS** this portion of Defendant's motion. The Court **recommends** to the District Court that, as a sanction for the discovery abuses relating to the production of information concerning the financial worth of Plaintiff, the District Court and the Jury be permitted, if punitive damages are awarded, to consider Plaintiff's net worth unlimited for the purpose of evaluating the appropriate amount of punitive damages. An appropriate instruction in that regard should be given, tailored to address the substantive relevance of that consideration under the applicable law.

14

Plaintiff should not be permitted to rebut that consideration either by evidence or argument.

### c.  Plaintiff's use of the internet to sell.

Plaintiff identified Sergio Andonian as its 30(b)(6) witness to testify regarding its "web presence and the advertising and sale of tires or wheels over the internet, including but not limited to its use, ownership, design, or awareness of . . . discounttires.com and DTCmotorsports.com," and other domain names used by Plaintiff to advertise or sell over the internet.  (Doc. 479-1, at 9.)  Defendant complains that the witness "did not know when discounttires.com had been registered and admitted that he had not investigated that topic."  (Doc. 479, at 12; Doc. 479-3, at 64.)  Defendant characterizes this as a "simple – yet potentially dispositive – issue that AKH should have been prepared to confirm."  (Doc. 479, at 12-13.)

While this may be so, the Court does not find this to be sanctionable conduct.  As stated before, regardless of how prepared a witness may be, no witness can be expected to have answers to every question potentially posed by opposing counsel.  The Court **GRANTS in part** this portion of Defendant's motion and finds this issue can be properly addressed by Plaintiff submitting a written response to the question and all supporting documents, **within thirty (30)**

**days of the date of this Order**, signed and attested to by a representative of

Plaintiff.  Plaintiff is also ordered to reimburse Defendant's reasonable legal fees

incurred in litigating this portion of the present motion (the parties will follow the

procedure in D. Kan. Rule 54.2) .

### 2.     Providing false information.

This case has involved a long-standing dispute regarding Plaintiff's alleged

ownership or use of the DTCMotorsports.com website.  (*See* Doc. 479, at 13-14.)

Defendant diplomatically characterizes Plaintiff's position regarding its ownership

of the website as "evolving."  (*Id*., at 13.)  Defendant contends that publically

available records contradict Plaintiff's denial of owning the website.  (*Id*.)  This

Court previously addressed the denials and stated that whether Plaintiff owned the

website was "a contested fact that cannot be resolved at this stage of the

proceedings as part of a discovery motion."  (Doc. 429, at 11.)

Defendant noticed this topic for 30(b)(6) deposition and Plaintiff designated

Sergio Andonian.  Defendant argues the witness's testimony "confirms the public

information" obtained by Defendant while "also flatly contradicts the denials

presented to this Court by [Plaintiff] and the statements of its counsel," as quoted

in Defendant's motion.  (*See* Doc. 479, at 13-15.)  Defendant argues that it "spent

thousands of dollars and months of discovery to prove this critical fact that is likely

16

dispositive to the coverage issues, only for [Plaintiff] ultimately to admit the truth of that fact under oath." (*Id.*, at 15.)  According to Defendant, this "suggests that [Plaintiff] and its counsel directly misled [Defendant] and this Court until its designated witness (apparently unaware of the company  line)" testified.  (*Id.*)

Plaintiff responds that "[p]rior to Sergio Andonian's testimony, [Plaintiff's] current management was not aware that [Plaintiff] had any affiliation with the DTCMotorsports.com website, and it still has no recollection of that website." (Doc. 486, at 22; Doc. 486-3, at ¶ 12.)  Plaintiff continues that

> [t]here has unquestionably been confusion regarding the DTCMotorsports.com website, but Sergio Andonian's testimony resolved that confusion and clarified the record.  The prior confusion and lack of knowledge by AKH's management does not equate to an intentional misrepresentation, and this Court has previously stated that '[t]he court will not find intentional misrepresentation upon a speculative possibility.' ***Starlight Int'l Inc. v. Herlihy***, 186 F.R.D. 626, 645 (D. Kan. 1999).  There is no basis for sanctions.

(Doc. 486, at 22-23.)

The Court finds that issues relating to factual inconsistencies, if any, perpetuated by Plaintiff are to be resolved by the District Court (on summary judgment) or the jury (at trial).  A party is not entitled to sanctions every time it contends statements of the opposing party have been disproved by other evidence. This portion of Defendant's motion is **DENIED**.

17

3.    **Changing answers to RFAs.**

Pursuant to Fed.R.Civ.P. 37(c)(2), when a party fails to properly admit a Rule 36 RFA and the requesting party later proves the matter to be true, the Court must order the failing party to pay reasonable expenses, including attorney's fees, incurred in making that proof unless there was good reason for the failure to admit. During Plaintiff's Rule 30(b)(6) depositions, Defendant asked about various denials of prior RFAs from 2013, 2015, and 2016. (*See* Doc. 479, at 15.) According to Defendant, "in several instances [Plaintiff's designated witness] either changed its answer or admitted that its reasons for denying the Request were without support." (*Id*., at 15-16.) Defendant argues that all RFA responses for which Plaintiff changed its answers or for which Plaintiff's objection is baseless should be treated as unqualified admissions. (*Id*., at 18.)

Upon review of the various RFAs specifically discussed in Defendant's brief, as well as those that are the subject of the deposition testimony cited in this section of Defendant's brief, the Court finds that RFA Nos. 37, 38, 53, 123, 195, 197 – which were previously denied – have now admitted as a result of Hratch Andonian's deposition testimony. (*See* Doc. 479-2, at 295-97, 297-300, 320-21, 325-328, 329-30.) Defendant's motion is **GRANTED** in regard to RFAs 37, 38, 53, 123, 195, and 197 and these RFAs are deemed admitted.

The status of the remaining RFAs cited in Defendant's brief is a bit more complicated. Request for Admission No. 59 asked Plaintiff to admit that it "used the mark and domain name www.DiscountTires.com from July 1997 through approximately January 2013." (Doc. 479-2, at 300-01.) Upon deposition questioning, Hratch Andonian stated that he would need to verify whether the inclusive dates were correct or whether it began using the domain name in October 1997. Plaintiff is instructed to provide a written, verified response to this Request for Admission, indicating the correct starting date, **within thirty (30) days of the date of this Order**.

Certain RFAs ask Plaintiff to admit statements that were included in its Complaint. (*See* Doc. 479-2, at 330-34, 336-38, regarding RFAs 200, 201, 205, and 208.) In response to deposition questioning, Hratch Andonian explains why he is reluctant to admit certain language from the Complaint. (*Id*.) Defendant merely cites to these passages of the deposition in its brief; it does not argue or discuss in the brief why the concerns raised in the deponent's testimony are inadequate or inaccurate. The Court will not presume to make Defendant's arguments for it. As such, the Court is unwilling to find Plaintiff's denial of the Requests was "baseless." Defendant's motion is **DENIED** in regard to RFAs 200, 201, 205, and 208.

Request No. 136 asked Plaintiff to "[a]dmit that, in December 2012, [it] intended for [Defendant's] policy limits to be used to compensate [Plaintiff]." (Doc. 479-2, at 322-23.)  The deponent testified he could not admit the RFA because of ambiguity of the term "policy limits."  (*Id.*)  Again, Defendant merely cites to a deposition passage and fails to discuss in the brief why the concerns raised in the deponent's testimony are inadequate or inaccurate.  Again, the Court is unwilling to find Plaintiff's denial of Request No. 136 to be "baseless." Defendant's motion is **DENIED** in regard to RFA 136.

Defendant argues that "because this Court has already chastised [Plaintiff] for its failure to properly respond to RFAs and the above-described misconduct expressly violates Fed. R. Civ. P. 36, this warrants an award of costs and fees." (Doc. 479, at 18.)  Given that the Court grants this portion of Defendant's motion in regard to the majority of the RFAs at issue (RFAs 37, 38, 53, 59, 123, 195, and 197), Plaintiff is hereby ordered to reimburse Defendant's reasonable legal fees incurred in litigating this portion of the motion.

### 4.    Speaking objections.

Plaintiff was previously warned by the Court regarding speaking objections and went so far as to restrict lead counsel Vatche Chorbajian's participation in depositions because of his practice of improper speaking objections.  (*See* Doc.

371.)  Defendant contends the practice has now been continued by Plaintiff's local counsel, Brian Sobczyk.  (Doc. 479, at 19.)

Federal Rule of Civil Procedure 30(c)(2) provides that objections taken during a deposition are noted on the record, but that the deposition proceeds with the testimony taken subject to the deposition. "An objection must be stated concisely in a nonargumentative and nonsuggestive manner." Fed.R.Civ.P. 30(c)(2). Form objections must be made at the time of the deposition to avoid waiver because they can be corrected at that time. Fed.R.Civ.P. 30(d)(3)(B).

Objections to relevance or materiality are not waived by a failure to object during the deposition.  Fed.R.Civ.P. 32(d)(3)(A).  An instruction not to answer is appropriate only when necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion to terminate or limit a deposition being conducted in bad faith or in a manner that unreasonably annoys, embarrasses or oppresses the deponent or party.  Fed.R.Civ.P. 30(c)(3), (30)(d)(3).[5]

To promote these principals, and to facilitate the efficient and fair conduct of depositions, this Court has promulgated Deposition Guidelines, which provide, in part:

> Objections shall be concise and shall not suggest answers
> to or otherwise coach the deponent.  Argumentative
> interruptions will not be permitted.  The only objections
> that should be asserted are those involving privilege or

21

> work product protection or some matter that maybe
> remedied if presented at the time, such as an objection to
> the form of the question or the responsiveness of the
> answer.  Other objections shall be avoided unless the
> deposition is being taken for the express purpose of
> preserving testimony.

Deposition Guidelines of the United States District Court for the District of

Kansas, ¶ 5(a). *See also*, ***Cincinnati Insurance Co. v. Serrano***, 11-2075-JAR-

KGG, 2012 WL 29071 (D. Kan. 2012).  The Scheduling Order in the present case

mandates the application of these guidelines. (Doc. 112, at 4.)

The Guidelines support Rules 30 and 32 by highlighting some important

concepts.  One is to prohibit objections that suggest answers to, or otherwise

coach, the witness, commonly referred to as "speaking objections."  The other

concept is to make clear that objections which need not be made to preserve the

objection under Rule 32 should not be made in a discovery deposition.  The

Guidelines also prohibit argumentative interruptions.  "Both the Rules and the

Guidelines require objections to be concise, non-argumentative and

non-suggestive.  Implicit in the Rule and explicit in the Guidelines is that counsel

will cooperate and be courteous to each other and to deponents." ***Ash Grove***

***Cement Co. v. Wausau Insurance Co.***, No. 05-2339-JWL-GLR, 2007 WL 689576

(D. Kan. 2007).

In regard to Defendant's previous motion for sanctions regarding speaking

objections, the Court held that

> [n]early every objection made by Plaintiff's counsel in
> this case was improper, except for some of the privilege
> objections . . . .  Relevance (foundation) objections of all
> stripes are improper.  Coaching and speaking objections
> are prohibited.  In the few instances in which a form
> objection might have had some merit, it was so
> encumbered by improper speaking objections as to render
> its evaluation by the questioner, or this Court, impossible.
> Generally, counsel impeded the deposition, confused the
> witnesses and their answers, wasted the time of counsel
> and witnesses, and was rude and unprofessional to
> opposing counsel.  The resulting transcripts from these
> depositions may be relatively useless.

(Doc. 371, at 9-10 (footnote omitted).)

This Court could not have been more clear as to what it found to be inappropriate in the context of the prior depositions as well as the Court's expectations going forward.  The Court ordered that two witnesses were to be re-deposed and went so far as to prohibit Plaintiff's lead counsel Vatche Chorbajian, who was admitted *pro hac vice*, from serving as counsel during the re-depositions. (*Id.*, at 11.)  The Court held that Mr. Chorbajian could be present during the re-depositions, "but will not be allowed to speak on the record."  (*Id.*)  The Court also required that local counsel appear with Mr. Chorbajian "in all depositions in which he participates to assure his compliance with this Court's rules, orders and guidelines."  (*Id.*)

23

Considering that the Court has given specific instruction on this issue

previously – instruction that should not have been necessary for established

attorneys – the Court is disturbed that the issue has persisted.  The Court is even

more disturbed that in the examples cited by Defendant, the offending behavior has

been attributed to counsel who is admitted to practice in the District of Kansas.

The first example provided by Defendant involves deposition questioning

regarding apparent contradictions between Plaintiff's allegations in the present

case and allegations made against its prior counsel in the related legal malpractice

suit.  Local counsel Brian Sobczyk interjected as follows:

> I'm going to object to the line of questioning on
> the grounds that the Complaint and a response to Request
> For Admissions in two separate proceedings, there are
> different legal standards that apply to both.
> Allegations in a Complaint are not subject to the
> same standards as a response to a Request For
> Admission.  The Complaint is based on – largely on
> information and belief, subject to later proof during
> discovery.

(Doc. 479-2, at 334-35.)  He then instructed the witness to answer.

Defendant complains that Mr. Sobczyk's speaking objection "influenced the

testimony of the witness, who immediately responded that the allegations of the

malpractice complaint 'still needs to be proved, I guess in court.'"  (Doc. 479, at

19; Doc. 479-2, at 335.)  The witness subsequently testified regarding Plaintiff's

apparently contradictory positions, "Well, first of all, the – again, those allegations are – have to be proved; right? . . . They have to be proved. They have to go through the process . . . ." (Doc. 479-2, at 413-14.)  The witness also testified "I don't know that. Again, these things have to be gone through the legal process." (*Id*.)  The Court agrees that Mr. Sobczyk's objection improperly coached the witness, whose subsequent testimony clearly mimicked the speaking objection.

Defendant also raises this issue as to questioning regarding Plaintiff's claim for damages.  In the context of that questioning, the following exchange occurred:

> MR. SOBCZYK:  Object to form.  [Plaintiff] has designated an expert witness on damages, who's provided an expert report and has been deposed in this case.  His calculations have been provided.  And the witness has not testified that he personally calculated damages.
>
> MS. KLEVENS:  And yet it's in [Plaintiff's] interrogatory response, it does not rely solely on its expert.  If it wants to do that, then we can hear that answer from the witness and not from the lawyer.
>
> MR. SOBCZYK:  And I'll read the response.  The response says if [Defendant] discounted rates by, say, 60 percent and 50 percent solution became a 20 percent solution, that is math.  A hundred percent cut in half is 50, cut by 60 is 20.  That's a simple statement.  It's just a general statement that can be calculated on a calculator.
>
> MS. KLEVENS: I'm going to – just  going to object on the record because I think you're coaching the witness.  I think your objection is entirely improper.  We can take that up with the court.  We've taken it up with the court

many times before.

(Doc. 479-2, at 354-55.)

Plaintiff responds that sanctions are not merited on the basis of only two objections. (Doc. 486, at 25- 28.) Plaintiff continues that the objections were warranted and did not coach or influence the witness. (*Id*.) Based on the above discussion, the Court strongly disagrees that the objections were proper. The Court also finds that the objections specifically coached the witness, as outlined by the testimony excerpted above. On the other hand, this is clearly not a situation in which "[n]early every objection made by Plaintiff's counsel . . . was improper . . . ." (Doc. 371, at 9-10 (footnote omitted).)

The Court "may impose an appropriate sanction . . . on a person who impedes, delays or frustrates the fair examination of the deponent." Fed.R.Civ.P. 30(d)(2). Although the Court finds the tactics of Mr. Sobczyk to be improper, it cannot find that Defendant's ability to examine the deponent was prejudicially impeded or frustrated. The Court does, however, admonish Mr. Sobczyk for his use of speaking objections and directs him to review the pertinent federal and local rules on the issue, as discussed herein.[2]

---

[2] On a related matter, the Court **DENIES** Plaintiff's request to revoke the *pro hac vice* status of Mr. Chorbajian.

C.    **Concealing or Destroying Documents.**

Plaintiff's pattern of deflection and delay when it comes to document production is well-established in this case.  Defendant characterizes it as a "repeated and tortured pattern" consisting of the following:

> [Plaintiff] claims that responsive documents do not exist or otherwise refuses to produce documents, only for agents of [Plaintiff] to then produce the purportedly non-existent documents.  In other instances, [Plaintiff] has ignored its obligations of production for months or years, before admitting either that it did not keep the documents that are being requested or stating that it will 'try' to produce the required materials.  Notwithstanding that it is involved in litigation, [Plaintiff] appears to have allowed the spoliation of many of its crucial documents, requiring [Defendant] to collect partial records from others or, in some instances, to accept that such records were not preserved and will never be produced.
>
> At this point, the law of diminishing returns is in full effect. Any efforts by [Plaintiff] at this date to produce additional documents that should have been produced in December 2015 are too late to be  helpful and do not undo the prejudice of [Defendant's] constant struggle to compel [Plaintiff] to comply with its discovery obligations. Further, this litigation will never end if [Plaintiff's] conduct is permitted to continue. Therefore, the only appropriate remedy is sanctions.

(Doc. 479, at 20-21.)  Defendant raises concerns regarding the following categories of documents.

1.    **Information on AKH Company, LLC.**

After noticing a reference to a company called "AKH Company, LLC,"

27

defense counsel inquired with Plaintiff to determine if additional discovery was needed on the entity. Plaintiff's counsel responded that February 2017 that "AKH Company, LLC [was] a separate Nevada business entity . . . merely used for tax reasons around 2013 for a tax related matter and not used thereafter." (Doc. 479-5.) This was reiterated in a deposition of Plaintiff's representative in March 2017.

Defendant contends that discovery received from Plaintiff's accountant Darrel Whitehead in May 2017 included a "Plan of Conversion," which indicated that Plaintiff "converted to a Nevada entity named 'AKH Company, LLC' shortly after filing this litigation, rendering Plaintiff a shell with no commercial purpose other than to litigate this case." (Doc. 479, at 22; Doc. 479-17.) Defendant argues the document establishes that "the LLC was not a company 'merely used for tax reasons,' as stated by [Plaintiff's] counsel, but that it was the vessel into which Plaintiff . . . deposited all of its assets in an apparent attempt to devalue itself." (*Id*.)

Plaintiff dubiously responds that because Defendant learned about AKH Company, LLC from documents produced by its accountant, "it is undisputed that [Plaintiff] voluntarily disclosed the existence of this entity." (Doc. 486, at 11.) Plaintiff contends that the deposition of its accountant Mr. Whitehead made it clear that AKH Company, LLC "was merely a pass-through entity that was created to

facilitate the disposition of [Plaintiff's] assets." (*Id*.; *see also* Doc. 486-6, at 12.) Further, Plaintiff points to a letter from its counsel Mr. Chorbajian dated April 20, 2017, that "explained the precise purpose of the LLC entity and specifically referenced the asset transfers" by Plaintiff. (Doc. 486, at 11.) Plaintiff also contends that the "Plan of Conversion" was not carried out "due to certain requirements of California law . . . ." (*Id*., at 12.)

Even assuming these assertions of Plaintiff to be true, these subsequent facts seem to be somewhat at odds with the explanation Plaintiff gave Defendant in February 2017 that "AKH Company, LLC [was] a separate Nevada business entity . . . merely used for tax reasons around 2013 for a tax related matter  and not used thereafter." (Doc. 479-5.)  The Court thus **GRANTS** this portion of Defendant's motion.  The Court finds that the jury instruction, recommended in § B(1)(b), *supra*, to consider Plaintiff's net worth unlimited for the purpose of evaluating the appropriate amount of punitive damages, provides an adequate and appropriate remedy.

## 2.    Schwab account.

Defendant also refers the Court to documents produced by Mr. Whitehead showing a previously undisclosed account with Charles Schwab. (Doc. 479, at 23.) According to Defendant, the documents "show that [Plaintiff] sold several million

dollars in assets after this lawsuit was filed, deposited the proceeds from that sale

into the undisclosed Schwab Account, and then paid multi-million dollar

distributions from that account directly to the owners of [Plaintiff], without ever

disclosing those transfers to [Defendant] in discovery." (*Id*; *see also* Docs. 479-12,

479-13.)

Defendant contends that it "had actually noticed prior to the accountants'

depositions that something appeared to be missing: [Plaintiff's] tax returns

claimed millions of dollars in sales of stores but the bank accounts did

not show any corresponding deposits." (Doc. 479, at 23.) Upon noticing this,

Defendant asked Plaintiff "to identify where those deposits were reflected in the

bank records." (Doc. 479-15.) Defendant contends that, despite this inquiry,

Plaintiff "never identified the Schwab account, leaving [Defendant] to uncover it in

the accountant's production months later." (Doc. 479, at 23.)

Although Plaintiff "finally indicated, the night before [Defendant] filed this

Motion, that it would produce the Schwab documents," Defendant contends this is

"too little, too late . . . ." (*Id*., at 24.)

Plaintiff responds that the Schwab account "was opened in 2013 for the

specific purpose of receiving and distributing the proceeds from [Plaintiff's]

reorganization and sales of assets to Pep Boys, 55, Inc. and Andonian Enterprises."

(Doc. 486, at 12.)  Apparently the account has not been used since 2014.  (*Id*.)
Further, the account was opened by a former CFO of Plaintiff who is no longer
employed by the company.  (*Id*.)  Plaintiff characterizes the account was simply
"overlooked" and was "inadvertent, and an honest mistake."  (*Id*., at 12-13.)

Given the history of discovery abuses by Plaintiff in this case, the Court is
hesitant to conclude that the withholding of any documents from Defendant
occurred "inadvertently."  Plaintiff's pattern of concealment overshadows its
attempt to concede an "honest mistake."  The Court **GRANTS** this portion of
Defendant's motion.  The Court finds that the jury instruction, recommended in §
B(1)(b), *supra*, to consider Plaintiff's net worth unlimited for the purpose of
evaluating the appropriate amount of punitive damages, provides an adequate and
appropriate remedy.

### 3.    Previously unidentified bank accounts.

In regard to one of Defendant's many previously granted Motions to
Compel, this Court ordered Plaintiff to produce all bank statements.  (Doc. 451.)
The undersigned Magistrate Judge stated that the Order was not limited to
Plaintiff's accounts with US Bank, stating that "[t]o the extent Plaintiff switched
banks or has opened/maintained accounts at any other banks since 2011, Plaintiff is
ordered to provide the requested information as to any and all such bank accounts

31

from 2011 through the present." (*Id*., at 4.)  This Court specifically stated that the production was to include, "but is not limited to, accounts with Bank of America." (*Id*.)

Plaintiff represented to Defendant that all bank accounts had been identified and all bank statements had been produced.  (Doc. 479-210, at 2.)  Approximately two months after the Court's Order, Plaintiff's lead counsel Vatche Chorbajian specifically stated to Defendant that "**All Bank Records have been produced**" and "**Nothing is missing.**"  (*Id*., (emphasis in original).)  Almost five months later, Plaintiff's former accountants produced documents referencing three previously undisclosed Bank of America accounts in Plaintiff's name.  (Doc. 479, at 25; Doc. 479-11.)  This is in flagrant violation of the Court's previous Order.  (Doc. 451.) Further, Defendant is concerned because its expert "previously reviewed what [Defendant] was told was a complete set of [Plaintiff's] bank statements."  (Doc. 479, at 25.)

Plaintiff again contends that its current management did not open the accounts at issue and did not know they existed.  (Doc. 486, at 13.)  Plaintiff also argues that the existence of these accounts "has not hindered [Defendant's] investigation of [Plaintiff's] ability to pay a judgment, and does not warrant sanctions."  (*Id*., at 14.)

Again, given the history of discovery abuses by Plaintiff in this case, the Court is hesitant to conclude that the withholding this information was inadvertent. The Court thus **GRANTS** this portion of Defendant's motion. The Court finds that the jury instruction, recommended in § B(1)(b), *supra*, to consider Plaintiff's net worth unlimited for the purpose of evaluating the appropriate amount of punitive damages, provides an adequate and appropriate remedy.

### 4.    Plaintiff's 2012 tax return.

In January 2016, Plaintiff produced a 2012 tax return. (Doc. 479, at 25.) The return was used as a deposition exhibit and provided to Defendant's experts. (*Id.*) Unfortunately, Defendant eventually learned that the 2012 tax return provided by Plaintiff was never filed with the IRS. (*Id.*, at 25-26.) Plaintiff's accountant Whitehead then produced the 2012 tax return that was filed with the IRS. (*Id.*, at 26.) Unfortunately, this did not occur until after all the depositions of Plaintiff's representative and executives. (*Id.*)

Plaintiff again contends that this was merely a "simple misunderstanding." (Doc. 486, at 14.) More specifically, Plaintiff contends it "learned for the first time that the return it previously produced to [Defendant] was not its final 2012 return" in connection with Defendant's deposition of Mr. Whitehead. (*Id.*) Plaintiff also contends that there is no prejudice to Defendant because Plaintiff's "accounting

treatment of [the RT] settlement has no relevance to the merits of this lawsuit, and there is no contention that the two returns differed in any respect as to that accounting." (*Id*., at 15.)

The Court is troubled by Plaintiff's assertion that it "worked with its accountants" to respond to Defendant's document requests (*id*., at 10), but then is surprised on more than one occasion at documents its accountant produces in conjunction with his deposition. The Court thus **GRANTS** this portion of Defendant's motion. The Court finds that the jury instruction, recommended in § B(1)(b), *supra*, to consider Plaintiff's net worth unlimited for the purpose of evaluating the appropriate amount of punitive damages, provides an adequate and appropriate remedy.

### 5.    Profit/loss statements.

In October 2016, the undersigned Magistrate Judge ordered Plaintiff to produce all of its "profit and loss statements, annual statements, balance sheets, and expense/ revenue reports for 2011 through the present." (Doc. 451, at 5.) After the entry of this Order, Plaintiff informed Defendant that it had no profit and loss statements to produce. (Doc. 479, at 26.) Defendant contends that "[o]n the day before his deposition . . ., [Plaintiff's] accountant Mr. Whitehead produced a number of [Plaintiff's] profit/loss statements. (*Id*., at 27.) Defendant only attached

one such profit and loss statement to the present motion, however.  (Doc. 479-16.)

According to Defendant, there are only two explanations for this:  "either [Plaintiff] knew about these documents and lied about them, notwithstanding a Court order that they be produced, or [Plaintiff] failed to ask its accountants to provide whatever profit/loss statements it had until [Defendant] served Subpoenas on the Accountants."  (Doc. 479, at 27.)  According to Defendant, "[e]ither way, [Plaintiff] again failed to meet its discovery obligations."  (*Id.*)

Plaintiff responds that it " does not routinely prepare or maintain profit and loss statements, nor has it requested that such statements be prepared by its outside accountants."  (Doc. 486, at 15; Doc. 486-3, at ¶ 17; Doc. 486-9, at ¶ 3.)  In his subsequent declaration, Whitehead states that the 2013 profit and loss statement was "mistakenly prepared" and that no such statements were subsequently prepared.  (Doc. 486-9, at ¶ 3.)  Plaintiff contends that sanctions are not warranted because it "did not know of any profit and loss statements in Mr. Whitehead's file and did not have any reason to believe any existed because [it] did not request that they be prepared."  The Court is not persuaded by Plaintiff's arguments.

The Court **GRANTS** this portion of Defendant's motion.  The Court finds that the jury instruction, recommended in § B(1)(b), *supra*, to consider Plaintiff's net worth unlimited for the purpose of evaluating the appropriate amount of

punitive damages, provides an adequate and appropriate remedy.

**6.    Checks.**

Defendant contends that "approximately $70.3 million worth of canceled checks are unexplained in [Plaintiff's] bank account records, making it difficult, if not impossible, to determine [Plaintiff's] profitability for punitive damages purposes." (Doc. 479, at 27.) Although Plaintiff initially offered to produce the checks, it ultimately stated that doing so "was too costly an expense" and that it understood that Defendant would subpoena copies of the checks at Defendant's expense. (Doc. 479-18, at 4.) Plaintiff indicated it would not object to such a subpoena. (*Id.*)

Plaintiff contends that this request is evidence of "how far afield [Defendant's] discovery campaign has strayed from the merits of this case . . . ." (Doc. 486, at 15.) Plaintiff continues that it never agreed to produce the checks, but merely agreed not to object if Defendant tried to obtain them from the banks. (*Id.*, at 16.) Further, Plaintiff argues that the checks "have no relevance to the merits of this case, and [Defendant] has not made any showing as to how they purportedly have any relevance to the punitive damages portion of its case." (*Id.*)

Defendant replies that when

> reviewed the bank account information that [Plaintiff]
> provided, it noticed tens of millions of dollars issued

36

> from those accounts with no record of why the money
> was paid and where it went. When [Defendant] asked
> [Plaintiff] about it, [Plaintiff] said that the money
> reflected checks it had sent, but that it did not know to
> whom the checks were issued (including whether they
> went to other [Plaintiff]-related entities or individuals) or
> for what purpose; instead, [Plaintiff] offered under oath
> to produce the cancelled checks to explain this massive
> amount of missing money.  (Doc. 486-7 at 212-13, 230.)
> Then, nothing happened.

(Doc. 488, at 24.)  The Court does not agree with Defendant's assertion that

Plaintiff promised "under oath" to produce the cancelled checks.  In response to

questioning as to how "we find out what all of these checks were for or who they

were paid to," Hratch Andonian merely replied, "I suppose we could ask the bank

to get us the cancelled checks."  (Doc. 486-7, at 212.)  The Court does not interpret

this as an agreement to produce this voluminous amount of documentation.

That stated, the Court agrees with Defendant's assertion that the cancelled

checks are within Plaintiff's possession, custody, or control.  As stated by the

Honorable District Judge Julie Robinson in this case, "control comprehends not

only possession but also the right, authority, or ability to obtain the documents."

(Doc. 400, citing *Super Film of Am., Inc. v. UCB Films, Inc.*, 219 F.R.D. 649,

651 (D. Kan. 2004) (quoting *Comeau v. Rupp*, 810 F. Supp. 1127, 1166 (D. Kan.

1992)); *Internationale v. Rogers*, 357 U.S. 197, 206 (1958); *Ice Corp. v.

Hamilton- Sundstrand Corp.*, 245 F.R.D. 513, 517 (D. Kan. 2007).)

37

The undersigned Magistrate Judge finds that Plaintiff has "the right, authority, or ability to obtain" its own cancelled checks, which he also finds to be relevant, discoverable, and proportional to the needs of this case. This portion of Defendant's motion is **GRANTED**. The Court finds that the jury instruction, recommended in § B(1)(b), *supra*, to consider Plaintiff's net worth unlimited for the purpose of evaluating the appropriate amount of punitive damages, provides an adequate and appropriate remedy.

### 7. Pep Boys sales agreement.

Defendant sought documents relative to the multi-million dollar sale of certain of Plaintiff's stores to Pep Boys in 2013. Defendant hoped the documents would help it "to understand the value of the stores owned by [Plaintiff] when the this action was initiated" and determine "how much money was paid to [Plaintiff] . . . . to track the funds in [Plaintiff's] bank account statements for valuation purposes related to punitive damages." (Doc. 479, at 28.)

Defendant argues that Plaintiff conceded the relevance of the documents, but stated it could not produce them because they were subject to "strict confidentiality" provisions. (Doc. 479-18, at 4.) As with other documents discussed herein, Defendant ultimately received the document from Plaintiff's accountant. In this instance, the document was not complete, as schedules and

38

exhibits were withheld.  According to Defendant, however, the agreement did not

contain any type of confidentiality provision, leading Defendant to believe Plaintiff

made this objection "solely to shirk its discovery obligations."  (Doc. 479, at 28.)

Further, even if the confidentiality provision existed, a Protective Order was

entered in this case.

> It is well settled that confidentiality does not act as a bar
> to discovery and is not grounds to withhold documents or
> information from discovery.  'A concern for protecting
> confidentiality does not equate to privilege.'  While a
> confidentiality objection may be appropriate when a
> party seeks a protective order limiting the parties' use or
> disclosure of confidential information, it is generally not
> a valid objection to withholding discovery altogether.  In
> ***Sonnino v. University of Kansas Hospital Authority***,
> this Court specifically addressed an objection to
> producing confidential information on the grounds the
> producing party was contractually barred from disclosing
> the information.  The Court held that in the context of
> settlement agreements the mere fact that the settling
> parties agree to maintain the confidentiality of their
> agreement does not serve to shield the agreement from
> discovery.  'Although a settlement agreement contains a
> confidentiality provision, litigants cannot shield
> otherwise discoverable information from disclosure to
> others by agreeing to maintain its confidentiality, and
> cannot modify the Federal Rules of Civil Procedure by
> agreement.'

***High Point SARL V. Sprint Nextel Corp***., No. 09-2269-CM-DJW, 2011 WL

4008009, at *1 (D. Kan. Sept. 9, 2011) (citations and footnotes omitted).

Plaintiff contends that "[t]he protective order entered by this Court would

not protect [it] from the consequences of . . . a breach" of the confidentiality provision.  (Doc. 486, at 16.)  Plaintiff does not, however, explain how or why this is so.  The Court is not persuaded by this factually-unsupported, conclusory statement.  *Cf. **Szczygiel v. Kansas***, No. 14-3011-EFM, 2015 WL 630570, at *2 (D.Kan. Feb.12, 2015) (citations omitted) (holding that "[c]onclusory statements, threadbare recitals of elements, and legal conclusions, however, are not entitled to a presumption of truth' in the context determining the futility of a proposed amendment).  Plaintiff contends it has requested a copy of the agreement containing the confidentiality provision from Pep boys "but has not yet received anything in response."  (Doc. 486, at 17.)

This portion of Defendant's motion is **GRANTED**.  The Court orders Plaintiff to produce to Defendant, **within thirty (30) days of the date of this Order**, a copy of the agreement containing the confidentiality provision that also evidences how the Protective Order in effect in this case would fail to protect Plaintiff would fail to "protect" Plaintiff "from the consequences of such a breach." (*Id*., at 16.)  Should Plaintiff be unable to do so, Plaintiff is ordered to produce to Defendant, **within thirty (30) days of the date of this Order**, unredacted copies all documents within its possession relative to the multi-million dollar sale of certain of Plaintiff's stores to Pep Boys in 2013.  The jury instruction

40

recommended in § B(1)(b), *supra*, provides an additional remedy. The Court also orders Plaintiff to reimburse Defendant for its costs relating to litigating this portion of the present motion for sanctions.

### 8.   Sales and internet records.

Defendant requested documents showing Plaintiff's pre-2007 use of the internet to sell tires. Plaintiff responded that documents produced in the RT litigation were the only ones that existed. Defendant continues that Sergio Andonian testified that "historical records relating to [Plaintiff's] sale of tires and wheels online are maintained in a database and that no one ever asked him - or to his knowledge, anyone else - to review that database for responsive documents. (Doc. 479, at 29; Doc. 479-3, at 40-41, 47.) Defendant complains that Plaintiff "[a]gain . . . misrepresented the thoroughness of its review for documents and prejudiced [Defendant's] ability to obtain discoverable information that could be dispositive to whether it ever owed coverage in the underlying case." (Doc. 479, at 29.)

As Plaintiff correctly points out, however, Sergio Andonian's testimony related to internet sales that *began* in October 2007. (Doc. 486, at 23; Doc. 479-3, at 40-41, 47.) Plaintiff argues that "[t]here is no evidence that [Plaintiff] sold tires online prior to October 2007, and there is no basis for [Defendant's] contention

that records of online sales exist from a time period during which there were no online sales." (Doc. 486, at 23.)

Defendant replies that Andonian's testimony related to sales via the discounttires.com website beginning in October 2007, but that Defendant is seeking information about Plaintiff's sales "through the DTC Motorsports website, which [Plaintiff] used for sales prior to 2007." (Doc. 488, at 25-26; *see also* Doc. 479-8, at 15-16.) Defendant also directs the Court to Sergio Andonian's testimony that he did not search for documents relating to Plaintiff's "eCommerce sales" in the context of this litigation and was never asked by anyone to do so." (Doc. 488, at 26; Doc. 479-3, at 46-48.) The cited portion of Andonian's testimony, however, again appears to relate to Plaintiff's eCommerce sales from 2007-on. (Doc. 479-3, at 46-48.)

The Court **GRANTS in part** this portion of Defendant's motion. This issue can be properly addressed by Plaintiff submitting a written response to the question and all supporting documents, **within thirty (30) days of the date of this Order**, signed and attested to by a representative of Plaintiff. Plaintiff is also ordered to reimburse Defendant's reasonable legal fees incurred in litigating this portion of the present motion.

**D.      Requested Sanctions.**

Fed. R. Civ. P. 37(b)(2) states that "[i]f a party . . . fails to obey an order to provide or permit discovery . . . the court where the action is pending may issue further just orders."  Sanctions enumerated by Rule 37(b) include:

> (I)   directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;
>
> (ii)  prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;
>
> (iii) striking pleadings in whole or in part;
>
> (iv)  staying further proceedings until the order is obeyed;
>
> (v)   dismissing the action or proceeding in whole or in part;
>
> (vi)  rendering a default judgment against the disobedient party . . . .

Subsection (b)(2)(C) of Rule 37 also allows the Court to order the "disobedient party" to pay reasonable expenses relating to the underlying motion.  The sanctions imposed should endeavor to remedy the violation and address the specific conduct to the extent possible.

In the context of the various misdeeds catalogued above, Defendant asks the Court to enter default judgment against Plaintiff on Defendant's counterclaim and

dismiss Plaintiff's claims against Defendant in their entirety. (*See* Doc. 479, at 30-31.) In the alternative, Defendant requests the following adverse inferences, instructions, and/or preclusive orders:

- An adverse inference or instruction that AKH failed to produce responsive documents and that AKH attempted to hide information from this Court;

- An Order that AKH is not permitted to adduce evidence in support of its claim for damages against Universal;

- An adverse inference or instruction that where AKH has been unable to produce responsive documents or states that such documents do not exist, such documents were intentionally destroyed and would have benefitted Universal and harmed AKH;

- An adverse inference or instruction that AKH withheld or obfuscated information sufficient to show that it moved or transferred all of its assets out of AKH to avoid liability or a damages award in this case;

- An adverse inference or instruction that AKH withheld or obfuscated information about its assets as part of its continuing efforts to conceal information from Universal;

- An adverse inference or instruction that any question AKH was unprepared to answer at its deposition would have benefitted Universal and harmed AKH;

- An adverse inference or instruction that AKH owned the DTCMotorsports.com website and that those records would have shown that AKH was selling tires and wheels through that website prior to 2007;

- An Order barring AKH from claiming that it lacks the

funds to satisfy a judgment or award; and

- An Order barring AKH from asserting at trial or in dispositive motions any affirmative defenses or claims that are impacted by the missing discovery.

(Doc. 479, at 31-32.) As addressed in footnote 2, *supra*, Defendant also requests that the *pro hac* admission of Vatche Chorbajian be revoked. *See **United States v. Howell***, 936 F. Supp. 774, 776 (D. Kan. 1996) (ordering revocation of *pro hac* status for counsel's continued "difficulties adhering to the court's ethical requirements").

Given the on-going pattern of misrepresentation and obfuscation by Plaintiff and its counsel in this matter, the Court finds the following sanctions to be measured and appropriate:

1.  As referenced above, Plaintiff is assessed attorney fees for Defendant's litigation of the specified portions of this motion. The Court orders the use of the procedure in D. Kan. Rule 54.2 to resolve the amount of this award.

2.  The undersigned Magistrate Judge **recommends** to the District Judge, as a sanction for the discovery abuses relating to the production of information concerning the financial worth of Plaintiff, that the District Court and the Jury be permitted, if punitive damages are

45

awarded, to consider Plaintiff's net worth unlimited for the purpose of evaluating the appropriate amount of punitive damages. An appropriate instruction in that regard should be given, tailored to address the substantive relevance of that consideration under the applicable law. Plaintiff should not be permitted to rebut that consideration either by evidence or argument.

3.    The Court also orders Plaintiff to produce documents, as well as provide responses verified by a representative of Plaintiff, as more fully set forth above. This shall occur **within thirty (30) days of the date of this Order**.

IT IS THEREFORE ORDERED that Defendant's Motion for Sanctions (Doc. 478) is **GRANTED in part** as more fully set forth above.

**IT IS SO ORDERED**.

IT IS THEREFORE RECOMMENDED to the District Judge that a Jury Instruction, as generally described *supra*, be given at trial and the recommended presumption be used during the consideration of dispositive motions (if applicable).

Pursuant to 28 U.S.C. §636(b)(1), Fed.R.Civ.P. 72, and D.Kan. Rule 72.1.4, the parties shall have **thirty (30) days** after service of a copy of these proposed

findings and recommendations to serve and file with the U.S. District Judge assigned to the case, any written objections to the findings of fact, conclusions of law, or recommendations of the undersigned Magistrate Judge.  Any party's failure to file such written, specific objections within the fourteen-day period will bar appellate review of the proposed findings of fact, conclusions of law, and the recommended disposition.

**IT IS SO RECOMMENDED.**

Dated this 14th day of November, 2017.

 S/ KENNETH G. GALE
Kenneth G. Gale
United States Magistrate Judge