# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| AKH COMPANY, INC., | |
| Plaintiff, | |
| v. | Case No. 13-2003-JAR-KGG |
| UNIVERSAL UNDERWRITERS INSURANCE CO., | |
| Defendant. | |

## MEMORANDUM AND ORDER

This is an insurance coverage dispute filed by AKH Company, Inc. ("AKH") against its insurance carrier, Universal Underwriters Insurance Company ("UUIC"), arising out of a trademark infringement action between AKH and a third party that UUIC defended and settled under a reservation of rights ("RT litigation"). UUIC counterclaimed, and both parties amended to assert various tort and contract theories. This Court recently allowed UUIC leave to amend to add several additional parties to its Counterclaim, and to add two additional counterclaims against AKH and these additional parties for alter ego liability and fraudulent transfer.[1] The new claims were based on allegations that after this lawsuit was filed, AKH diverted its assets to these related parties in order to avoid any potential judgment in this case.

In response to the motion for leave to amend, AKH argued in part that the proposed amendment was futile because there was no personal jurisdiction over the proposed new parties. The Court declined to take up this argument in the context of a motion for leave to amend, and preliminarily found UUIC had alleged a prima facie case of personal jurisdiction in its proposed

---

[1]Doc. 515.

pleading. But the Court expressly deferred ruling on the issue until it could be properly briefed.[2]

Now before the Court is a Motion to Dismiss (Doc. 532) under Fed. R. Civ. P. 12(b)(1) and 12(b)(2), filed by Counter-Defendants AKH; Andonian Enterprises, Inc.; 55, Inc.; Tirenetwork Group, Inc.; Andy Andonian; and Hratch Andonian. The motion is fully briefed and the Court is prepared to rule. As described more fully below, the Court denies the motion to dismiss.

## I. Subject Matter Jurisdiction

The counter-defendants argue first that the Court lacks subject matter jurisdiction over Counts XIV and XV (fraudulent transfer and alter ego) because they are not "sufficiently related to the pending claims," under 28 U.S.C. § 1367(a).[3] Under the statute, once the Court has original jurisdiction over some claims, supplemental jurisdiction extends to "other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder . . . of additional parties."[4] A claim or counterclaim "is part of the same case or controversy if it 'derive[s] from a common nucleus of operative fact.'"[5]

This Court has already disposed of this argument in ruling on the motion to review Judge Gale's Order denying leave to amend. In so ruling, the Court found that the new claims were part of the same transaction and occurrence as the original claims in this case. The counter-defendants suggest that the "same transaction or occurrence" standard under the Federal Rules is more liberal than the case or controversy standard under § 1367. But they have it backwards.

---

[2]*Id.* at 11.

[3]Doc. 533 at 1.

[4]28 U.S.C. § 1367(a).

[5]*Price v. Wolford*, 608 F.3d 698, 702–03 (10th Cir. 2010) (quoting *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 165 (1966)).

2

"[T]he 'common nucleus' test is broader than the 'transaction or occurrence' test used in the Civil Rules. . . . In practice, § 1367(a) requires only that the jurisdiction-invoking claim and the supplemental claim have some loose factual connection."[6] Therefore, claims that meet the "same transaction or occurrence test" under the Federal Rules will satisfy § 1367.[7] For the same reasons the Court found that the new claims are part of the same transaction or occurrence as the original claims in its April 30, 2018 Memorandum and Order,[8] the Court finds that the new claims are part of the same case or controversy under § 1367(a).

## II. Personal Jurisdiction

### A. Standard

Andonian Enterprises, Inc. ("AEI"); 55, Inc.; Tirenetwork Group, Inc. ("TNG"); Andy Andonian; and Hratch Andonian (collectively, "the new counter-defendants") challenge this Court's personal jurisdiction. Both sides of the dispute misstate the applicable standard. UUIC has the burden of establishing personal jurisdiction over the new counter-defendants.[9] In the absence of an evidentiary hearing, as in this case, the party asserting jurisdiction must make only a prima facie showing to defeat a motion to dismiss.[10] This showing is "light."[11] "The plaintiff may make this prima facie showing by demonstrating, via affidavit or other written materials,

---

[6] 13D Charles Alan Wright, et al., FEDERAL PRACTICE AND PROCEDURE § 3567.1 (3d ed. 1998 & Apr. 2018 update).

[7] *Id.*; *see also Price*, 608 F.3d at 703 (finding claim for share of settlement proceeds arose out of same claim or controversy as underlying tort claims); *Edward v. Doe*, 331 F. App'x 563, 568–71 (10th Cir. 2009) (finding fee dispute between attorneys was part of the same case or controversy as original claims for personal injury).

[8] Doc. 514 at 12–14.

[9] *Shrader v. Biddinger*, 633 F.3d 1235, 1239 (10th Cir. 2011).

[10] *AST Sports Sci., Inc. v. CLF Distrib. Ltd.,* 514 F.3d 1054, 1056–57 (10th Cir. 2008); *Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995).

[11] *Racher v. Lusk*, 674 F. App'x 787, 789 (10th Cir. 2016) (quoting *Wenz*, 55 F.3d at 1505).

facts that if true would support jurisdiction over the defendant."[12] Allegations in the counterclaim are accepted as true if they are plausible, non-conclusory, and non-speculative, to the extent that they are not controverted by submitted affidavits.[13] When a defendant has produced evidence to support a challenge to personal jurisdiction, a plaintiff has a duty to come forward with competent proof in support of the jurisdictional allegations of the complaint.[14] The court resolves all factual disputes in favor of UUIC.[15] "In order to defeat a plaintiff's prima facie showing of jurisdiction, a defendant must present a compelling case demonstrating 'that the presence of some other considerations would render jurisdiction unreasonable.'"[16]

Thus, the new counter-defendants' assertion that Plaintiff must establish more than a prima facie showing of personal jurisdiction is incorrect. Absent an evidentiary hearing, a prima facie showing is all that is required. But UUIC is also incorrect to suggest that (1) the Court's April ruling somehow precludes the new counter-defendants' renewed challenge to personal jurisdiction in this motion; and (2) it need not submit proof in support of its jurisdictional allegations in the amended counterclaim, to the extent its allegations are challenged by competent proof submitted by the new counter-defendants.[17] The Court must not accept as true

---

[12]*Emp'rs Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1159 (10th Cir. 2010) (citing *TH Agric. & Nutrition, LLC v. Ace European Grp. Ltd.*, 488 F.3d 1282, 1286 (10th Cir. 2007)); *OMI Holdings, Inc. v. Royal Ins. Co. of Can.*, 149 F.3d 1086, 1091 (10th Cir. 1998).

[13]*Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)); *Pytlik v. Prof'l Res., Ltd.*, 887 F.2d 1371, 1376 (10th Cir. 1989); *Behagen v. Amateur Basketball Ass'n of U.S.A.*, 744 F.2d 731, 733 (10th Cir. 1984), *cert. denied*, 471 U.S. 1010 (1985).

[14]*Pytlik*, 887 F.2d at 1376; *see also Shrader*, 633 F.3d at 1248.

[15]*Dudnikov*, 514 F.3d at 1070. Generally, conflicting affidavits are also resolved in the plaintiff's favor, and "the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party." *Behagen*, 744 F.2d at 733. Because UUIC did not submit affidavits, this rule does not apply.

[16]*OMI Holdings*, 149 F.3d at 1091 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)).

[17]*See, e.g.*, *Luc v. Krause Werk GMBH & Co.*, 289 F. Supp. 2d 1282, 1287 (D. Kan. 2002) ("When *both* parties produce supporting evidence, 'the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party.'" (emphasis added) (quoting *Intercon, Inc. v. Bell Atl. Internet Solutions, Inc.*, 205 F.3d 1244, 1247 (10th Cir. 2000)).

UUIC's factual allegations in the counterclaim that are controverted by the new counter-defendants' evidence. With the correct standards in mind, the Court proceeds to consider the factual record and UUIC's assertion of personal jurisdiction on that record.

**B.     Background**

**1.     Procedural History**

AKH filed this case on January 2, 2013, seeking, *inter alia*, declaratory relief that UUIC had a duty to defend and settle the RT litigation. UUIC answered and brought counterclaims for declaratory relief and breach of contract arising out of its defense and settlement of the RT litigation. UUIC also immediately sought transfer of this case to the Central District of California. After considering the requisite factors, the Court sided with AKH and denied transfer, finding no countervailing factors that outweighed AKH's choice of Kansas forum. In November 2014, both parties added tort claims based on the other's alleged conduct before, during, and after settlement of the RT litigation.

Numerous discovery disputes ensued, interfering with the Court's ability to guide this case to trial in a timely manner. Most recently, discovery by UUIC into AKH's finances, in furtherance of UUIC's claim for punitive damages, revealed that AKH allegedly transferred its assets to other entities owned by its co-owners, brothers Hratch and Andy Andonian, to avoid any judgment that may be awarded to UUIC in this case. The fraudulent conveyance claim asserts that AKH is "essentially a shell at this point, serving no purpose other than to litigate this action. AKH is systematically devaluing itself which could result in AKH's potential inability to pay any judgment against it for its tortious and other misconduct."[18] The alter ego claim asks the Court to disregard the legal fiction of corporate separateness and treat AKH and the new counter-

---

[18]Doc. 515 ¶ 263.

5

defendants as alter egos of one another. The claim alleges various ways in which the new counter-defendants have transferred assets and diluted AKH, and argues that treating them all separately "would serve as a cover for fraud and illegality and promote an injustice."[19]

### 2. Jurisdictional Facts

Drawing all reasonable inferences in favor of UUIC, the following relevant facts are taken from the Fifth Amended Counterclaim, and the exhibits attached to the new counter-defendants' brief in support of the motion to dismiss.[20]

AKH has operated wholesale and retail tire and wheel distribution and automotive service centers in California under the name "Discount Tire Centers" since 1976. For all periods relevant to this litigation, AKH was owned by brothers Andy and Hratch Andonian. Andy holds a 55% interest and Hratch holds a 45% interest in this California corporation. In 2011–12, AKH had approximately 200 employees. Darrel Whitehead, CPA, was hired by AKH as its accountant in 2012, and met with the Andonians for the first time in October 2012. At that meeting, the Andonians advised they wanted to "go their separate ways," and asked him to help them.[21] Whitehead's first task was to perform a valuation of AKH, and he determined it was worth $13 million.[22]

In June 2012, Andy established TNG, a California corporation wholly owned by him. Andy is also the Chairman. In December 2012, AKH sold its wholesale and e-commerce

---

[19]*Id.* ¶ 277.

[20]The exhibits attached to Doc. 533 are: (A) Darrel Whitehead, CPA's deposition transcript; (B) Hratch Andonian's March 8, 2017 deposition transcript; (C) Hratch Andonian's affidavit and attached Asset Purchase Agreement between 55, Inc. and AKH; (D) Hratch Andonian's April 7, 2016 deposition transcript; and (E) Andy Andonian's affidavit and attached Asset Purchase Agreements between AKH Company LLC, and Andonian Enterprises, Inc. and between Tirenetwork Group, Inc. and AKH.

[21]Doc. 533-1, Ex. A at 29:9–10.

[22]*But see* Doc. 533-1 at 66:11–14 (Whitehead referring to AKH as "an $80 million company").

business to TNG in exchange for $2,165,879, to become effective on January 1, 2013, the day before AKH filed this action. The agreement included AKH's tire inventory and fixed assets. Hratch signed this Asset Purchase Agreement on behalf of AKH, and Andy signed on behalf of TNG. The sale was for less than fair market value. Although TNG paid for the value of inventory transferred, it did not pay additional consideration for receipt of the wholesale division or e-commerce business. The purchase price was wired by AKH to TNG over a series of several transfers that AKH cannot explain. TNG now operates a wholesale business for the sale of tires and wheels. In 2013, TNG's sales increased from $0 to eight figures.

At some point after this transaction, Whitehead helped transfer at book value all of the Discount Tire Centers stores owned by AKH to AKH Company, LLC ("the LLC"), a Nevada LLC created by Whitehead as a tax savings device. Andy and Hratch are the managing members of the LLC. "The LLC owners own the same percentage."[23] AKH and the LLC share the same business address on Anaheim Blvd. in Anaheim, California.

Even though AKH signed a Plan of Conversion and transferred most of its assets to the LLC, AKH continues to exist as a corporate entity and files tax returns, although the most recent tax returns show no current income. Minimal assets remained with AKH after the 2013 transfer, except for the $5 million insurance payment AKH received from UUIC in 2012, which was recorded as a "deferred revenue item." Hratch testified by deposition that "now we just manage the day-to-day, some of the legal matters, obviously. The tax returns and—and if there are any other things—it's on hold because of all this situation right now. We're not really doing much other than trying to manage it right now."[24] AKH has no revenue, but it has legal and other

---

[23]*Id.* at 39:1.

[24]Doc. 533-2, Ex. B at 31:14–20.

expenses. Hratch testified that the expenses are paid by corporate credit cards, and paid off by personal loans and lines of credit obtained by Hratch and Andy in their individual capacities. AKH currently only has two employees: Hratch and Andy. In 2016, Hratch testified that "depending on the year," he and Andy each draw an annual salary of $200,000.

After the asset transfer to the LLC, Pep Boys, Manny, Moe & Jack ("Pep Boys"), a competitor, negotiated a sale for AKH's "best" Discount Tire Centers stores. In August 2013, Pep Boys purchased from the LLC eighteen stores for approximately $10 million. The cash "flowed through an account that was set up for just that transaction at Charles Schwab."[25] Whitehead does not know whose name was on the Charles Schwab account, but admits that the accounts for AKH and the LLC often comingled.

On October 1, 2013, the LLC sold to 55, Inc. two Discount Tire Centers stores at book value. 55, Inc. was created on August 7, 2013, and is wholly-owned by Hratch; he draws an annual salary of about $100,000 from this entity. The Asset Purchase Agreement was signed by Hratch on behalf of 55, Inc., and by both Hratch and Andy on behalf of the LLC as managers. The same attorney represented both parties for this sale.

Also on October 1, 2013, counter-defendant AEI purchased seventeen Discount Tire Centers stores from the LLC "at book value."[26] Hratch testified by deposition that AEI paid approximately $1 million for these stores. AEI was created on September 10, 2013, and is wholly-owned by Andy. It absorbed at least one AKH employee. AEI has the same business address as AKH and the LLC. The Asset Purchase Agreement was signed by Andy on behalf of

---

[25]Doc. 533-1, Ex. A at 62:13–16.

[26]Although the new counter-defendants introduced this Asset Purchase Agreement, the list attached to the schedule of stores is not included. Therefore, the Court assumes as true UUIC's allegation that the sale was for seventeen stores, which is corroborated by Hratch's deposition testimony. *See* Doc. 533-2, Ex. B at 30:3–11.

8

AEI, and by both Hratch and Andy on behalf of the LLC as managers. The same attorney represented both parties for this sale. AEI now owns the Discount Tire Centers name. 55, Inc. pays a licensing fee to AEI for the use of the name, but there is no written licensing agreement. Although AEI and TNG are both owned by Andy, they are different types of business that maintain different vendors, advertising, and day-to-day decisions. They keep separate records and bank accounts. AEI is a client of TNG.

The sales of Discount Tire Centers stores by the LLC to AEI, and 55, Inc. were for less than fair market value.

The tax returns for AKH's show a decline in sales income from eight figures in 2012 to essentially $0, yet the cumulative recent sales by AEI, TNG, and 55, Inc. are comparable to what AKH's sales income was when this litigation began, even accounting for AKH's settlement with and sale to two competitors in 2012 and 2013.

Additionally, the counter-defendants exchanged numerous loans and contributions among each other that were not documented, and their funds were often commingled.[27] AKH pays its current obligations and debts through contributions from its owners or their business entities. All counter-defendants routinely wire money to and from each other to pay debts and other liabilities. Although Whitehead maintains that the accounting for each of the counter-defendants was maintained separately, in some instances, "for administrative ease," the Andonians would use the AKH bank accounts to operate their individual businesses.

AKH took steps to conceal AKH's conversion of assets to the LLC, and sales of the Discount Tire stores; it never disclosed to UUIC or to this Court that it had reorganized or that it

---

[27]UUIC's allegation of comingling is supported by both Whitehead's and Hratch's deposition testimony. *See* Doc. 533-1, Ex. A at 66:19–67:22; 533-2, Ex. B. at 32:3–34:16.

9

had transferred or sold its assets. These facts only came to light through the depositions of AKH and AKH's accountants in March and May 2017 and through the production of documents by AKH and AKH's accountants in the spring of 2017. Prior to those depositions and document productions, AKH's counsel told UUIC that the LLC was created for an unrelated tax issue, that the various entities (who purchased or received AKH's assets) were not related to AKH or to this litigation, and provided inconsistent answers to UUIC regarding AKH's financial status or ability to satisfy a judgment.

### C. Discussion

Federal courts follow state law "in determining the bounds of their jurisdiction over persons."[28] To establish personal jurisdiction over a defendant, a plaintiff must show that jurisdiction is proper under the laws of the forum state and that the exercise of jurisdiction would not offend due process.[29] The Kansas long-arm statute is construed liberally so as to allow jurisdiction to the full extent permitted by due process, therefore the Court proceeds directly to the constitutional analysis.[30]

The due process analysis is comprised of two steps. First, the court must consider whether the defendant has such minimum contacts with the forum state "that he should reasonably anticipate being haled into court there."[31] If the requisite minimum contacts are found, the Court will proceed to the second step in the due process analysis—ensuring that the

---

[28] *Daimler AG v. Bauman*, 134 S. Ct. 746, 753 (2014).

[29] *Intercon, Inc. v. Bell Atl. Internet Sols., Inc.*, 205 F.3d 1244, 1247 (10th Cir. 2000).

[30] *Federated Rural Elec. Ins. Corp. v. Kootenai Elec. Coop.*, 17 F.3d 1302, 1305 (10th Cir. 1994) (citing *Volt Delta Res., Inc. v. Devine*, 740 P.2d 1089, 1092 (Kan. 1987)).

[31] *Emp'rs Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1159–60 (10th Cir. 2010) (citing *OMI Holdings, Inc.*, 149 F.3d at 1091).

exercise of jurisdiction "does not offend 'traditional notions of fair play and substantial justice.'"[32]

### 1. Minimum Contacts

"Minimum contacts" can be established in one of two ways, either generally or specifically for lawsuits based on the forum-related activities.[33] UUIC does not argue general jurisdiction, and the Court sees no basis for general jurisdiction given the factual allegations in the Counterclaim. Instead, UUIC alleges the new counter-defendants had minimum contacts with Kansas based on specific jurisdiction, as alter egos of AKH and given their alleged efforts to fraudulently avoid AKH's potential judgment in this case. The specific jurisdiction inquiry "focuses on the relationship among the defendant, the forum, and the litigation."[34] To establish minimum contacts, the "defendant's suit-related conduct must create a substantial connection with the forum State."[35] "Each defendant's contacts with the forum State must be assessed individually."[36]

#### a. Alter Ego

The question of jurisdiction over a nonresident defendant sued in diversity is determined by the law of the forum state.[37] Under Kansas law, "[a] corporation that transacts business through the instrumentality of an alter ego corporation is subject to service for causes of action

---

[32]*See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

[33]*Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1078 (10th Cir. 2008) (citations omitted).

[34]*Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014) (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984)).

[35]*Id.* at 1121–22.

[36]*Calder v. Jones*, 465 U.S. 783, 790 (1984).

[37]Fed. R. Civ. P. 4(e)(1)&(h); *Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995).

11

arising therefrom."[38] If the new counter-defendants are alter egos of AKH, then its contacts with Kansas may be attributable to them for purposes of personal jurisdiction.[39] In order to pierce the corporate veil and treat a nonresident corporate entity as the alter ego of a resident corporation, there must be a showing of "such domination of finances, policy, and practices that the controlled corporation has no separate mind, will, or existence of its own and is but a business conduit for its principal."[40] "Courts look to the following nonexhaustive factors for determining whether the corporate veil should be pierced under an alter ego liability theory:

> (1) whether the parent owns all or a majority of the capital stock of the subsidiary;
> (2) whether the parent and subsidiary have common directors or officers;
> (3) whether the parent finances the subsidiary;
> (4) whether the parent subscribes to all the capital stock of the subsidiary or otherwise causes its incorporation;
> (5) whether the subsidiary has grossly inadequate capital;
> (6) whether the parent pays the salaries or expenses or losses of the subsidiary;
> (7) whether the subsidiary has substantially no business except with the parent or no assets except those conveyed to it by the parent;
> (8) whether in the papers of the parent, and in the statements of its officers, 'the subsidiary' is referred to as such or as a department or division;
> (9) whether the directors or executives of the subsidiary do not act independently in the interests of the subsidiary but take direction from the parent; and
> (10) whether the formal legal requirements of the subsidiary as a separate and independent corporation are not observed.[41]

---

[38]*Cotracom Commodity Trading AG v. Seaboard Corp.*, 94 F. Supp. 2d 1189, 1195 (D. Kan. 2000).

[39]*See, e.g.*, *Ireland v. Dodson*, 250 F.R.D. 538, 543 (D. Kan. 2008).

[40]*Cotracom*, 94 F. Supp. 2d at 1195.

[41]*Id.* at 1195–96. UUIC challenges this analysis by arguing that it conflates the merits of the case with a jurisdictional analysis. But when a plaintiff asserts personal jurisdiction on the basis of alter ego liability, as UUIC does here, the Court must find determine whether there is a prima facie case of jurisdiction by evaluating the alter ego liability standards. *Id.* To do so is neither premature, nor an improper attempt to force a merits analysis on a Rule 12(b)(2) motion.

Here, AKH is owned by Hratch or Andy Andonian. The new corporate defendants are each wholly owned by either Hratch and Andy. UUIC alleges that TNG, AEI, and 55, Inc. were created by Hratch and Andy near in time to the filing of this lawsuit, and that their revenues depended on the asset purchases from AKH by and through the LLC. Although it is true that common ownership alone is insufficient to pierce the corporate veil,[42] UUIC's allegations go much further by maintaining that TNG, AEI, and 55, Inc. do not act independently. Hratch and Andy have moved money between AKH, the LLC, themselves, and their new entities, at times without documentation or explanation. These allegations also bear on the tenth factor, by suggesting that the legal requirements of the new corporate defendants as separate and independent are not observed. Contrary to the new counter-defendants' suggestion, UUIC's allegation of intermingling is not conclusory; it is supported by Whitehead's and Hratch's deposition testimony. Whitehead conceded that during the time when the LLC was created and the new entities were formed, things were moving quickly and there was some intermingling of bank accounts. And he cannot recall to whom the payment was made for the Pep Boys stores. Hratch admits to moving money in and out of AKH to deal with cash flow problems. He had no firsthand knowledge that these payments were documented appropriately, and deferred to his accountant about such matters.

UUIC also alleges that the asset purchases between AKH and its LLC to AEI, TNG, and 55, Inc. were not arms-length. The AEI and 55, Inc. asset purchase agreements were signed by the same individuals on behalf of both parties, and the same attorney represented both sides of the transactions. UUIC alleges that these transactions were for less than fair market value, and the moving parties do not controvert this allegation. Instead, their evidence demonstrates that the

---

[42]*See id.* at 1196.

transactions were for book value, which does not controvert the allegation that they were not sold for fair market value. There is no evidence in the record that the book value of these transactions equated to fair market value. Viewing the evidence and allegations in the light most favorable to UUIC, as the Court must, UUIC has demonstrated a prima facie case that AEI, TNG, and 55, Inc. are alter egos of AKH.

As to the individual counter-defendants, Hratch and Andy, it may be appropriate to pierce the corporate veil to avoid the well-established rule that the corporate structure generally insulates individual corporate representatives from the Court's jurisdiction "where the corporation is not a viable one and the individuals are in fact conducting personal activities and using the corporate form as a shield."[43] UUIC has alleged sufficient facts to establish a prima facie case that AKH is not viable, and that the Andonians conduct personal activities and use AKH as a shield to avoid any potential liability. Hratch admitted in his deposition that AKH has minimal assets after it converted all but the UUIC settlement to an LLC in late 2012 and 2013. It went from a company that employed about 200 people, to employing the Andonian brothers only. They each draw an annual salary of $200,000, even though the entire business is "on hold" pending the outcome of this lawsuit, and that they each pay AKH's legal liabilities with their own money, as well by transferring money between themselves, AKH, and their three new business entities. Accepting all inferences in favor of UUIC, the Andonians intentionally divested AKH of any assets that could be used to pay a potential judgment in this case just before and after it initiated this lawsuit. Then, they sold the most profitable Discount Tire Centers stores in exchange for a significant sum of money, and sold the remaining assets to the

---

[43]*Ten Mile Indus. Park v. W. Plains Serv. Corp.*, 810 F.2d 1518, 1527 (10th Cir. 1987) (quoting 4C Wright & Miller, et al., FEDERAL PRACTICE AND PROCEDURE § 1069 (1985 supp.)); *see also Luc v. Krause Werk GMBH & Co.*, 289 F. Supp. 2d 1282, 1287 (D. Kan. 2002).

Andonians' newly formed companies for less than fair market value in arms-length transactions. There is no evidence that the $10 million paid to AKH by Pep Boys was paid to AKH or the LLC.[44] The evidence submitted by Defendant indicates a Charles Schwab account was created for this transaction, but Whitehead cannot recall whose name the account was under. Therefore, this evidence does not defeat UUIC's allegation in the Counterclaim that this money was funneled through Hratch and Andy. These facts are sufficient to pierce the corporate veil for purposes of personal jurisdiction over the individual defendants.

Moreover, UUIC has alleged facts demonstrating that the failure to pierce the corporate veil would serve an injustice in this case. AKH concealed the facts surrounding the creation of the LLC and its subsequent transfers of almost all AKH assets to the Andonian brothers and their new corporations. The reorganization and transfers only came to light in the spring of 2017, despite repeated questions by UUIC about AKH's financial condition prior to that time. According to the well-pled facts in the Counterclaim, AKH has been drained of all assets that would allow it to pay a judgment in this matter if UUIC prevails, and those assets have been transferred to other companies owned by the same co-owners of AKH, who now enjoy revenue comparable to AKH's revenue before these transfers. For these reasons, the Court concludes that UUIC has made a prima facie case of minimum contacts based on AEI, TNG, and 55, Inc.'s status alter egos of AKH.

### b. Fraudulent Transfers

In addition to the alter ego theory of jurisdiction, UUIC argues that the facts alleged in support of its fraudulent transfer counterclaim support purposeful direction of conduct by the new counter-defendants aimed at Kansas. The Court agrees that UUIC has made a prima facie

---

[44]If paid to the LLC, there is no evidence as to how the payment was dispersed after the LLC dissolved.

showing of minimum contacts by all five additional counter-defendants on this basis. As the Tenth Circuit found in *Racher v. Lusk*, where a nonresident defendant deliberately strips a resident defendant company of assets in order to "deprive the plaintiffs from satisfying the judgments obtained in" the forum state, it constitutes purposeful direction of activities at residents of the forum state.[45] Accepting the well-pled allegations as true, the new counter-defendants deliberately schemed to deprive AKH of its assets, with knowledge of the claims in this case. They then misled UUIC about the 2012 and 2013 transfers and sales, and obfuscated the purpose and relationship of the new companies in relation to AKH. By directing the creation of the LLC and new corporations that would absorb all meaningful assets of AKH, rendering it nonviable save for legal liabilities, the new counter-defendants purposefully directed their activities toward the forum state, causing injury here.

Counter-defendants object that the *Racher* decision and other cases focusing on fraudulent transfers as a basis for personal jurisdiction require a prior judgment. Since any judgment in this case is only potential, they argue that alleged fraudulent transfers cannot form the basis of this Court's personal jurisdiction. The Court disagrees. First, the facts in *Racher* included a fraudulent transfer by the nonresident defendant before the judgment at issue was entered.[46] Second, nothing in the court's minimum contacts analysis suggests the prior entry of judgment was required to show purposeful direction of activity aimed at the forum state.[47] In addition to UUIC's alter ego basis for jurisdiction, the Court agrees that the facts alleged in

---

[45] 674 F. App'x 787, 791–92 (10th Cir. 2016).

[46] *Id.* at 788.

[47] As UUIC points out, under California law, a plaintiff can maintain a fraudulent transfer claim based on a potential judgment. *See* Cal. Civ. Code §§ 3439.01(b), 3439.04(a).

16

support of fraudulent transfer support a prima facie case of personal jurisdiction against the new counter-defendants.

### 2. Reasonableness

Having determined that Defendant has the requisite minimum contacts, the Court must determine whether subjecting Defendant to jurisdiction in Kansas would offend traditional notions of fair play and substantial justice.[48] Once a plaintiff has made a minimum contacts showing, a defendant "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable."[49] This requires weighing the following factors: (1) the burden on defendant; (2) the forum state's interest in resolving the dispute; (3) the plaintiff's interest in receiving convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental substantive social policies.[50] Further, in this second step of the analysis, the court should consider the strength of the defendant's minimum contacts.[51] If these factors are strong, they may serve to establish the reasonableness of jurisdiction even if plaintiff's showing of minimum contacts is weak.[52] Conversely, "the weaker the plaintiff's showing on minimum contacts, the less a defendant need show in terms of unreasonableness to defeat jurisdiction."[53]

---

[48] *See Emp'rs Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1161 (10th Cir. 2010).

[49] *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985).

[50] *Emp'rs Mut. Cas. Co.*, 618 F.3d at 1161.

[51] *TH Agric. & Nutrition, LLC v. Ace European Grp. Ltd.*, 488 F.3d 1282, 1292 (10th Cir. 2007).

[52] *OMI Holdings, Inc. v. Royal Ins. Co*, 149 F.3d 1086, 1095 (10th Cir. 1998); *Pro Axess, Inc. v. Orlux Distrib., Inc.*, 428 F.3d 1270, 1280 (10th Cir. 2005).

[53] *Trujillo v. Williams*, 465 F.3d 1210, 1221 (10th Cir. 2006) (quoting *Pro Axess, Inc.*, 428 F.3d at 1280).

The balance of factors weighs in favor of UUIC. Although the new counter-defendants are all located in California, the corporate entities are wholly owned by the same co-owners of AKH, who have been involved in this five-year-old case from the beginning. To be sure, AKH initiated this action in Kansas, relying on UUIC's contacts with the forum state. It has argued at various points during this litigation that the lawsuit's connections to Kansas are stronger than California by objecting to UUIC's motion to transfer this case to California, and by arguing for application of Kansas law based on the location of certain aspects of the insurance contract formation and performance. Moreover, while defending this action in Kansas would certainly impose some burden, "defending a suit in a foreign jurisdiction is not as burdensome as in the past," so the Court finds that this factor weighs in favor of UUIC.[54]

The Court finds that the second factor also weighs in favor of Plaintiff, as Kansas has an interest in resolving disputes involving residents of its state.[55]

The next two factors weigh firmly in favor of UUIC. Although the Court is certain that UUIC could receive effective relief in another forum, litigating this action in Kansas is obviously more convenient for all parties given the existing litigation.

The fourth factor considers the interstate judicial system's interest in obtaining the most efficient resolution of controversies. "The key points to consider when evaluating this factor are (1) the location of witnesses, (2) the location of the wrong underlying the lawsuit, (3) what forum's law applies, and (4) 'whether jurisdiction is necessary to prevent piecemeal litigation.'"[56] This Court previously considered similar factors when denying UUIC's motion to

---

[54]*See AST Sports Sci., Inc. v. CLF Distrib. Ltd.*, 514 F.3d 1054, 1061 (10th Cir. 2008).

[55]*See OMI Holdings, Inc.*, 149 F.3d at 1096 ("The state's interest is also implicated where resolution of the dispute requires a general application of the forum state's law.").

[56]*Pro Axess, Inc. v. Orlux Distr., Inc.*, 428 F.3d 1270, 1279 (10th Cir. 2005) (quoting *OMI Holdings, Inc.*,

transfer this case to California, finding that they weighed against transfer. Moreover, the judicial system's interest in avoiding piecemeal litigation weighs heavily in favor of UUIC given the original claims that have been pending for over five years in Kansas.

As to the fifth factor—the shared interest of the several states in furthering fundamental social policies—nothing suggests that this is relevant in the instant case and therefore the Court does not address it.

Considering all the above factors and the minimum contacts in this case, the Court concludes the new counter-defendants have not established a compelling case that this Court's exercise of jurisdiction would offend traditional notions of fair play and substantial justice.

### D. Request for Bifurcation

Counter-defendants alternatively argue that the Court should bifurcate trial on the newly-added claims, only trying those claims if judgment is entered on the original claims. They argue that trying the fraudulent transfer and alter ego claims along with the original claims would be prejudicial. As the Court previously recognized, there is overlapping proof and testimony on the additional claims and the original counterclaims involving a prayer for punitive damages, which may render bifurcation inefficient and unworkable. Nonetheless, the Court concludes that it is premature to decide this issue. The counter-defendants may renew their request in the form of a pretrial motion in limine.

**IT IS THEREFORE ORDERED BY THE COURT** that the counter-defendants' Motion to Dismiss (Doc. 532) is **denied**.

**IT IS SO ORDERED.**

Dated: August 29, 2018

---

149 F.3d at 1097).

S/ Julie A. Robinson
JULIE A. ROBINSON
CHIEF UNITED STATES DISTRICT JUDGE