# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

AKH COMPANY, INC.,

      **Plaintiff,**

      **v.**

UNIVERSAL UNDERWRITERS INSURANCE
CO.,

      **Defendant,**

**and**

UNIVERSAL UNDERWRITERS INSURANCE
CO.,

      **Counter-Claimant**

      **v.**

AKH COMPANY, INC., ANDONIAN
ENTERPRISES, INC., 55, INC.,
TIRENETWORK GROUP, INC., TRADE CO,
LLC, ANDY ANDONIAN, AND HRATCH
ANDONIAN,

      **Counter-Defendants.**

Case No. 13-2003-JAR -KGG

## MEMORANDUM AND ORDER

Before the Court is Defendant/Counter-Claimant Universal Underwriters Insurance Co.'s ("UUIC") most recent Motion for Sanctions (Doc. 601), which includes a request for dismissal. The motion is fully briefed and the Court is prepared to rule. As described more fully below, the Court grants in part the motion and awards UUIC fees and costs. The Court also grants UUIC's request that adverse inference instructions be read to the jury at trial. UUIC's request for case-terminating sanctions is denied.

# I.    Standards

UUIC brings this motion under Fed. R. Civ. P. 26, 33, 34, and 37.[1]  UUIC's

memorandum in support argues that sanctions should be awarded under Rule 37(b)(2).  UUIC

references and quotes Rule 37(b) and states "AKH's continuous discovery misconduct

throughout this final stage of discovery . . . warrants sanctions."[2]  Rule 37(b) governs a party's

failure to comply with a *court order* and lists several permissible sanctions for such violations:

> (i) directing that the matters embraced in the order or other
> designated facts be taken as established for purposes of the action,
> as the prevailing party claims;
>
> (ii) prohibiting the disobedient party from supporting or opposing
> designated claims or defenses, or from introducing designated
> matters in evidence;
>
> (iii) striking pleadings in whole or in part;
>
> (iv) staying further proceedings until the order is obeyed;
>
> (v) dismissing the action or proceeding in whole or in part;
>
> (vi) rendering a default judgment against the disobedient party; or
>
> (vii) treating as contempt of court the failure to obey any order
> except an order to submit to a physical or mental examination.[3]

But UUIC does not offer any evidence that AKH violated a court order.  In fact, UUIC maintains

that "a ninth motion to compel, though warranted, would be ineffective and could actually harm

Universal by compelling it to engage in unending discovery."[4]

---

[1] Under local rule, the parties are required to meaningfully meet and confer before filing a motion under Rule 26 or 37.  D. Kan. R. 37.2.  UUIC's opening brief explains that the parties "have met and conferred extensively by phone, letter, and email on these issues."  Doc. 602 at 4.  This satisfies the conference requirement.

[2] Doc. 602 at 18.

[3] Fed. R. Civ. P. 37(b)(2)(A).

[4] Doc. 602 at 4.

Since UUIC does not contend that AKH violated a court order, it must demonstrate that Rule 37(c), rather than Rule 37(b), applies. Rule 37(c) governs a party's "[f]ailure to disclose, to supplement an earlier response, or to [a]dmit." Rule 37(c)(1) provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e)," then the party is not allowed to use the witness or information on a motion or at trial

> unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:
>
> (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;
>
> (B) may inform the jury of the party's failure; and
>
> (C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)—(vi).[5]

In the reply brief, UUIC suggests that the Court may impose sanctions under its inherent authority.[6] Because this ground for sanctions was raised for the first time in reply, the Court may not consider it without allowing AKH an opportunity to file a surreply.[7] Given the impending dispositive motion deadline, and the Court's previously-stated dedication to keeping this case on track for its November trial date, the Court declines to reopen briefing. The Court therefore confines its analysis to the original request for sanctions under Rule 37.

## II.    Discussion

UUIC argues that three discovery violations require imposition of sanctions: (1) the Counter-Defendants wrongfully withheld check registers and deposit lists from production until recently; (2) AKH recently attempted to change its long-standing response to a discovery in

---

[5]Fed. R. Civ. P. 37(c)(1).

[6]*See Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45 (1991).

[7]*See Pippin v. Burlington Res. Oil & Gas Co.*, 440 F.3d 1186, 1192 (10th Cir. 2006).

which it stated that it has no assets; and (3) AKH "dumped" more than 68,000 documents from ex-employee Michael Schaeper's computer, including documents that appear to have been wrongfully withheld from earlier responses to UUIC's requests for production. The Court addresses each in turn.

## A. Check Registers and Deposit Lists

### 1. Background

In November 2015, UUIC issued a Request for Production ("RFP") to AKH for "all documents sufficient to show AKH's profits, losses, revenue, bank statements, and income for the last 5 years, including 2015."[8] AKH objected that the request was overly broad, but produced corporate bank statements for the years 2011, 2012, and 2013.[9] By October 17, 2016, Magistrate Judge Gale found good cause to grant UUIC's request to designate a forensic accounting/damages expert after the deadline expired for expert designations, due to "Plaintiff's stonewalling tactics and failures to be forthcoming with discovery," on the topic of AKH's net worth.[10]

In a January 30, 2017 letter from UUIC to AKH, UUIC's counsel requested on its expert's behalf financial documents that AKH would have provided to its tax preparer or accountant, showing losses, profits, revenues, and costs. Counsel referenced "AKH's previous position . . . that it possessed absolutely no accounting information other than its bank statements," but indicated that there was still missing a general ledger of AKH's transactions and copies of checks written from the bank accounts.[11] Counsel for AKH responded that "AKH does

---

[8]Doc. 413-1 at 3.

[9]Doc. 413-2 at 4–5.

[10]*See* Doc. 451 at 11–12.

[11]Doc. 602-2 at 3.

not maintain a general ledger program for its business any longer.  All documents responsive to this request in its possession have been produced."[12]  AKH's counsel offered to contact the bank to obtain copies of the requested checks.

In March 2017, UUIC deposed AKH's corporate representative, Hratch Andonian.  Mr. Andonian did not know the answers to specific questions about AKH's finances, and "conceded . . . that [the] canceled checks would be the only way to identify how AKH spent its money."[13]

For example:

> 13 [Q.] If you look on that page, there's a section
> 14 titled "Checks Presented Conventionally."
> 15 Do you see that?
> 16 A. Yes.
> 17 Q. And then there are all those checks listed
> 18 right below there?
> 19 A. Yes.
> 20 Q. How would we find out what all of these
> 21 checks were for or who they were paid to?
> 22 A. I suppose we could ask the bank to get us
> 23 the canceled checks.
> 24 Q. Okay.
> 25 A. Yeah.
>
> . . . .
>
> 3 [Q.] But I'm wondering if AKH also used any
> 4 written documents to record its accounting materials
> 5 like, you know, a checkbook ledger where you would
> 6 have a printout of the check and a record of who
> 7 checks were paid to and from?
> 8 A. Frankly, I don't remember having anything
> 9 like that because the -- again, on the MaddenCo
> 10 system was connected to the point of sale and the
> 11 data was in the MaddenCo system. So the only thing
> 12 would be the checks and the vendor invoices. Parts
> 13 houses, tire supplies, those are the invoices would
> 14 be when -- and they would be entered in the system
> 15 and to be paid.

---

[12]Doc. 602-3 at 4.

[13]Doc. 602-4 at 4.

> 16 That's the process.  I don't know if there
> 17 are any ledgers or -- I don't know that.[14]

On June 9, 2017, UUIC moved for sanctions based in part on AKH's failure to produce the checks AKH requested after this testimony.[15]  Judge Gale granted the motion on November 14, 2017, after finding that the checks were within the custody and control of AKH.[16]

On April 30, 2018, this Court granted UUIC's motion to amend its counterclaim to add Andy and Hratch Andonian, 55 Inc., TireNetwork Group, Inc. ("TireNetwork"), and Andonian Enterprises, Inc. ("AEI"), and to add claims for fraudulent conveyance and alter ego liability.[17] Additional, limited discovery ensued.  As part of that discovery, UUIC issued new RFPs to the Counter-Defendants, which included requests for net worth documents from 2011 to the present, and for documents sufficient to show the value or worth of any transfers between the Counter-Defendants.[18]  In August 2018, UUIC noted in a letter to AKH that ledger and accounting software records were still missing.  And during phone calls in September and November 2018, UUIC asked AKH for a proposal by which AKH could produce summary information that would not require UUIC to review bank statements and canceled checks.  AKH produced over 7,000 pages of check images alone for one bank account for the period of April 2012 to June 2015. Many of the check images include redacted payee information.

In a letter from UUIC to AKH dated December 21, 2018, UUIC informed AKH that certain recently-produced documents contradicted AKH's longstanding claim that it did not have a ledger or accounting report that would allow UUIC to more easily determine check payees:

---

[14]Doc. 602-6 at 212:13–25, 234:3–17.

[15]Docs. 478–79.

[16]Doc. 501.

[17]Doc. 514.

[18]Doc. 602-20.

> First, documents produced by AKH's accountant, Darrel
> Whitehead, include a tab labeled "MANUAL CHECK REGISTER
> LIST." This chart appears to list the check number, date, payee,
> and amount for some checks written in 2015. A similar chart was
> produced that identifies the same information for at least some
> checks written in 2014. Second, correspondence produced by
> AKH suggests reports can be run to show checks written. (See
> AKH_031135.) Finally, just this week Rene Peth, AKH's former
> CFO, testified that AKH can, or at least could, produce a report
> from the MaddenCo system that summarized checks written during
> a given date range, including check number, payee, and amount.
> Ms. Peth also noted that it was AKH policy to retain financial
> information for at least seven years. Please produce all manual
> check register lists or documents showing similar information, or,
> there are periods for which no such document was created or can
> now be created, please confirm the same in writing and explain
> why such summary materials are missing.[19]

On January 9 and 18, 2019, AKH and the other Counter-Defendants produced for the first

time check registers for 2011 to 2018, and deposit lists for 2013 to 2018. UUIC argues that this

new production creates even more questions, and now that discovery is effectively closed, it is

unable to resolve these questions through depositions or other follow-up discovery. UUIC

identifies the following issues: (1) the ledgers do not consistently state the purpose of the transfer

of money, so it is unclear whether payments listed relate to the alleged purchase of assets or

loans among the entities; (2) the document entitled "2013 AKH Deposits" appears to be

incomplete as the first chronological entry is in September 2013;[20] (3) Counter-Defendants 55

Inc., AEI, and TireNetwork produced check registers, but not deposit lists; (4) AEI's check

register for 2013 is incomplete and shows only entries dated September 29, 2013;[21] (5) 55 Inc.'s

check register for all years is completely unusable because of the manner in which it was

produced—the payee information and corresponding amount seem to appear over 500 pages

---

[19]Doc. 602-9 at 3.

[20]Doc. 602-10.

[21]Doc. 602-11.

apart because the columns of the native document did not fit on one page of the .pdf document that 55 Inc. produced; and (6) the Counter-Defendants' newly-produced ledgers are inconsistent with each other, raising questions as to the overall reliability of the documents.[22]

### 2. Ruling

The Court agrees that AKH's delay in producing the check ledgers and deposit lists before January 2019 evidences a failure to produce and/or supplement documents responsive to an RFP that was originally served on AKH in 2015. The history of UUIC's goose chase for these documents reveals a waste of judicial time and resources, a waste of the parties' time and resources, and has resulted in substantial prejudice to UUIC. Discovery has closed; dispositive motions are due on March 27, 2019. UUIC no longer has the ability to resolve the many inconsistencies it has gleaned from the January 2019 production; inconsistencies that go to the heart of their claims of fraudulent transfer and alter-ego liability. AKH's many explanations in the briefs come too late.

AKH and the Counter-Defendants respond that UUIC never specifically requested check registers or deposit lists in its RFPs. They concede that there were broad requests for financial information, but contend that since they objected that the requests were overly broad, they were not required to produce them. This argument ignores the many informal clarifying requests between 2015 and 2019 for these summary documents, the repeated representations by AKH that they did not exist, AKH's representations under oath by its corporate representative that such documents did not exist, its insistence that UUIC must pursue discovery of voluminous canceled checks and bank statements instead to determine net worth, and its decision to produce these

---

[22]As one of several examples, compare Doc. 602-12 (2014 deposit list for AKH showing payment from TireNetwork on January 17, 2014 for $18,095.63) with Doc. 602-13 (TireNetwork check register showing a check written to AEI on January 15, 2014 for $18,095.63).

documents only after being confronted by undeniable evidence that they existed after all. It is simply not credible to suggest that UUIC did not request these specific documents, or that they were not clearly responsive to net worth RFPs, including one directed at AKH in 2015, to which a duty to supplement under Rule 26(e) applies.

Next, AKH and the Counter-Defendants complain that their more than 21,000-page production regarding the flow of money between Counter-Defendants could not possibly be insufficient given its volume, and given that the documents were produced as they are kept in the ordinary course of business. But neither the volume of documents nor the fact that they were produced as they had been maintained disproves the fact that AKH and the Counter-Defendants' denied the existence of check registers and deposit lists until confronted by UUIC in January. The Counter-Defendants explain the different systems they used to maintain these lists over the years but fail to explain how these different systems explain the many issues identified by UUIC in its motion. For example, how does the fact that the entities maintained check registers in different software systems explain the wholesale failure to produce those check registers for certain years? As UUIC effectively sets forth in its briefing, this is but one of many questions raised by this late production, after years of AKH denying that such documents existed at all. Importantly, the biggest question raised by this production—the inconsistencies between the various Counter-Defendants' financial documents—is not addressed at all by the Counter-Defendants' response brief.

The Court finds that Rule 37(c) applies here because AKH and the Counter-Defendants failed to provide information required by Rule 26(a) and (e) by withholding check registers and deposit lists until January 2019, even though they were responsive to multiple RFPs, and despite UUIC's repeated follow-up requests.

### 3.    Sanctions

Under Rule 37(c)(1), AKH and the Counter-Defendants may not use wrongfully withheld information as evidence on a motion or at trial unless the failure to produce was "substantially justified or is harmless."  The Court considers the following factors when making this inquiry: "(1) the prejudice or surprise to the party against whom the [evidence] is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such [evidence] would disrupt the trial; and (4) the moving party's bad faith or willfulness."[23]

A rote application of these factors clearly weighs in favor of UUIC.  The prejudice to UUIC is high because of the amount of time and money spent deciphering bank statements and canceled checks based on AKH's repeated representations that such was the only way to determine its net worth, or the flow of money between AKH and the other Counter-Defendants. UUIC was required to file a motion to compel when those canceled checks were not forthcoming, and hired a forensic accountant to try to decipher the net-worth documents, without the assistance of any summary documents like a general ledger, check register, or deposit list. Many depositions were taken, including AKH's Rule 30(b)(6) depositions, without these documents, meaning that UUIC was never given the opportunity to clarify or follow-up on the many issues that the documents now present.  Given this posture, not only is the prejudice high, but AKH cannot cure the prejudice without completely derailing the case's schedule again—six years after it was originally filed.  As described throughout this section, the Court also finds AKH and the Counter-Defendants acted in bad faith.  There is simply no other credible way to explain the failure to produce these documents sooner.

---

[23]*Jacobsen v. Deseret Brook Co.*, 287 F.3d 936, 953 (10th Cir. 2002) (quoting *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999)).

Nonetheless, the Court is not inclined to prohibit introduction of these documents as evidence at trial, largely because UUIC should be able to point to the many inconsistencies in the record that it has documented in its motion. Instead, the Court will "inform the jury of the party's failure" to timely produce this information under Rule 37(c)(1)(B). UUIC also requests an adverse-inference instruction that any ambiguity or inconsistency in the check registers and deposit lists should be resolved in UUIC's favor. An adverse-inference instruction is permissible in federal court when, as here, "there exists an 'unexplained failure or refusal of a party . . . to produce evidence that would tend to throw light on the issues.'"[24] The Tenth Circuit has followed the Eighth Circuit's lead in considering whether the following factors are present to trigger the adverse-inference rule:

> (1) it appears that the documentary evidence exists or existed; (2) the suppressing party has possession or control of the evidence; (3) the evidence is available to the suppressing party, but not to the party seeking production; (4) it appears that there has been actual suppression or withholding of evidence.[25]

As documented above, all these factors are present here. The check registers and deposit lists for AKH existed at the time UUIC first requested AKH's net worth documents and at the time Mr. Andonian testified that UUIC would need to look at the bank statements and canceled checks to determine AKH's net worth and asset transfers. AKH had control of those documents and withheld them from production. AKH was given multiple opportunities after the initial RFP was issued in 2015 to produce the evidence or correct the record that summary documents did in fact exist, but it did not. Instead, it allowed UUIC to litigate these issues and hire an expert to make sense of the thousands of bank statements and canceled checks it produced to demonstrate

---

[24]*Gilbert v. Cosco Inc.*, 989 F.2d 399, 406 (10th Cir. 1993) (quoting *Gumbs v. Int'l Harvester, Inc*., 718 F.2d 88, 96 (3d Cir.1983)).

[25]*Id.* (quoting *Evans v. Robbins*, 897 F.2d 966, 970 (8th Cir.1990)).

AKH's net worth. By the time the summary documents were finally produced, it was too late for UUIC to conduct follow-up discovery to resolve issues and inconsistencies. An adverse inference instruction is thus warranted that when determining punitive damages, fraudulent conveyance, and alter ego liability, any inconsistencies in the check registers and deposit lists may be resolved in UUIC's favor.

Therefore, in accordance with the rule, instead of prohibiting the use of this evidence on a motion or at trial, the Court orders as follows: (1) payment of reasonable attorneys' fees and costs in litigating this motion, and the reasonable fees UUIC incurred retaining an expert to evaluate the bank statements and canceled checks, under Fed. R. Civ. P. 37(c)(1)(A); and (2) adverse-inference instructions shall be read to the jury regarding the Counter-Defendants' failure to timely produce these records under Fed. R. Civ. P. 37(c)(1)(B), and allowing them to resolve inconsistencies in favor of UUIC. The Court finds that these sanctions appropriately and proportionally address the Counter-Defendants' failure to timely produce these financial summary documents. They compensate UUIC for its expensive efforts in deciphering massive quantities of documents associated with bank statements and canceled checks, after repeated efforts to obtain summary documentation about AKH and the Counter-Defendants' many transfers of assets during the course of this lawsuit.

### B.     AKH's Assets

#### 1.     Background

Several years ago, AKH responded to UUIC's requests for admissions that it was not financially viable and that it would not be able to satisfy a $5 million judgment.[26] On November 6, 2015, UUIC followed up with RFPs seeking all documents that support these two

---

[26]Doc. 602-17 at 7 ¶¶ 25–26.

admissions.[27]  On March 8, 2017, Hratch Andonian testified as AKH's Rule 30(b)(6) corporate

representative.  UUIC designated the following matters, among other items, for the corporate

deponent's examination:

> 6. AKH's web presence and the advertising and sale of tires or
> wheels over the internet, including but not limited to its use,
> ownership, design, or awareness of the domain names
> discounttires.com and DTCmotorsports.com, as well as any other
> domain names used by AKH to advertise its business, offer to sell,
> and/or sell products over the internet.
>
> . . . .
>
> 16. Financial status, tax returns, loans, bank accounts, and financial
> transactions of AKH, including AKH's net worth, both at the time
> of the Settlement and at the present time.[28]

Mr. Andonian was not designated to testify about topic number 6—AKH's web

presence—but he was designated to testify about topic number 16.  At the beginning of his

deposition, UUIC's counsel went over the list of matters designated for deposition.  Mr.

Andonian answered "Yes," when asked if he was prepared to testify about topic number 16.[29]

He testified further:

> 14 Q. And so right now AKH does what?
> 15 A. Right now we just manage the day-to-day,
> 16 some of the legal matters, obviously. The tax
> 17 returns and -- and if there are any other things --
> 18 it's on hold because of all this situation right
> 19 now. We're not really doing much other than trying
> 20 to manage it right now.
> 21 Q. Does AKH have any revenue?
> 22 A. Not today.
>     . . . .
>
> Q. And so right now, AKH has no assets, but it

---

[27]*Id.*

[28]Doc. 602-19 at 11–12.  "Settlement" in this document presumably refers to the R-T litigation settlement that underlies the insurance dispute in this matter.

[29]Doc. 615-2 at 17:4–16.

14 still has liabilities; is that right?

15 A. No fixed assets, yes.[30]

He also testified that the "discounttires.com" ("DTC") website, once owned by AKH, was now owned by AEI. This testimony, along with other evidence, led to UUIC's assertion that AKH had transferred its assets in an effort to avoid a judgment in this matter. UUIC sought and was ultimately granted leave to join the other Counter-Defendants, alleging claims of fraudulent conveyance and alter-ego liability based on its theory that "AKH effectively devalued itself during this litigation to protect its assets from judgment."[31]

On October 2, 2018, after discovery reopened on the newly amended claims and parties, UUIC issued to AKH its Third Set of Interrogatories, which included Interrogatory No. 7: "To the extent you contend that AKH did not sell or transfer substantially all of its assets between 2012 and the present, state all facts supporting that contention."[32] On November 26, 2018, AKH responded with an objection to this interrogatory "to the extent it calls for a legal conclusion and invades attorney work product in that it seeks the mental impressions or theories of counsel."[33] On January 18, 2019, AKH supplemented that response as follows:

> Subject to prior objections, AKH has not sold or transferred all of its assets. For example, AKH still owns the rights and interests of its lawsuit against Universal. AKH also did not sell or transfer cash in its bank accounts, accounts receivable, the DTC domain name, or certain Intellectual Property, as that term is defined [i]n AKH_27675 (excluding the mark "Discount Tire Centers" and any variation thereof).[34]

---

[30]Doc. 602-6 at 31:14–22, 113:13–15.

[31]Doc. 615 at 7.

[32]Docs. 602-16 at 20; 571.

[33]Doc. 602-16 at 20.

[34]*Id.*

A few days later, on January 22, 2019, Andy Andonian testified at deposition that the DTC domain name is an asset owned by AKH, worth "upwards of $15 million."[35]  He stated that AKH never transferred the domain name to AEI, that AKH kept the domain name, and that "[h]opefully one of these days we'll sell that name."[36]  UUIC argues that this January 2019 discovery contradicts prior discovery aimed at minimizing AKH's value, and that AKH should be sanctioned.

### 2.    Ruling

The Court finds that AKH failed to timely supplement its discovery responses under Rule 26(e) with information that AKH owns the DTC domain name and did not transfer it to AEI.[37]  Under Rule 26(e), AKH had a duty to supplement the 2015 admission that it was not financially viable and could not satisfy a $5 million judgment.  It also had a duty to supplement the RFPs for documents in support of those admissions.  Moreover, AKH had a duty to correct Hratch Andonian's false deposition testimony that the DTC domain name had been transferred to AEI.

The Court further finds that under Rule 37(c)(1), this omission was neither substantially justified nor harmless.  Part of the basis for the last year of amendments and discovery was AKH's repeated representation that it was not financially viable.  Now that new counter-defendants have been added to this lawsuit, along with allegations of fraudulent conveyance, AKH reveals that it owns a $15 million asset.  Its ownership of this asset was material and should have been disclosed before January 2019.

---

[35] Doc. 615-3 at 161:14–15.

[36] *Id.* at 161:2–3.

[37] *See* Fed. R. Civ. P. 26(e)(1) (requiring that the supplement or correction be filed "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect."); *see also* Fed. R. Civ. P. 30(e)(1) (allowing deponent to request time to review deposition transcript and make changes to form or substance).

AKH argues that it never changed its position on asset ownership. First, it argues that "AKH never stated under oath it sold or transferred substantially all of its assets."[38] But this is a red herring. Even if AKH never made this statement verbatim, its admissions went a step further, contending that it was not financially viable. AKH also admitted that it could not satisfy a $5 million judgment—a statement that is directly contradicted by new evidence that it never transferred an asset worth three times that amount. Moreover, the interrogatory asks: "*To the extent* you contend that AKH did not sell or transfer substantially all of its assets between 2012 and the present" state all facts supporting the contention.[39] AKH fails to explain why it took two months to answer this interrogatory with information about the DTC domain name, or to respond that it did not sell or transfer substantially all its assets. Moreover, Hratch Andonian's March 2017 deposition, which of course includes statements made under oath, corroborated AKH's admissions about its lack of assets when he testified on behalf of the company that AKH had no revenue and no "fixed assets." AKH responds that a domain name is not a fixed asset. But Hratch Andonian also testified that AKH *transferred the DTC domain name to AEI*, a claim directly contradicted by AKH's recent supplemental response to Interrogatory No. 7, and by Andy Andonian's deposition testimony.

AKH offers several excuses for Hratch Andonian's apparently false testimony. First, AKH suggests that this testimony was offered in his individual capacity and not in his capacity as a Rule 30(b)(6) witness. AKH is correct that Hratch Andonian was not designated to testify on topic 6 pertaining to AKH's web presence. That topic explicitly included the ownership of the DTC domain name. Yet, he told UUIC's counsel on the record that he was prepared to

---

[38]Doc. 610 at 11.

[39]Doc. 602-16 at 20 (emphasis added).

testify about topic 16, which included information about AKH's assets that bear on its net worth. Whether AKH owned the DTC domain name, later estimated to be worth approximately $15 million, was certainly within the scope of both topics. Indeed, the transcript makes plain that UUIC was questioning the witness about the website in the context of AKH's net worth, not "AKH's web presence and the advertising and sale of tires or wheels over the internet." Moreover, AKH fails to explain how Mr. Andonian's status as an individual witness rather than a corporate witness excuses his false testimony—he did not testify that he failed to recall, he testified incorrectly about a highly valuable asset, and then failed to correct the record for almost two years.

AKH argues that it is not precluded from correcting and amending its prior discovery responses because otherwise the case would be tried on incorrect facts. It contends that because no transactional documents or asset-purchase agreements were presented or used as exhibits during the March 2017 deposition, Mr. Andonian was required to testify from memory "regarding every asset that was sold by AKH to four different entities (55, Inc., AEI, Tire Network, and Pep Boys) approximately four years prior to his deposition."[40] Now that Mr. Andonian has reviewed those documents, almost two years after his deposition, he discovered that the almost-$15 million DTC domain name was not in fact sold to AEI, and thus supplemented his interrogatory response.

The question of Mr. Andonian's inadequate preparation for the March 8, 2017 deposition as to topic 16 has already been decided by Judge Gale. In a November 14, 2017 Order ruling on another motion for sanctions by UUIC, Judge Gale explained why he was unpersuaded by

---

[40]Doc. 610 at 15.

AKH's argument that the deposition topic on net worth was too broad, and the expectations for the witness too high:

> Some of the issues raised in the present motion, as well as one previous ruling by the undersigned Magistrate Judge (Doc. 374), evince an on-going effort by Plaintiff to obstruct discovery of its financial status. The discovery of Plaintiff's available assets against which to enforce a potential judgment is of understandable interest to Defendant, but not relevant to the substantive issues for trial. However, if Defendant prevails in proving its entitlement to an award of punitive damages, the financial status of Plaintiff may be relevant at trial to a determination of the amount of such an award.

> Discovery into this issue, however, has become the proverbial "tail wagging the dog" in this case. Sanctions are appropriate – and an appropriate sanction should be one which will allow the parties to move past this issue towards resolution of the merits of this case.[41]

The Court does not find credible that (1) Mr. Andonian's incorrect testimony was an honest mistake; or (2) that AKH only recently learned of its duty to correct the record—almost one year after litigating UUIC's motion for leave to amend that was largely based on AKH's position that it had insufficient assets to satisfy a judgment of $5 million or more. AKH's failure to document the various transfers to the Counter-Defendants should not inure to AKH's benefit. And AKH should have been on notice as of at least November 11, 2017 that Mr. Andonian's Rule 30(b)(6) testimony might require correction. There is an easy mechanism built into Rule 30(e) to timely accomplish just that, yet there is no indication that Mr. Andonian availed himself of that option after being presented with questions for which he struggled to answer. Nor did AKH supplement its discovery responses after reading Judge Gale's November 2017 Order.

---

[41]Doc. 501 at 13–14 (quoting *Mansourian v. Regents of the Univ. of Calif.*, No. 03-2591-FCD-EFB, 2011 WL 98814, at *1 (E.D. Cal. Jan. 12, 2011)), adopted as modified by Doc. 514.

Mr. Andonian's false testimony about the DTC domain name is distinguishable from the contradictory testimony about the DTCMotorsports.com website discussed by Judge Gale in his November 11, 2017 Order. In that Order, Judge Gale considered a motion for sanctions by UUIC because Sergio Andonian, who had been designated as AKH's Rule 30(b)(6) witness on topic number 6, admitted during his testimony that AKH owned the DTC Motorsports website after previous denials. Judge Gale denied UUIC's motion for sanctions based on this inconsistency because the fact of ownership had been highly contested, and because AKH credibly argued that its prior denials were based on genuine confusion as to that website's ownership rather than intentional misrepresentation. In contrast, here there is no evidence of prior confusion or a prior fact issue as to the ownership of the DTC domain name. Moreover, it strains credulity that the Rule 30(b)(6) witness designated to testify about this company's net worth would be unprepared to testify truthfully as to whether it owned an asset worth approximately $15 million. Finally, AKH offers no explanation as to the almost two-year delay in correcting the record, if there was indeed a genuine mistake made in previously denying AKH owned anything but nominal assets. The Court easily finds that AKH failed to timely supplement its earlier discovery responses regarding the correct ownership of the DTC website, and sanctions are warranted under Rule 37(c).

### 3. Sanctions

As with the deposit lists and check registers, the Court will not prohibit the use of AKH's net-worth information at trial. UUIC should be allowed to impeach witnesses about the contradictory discovery and point out the changed position. As with the deposit lists and check registers, the Court will "inform the jury of the party's failure" to timely produce this information under Rule 37(c)(1)(B). And the Court finds that an additional adverse inference

instruction is warranted directing the jury that it may infer from AKH's changed position that it sought to conceal assets from UUIC in order to avoid a judgment in this matter. This instruction shall be given in tandem with the adverse-inference instruction ordered by Judge Gale that for the purpose of punitive damages, the jury may draw a negative inference from the fact that AKH withheld or obfuscated information that it moved or transferred all of its assets out of AKH to avoid liability or a damages award in this case.

The applicable adverse-inference rule factors support this sanction. First, evidence about the true ownership of the DTC domain name existed, and AKH possessed and controlled that evidence, yet denied under oath that it existed. Second, there appears to have been actual suppression of evidence by AKH. There is no other credible explanation than that AKH suppressed and withheld this evidence until January 25, 2019, approximately two weeks before the close of discovery, after several years of denying financial viability. This adverse inference instruction allows UUIC to present to the jury the inconsistent discovery responses by AKH over these last many years, and allows the jury to infer from those inconsistent responses that AKH intended to misrepresent its financial picture for strategic reasons.

UUIC also requests an order from the Court precluding AKH from asserting that it has not sold or transferred all its assets during this litigation and asks that the supplemental interrogatory response be stricken. The Court declines to impose these sanctions. First, there is no evidence that AKH ever testified under oath or responded to a discovery request that it sold or transferred *all* its assets after this lawsuit was filed. AKH admitted it was not "financially viable," that it could not satisfy a $5 million judgment, that it did not have revenue, and that it did not own the DTC domain name. But these denials are not the same as denying ownership of any assets. Thus, such a preclusive order would not be consistent with the facts as presented on

this motion. Moreover, the Court declines to strike the interrogatory response. As already discussed, UUIC will be permitted to impeach AKH's recent admission that it owns the highly valuable DTC domain name, the jury will be instructed that this evidence was not disclosed until after UUIC amended the counterclaim, and the jury will be instructed that it may draw an adverse inference from the fact that AKH previously withheld this information to establish its inability to satisfy any judgment in this case. This sanction is proportional to the violation and sufficient to compensate UUIC for AKH's failure to timely disclose.

### C. Schaeper Computer

#### 1. Background

The final basis for sanctions offered by UUIC is a recent production associated with ex-AKH President Michael Schaeper's laptop computer. The Court attempts to reconstruct the genesis of this dispute, adding important details from the record that UUIC fails to account for in its briefing.

On March 31, 2016, AKH represented in its brief in opposition to a UUIC motion to compel and for sanctions that:

> AKH recently learned that Mr. Schaeper's emails were lost due to a catastrophic server crash that occurred in July 2015, which was after AKH had already conducted the extensive searches of its email databases described above, including Mr. Schaeper's emails, and produced documents requested by Universal. To AKH's knowledge, all other emails have been restored, but because Mr. Schaeper left the company in 2013, his email account was no longer active and his emails could not be restored despite best efforts to do so. Universal has not been prejudiced by this matter because Mr. Schaeper's emails were previously searched for documents responsive to Universal's requests, and the additional emails from Mr. Schaeper that are the subject of Universal's motion to compel have been produced by other sources in response to Universal's duplicative and redundant discovery requests.[42]

---

[42]Doc. 396 at 7–8 (footnote omitted).

In August 2016, Judge Gale denied UUIC's motion to sanction AKH based on its loss of the Schaeper emails, finding no indication that responsive materials were lost or UUIC was prejudiced.[43]

At Hratch Andonian's March 2017 deposition, he was asked about Mr. Schaeper's laptop computer that was "recently" found in storage. He testified that he was told "the machine is crashed and there isn't much left on there," although there is no indication of when he received that information in transcript excerpts attached to the parties' briefing.[44] Mr. Andonian also testified that he instructed another person to search for "McGladery documents" on that computer, and that person discovered one such email. Again, there is no indication in the short excerpts attached to the briefing when this search occurred. And there is no indication that the computer was the subject of a motion to compel or other discovery dispute following this deposition.

As already discussed, about one year after this deposition, this Court allowed UUIC to join the Counter-Defendants and add claims for fraudulent conveyance and alter ego liability. In July 2018, UUIC issued a new RFP to AKH seeking "Michael Schaeper's old computer, as identified during Hratch Andonian's March 8, 2017 deposition ('You can have that computer by the way.')."[45] AKH initially responded to this request that it would produce the computer.[46] In a November 1, 2018 email from UUIC to AKH, UUIC states it has "repeatedly asked [AKH] . . . to give us a written proposal for how to deal with . . . Michael Schaeper's computer before any

---

[43]Doc. 429.

[44]Doc. 615-2 at 43:18–23.

[45]Doc. 602-20 ¶ 23 (quoting Doc. 610-19 at 48:17–18).

[46]Doc. 610-6 ¶ 23.

additional steps were taken. . . . [M]y request was to ensure that we agreed to the method of imaging to avoid unanticipated costs or technical issues."[47]  This reference is made again in an email UUIC wrote on December 21, 2018.[48]  These emails reference prior phone conversations, but there is no further evidence in the record about the date, frequency, or substance of these conversations.  There is no indication that AKH ever responded to this informal request for a written proposal on producing the computer's contents.

At some point, the Counter-Defendants' law firm retained Jack Nevins, a digital forensic consultant in Kansas City, Missouri, to image the hard drive of Mr. Schaeper's computer, index the active data files on the hard drive, and prepare the documents for production.  Mr. Nevins was also retained "to ensure the integrity of the data collection from Mr. Schaeper's computer and the corresponding production of that data."[49]  Then, AKH's attorneys provided Mr. Nevins with "broad keywords . . . to produce as many documents as possible because the formal document request sought the entire computer."[50]

AKH supplemented its response to the RFP, stating that by November 21, 2018, it would produce a flash drive containing "more than 50,000 documents found on Schaeper's old computer that contain every document that could be remotely relevant to any of the parties in this case."[51]  On November 19, 2018, AKH produced on a flash drive all documents that were not flagged as potentially privileged because they included the name of an attorney or law firm in the email or the metadata.  The flash drive contained more than 68,000 documents, about 52,000 of

---

[47]Doc. 615-4.

[48]Doc. 602-9.

[49]Doc. 610-12 ¶ 4.

[50]*Id.* ¶ 6.

[51]Doc. 602-21.

which were emails.[52]  AKH submits that while previous searches for Mr. Schaeper's emails on the company's server were fruitless due to the server crash, Mr. Nevins was able to retrieve offline copies of these emails that were maintained on the computer's hard drive.  Therefore, "an email that was deleted by the user, and no longer accessible to the user, could be located by the forensic tool [used by Mr. Nevins]."[53]  Mr. Nevins attempted to organize the documents by placing them in folders.  He created six folders based on document type—email, other, presentations, spreadsheets, text, and word processing.

AKH admits that it did not bates stamp any of these documents; instead, Mr. Nevins' search tool created a cover sheet for each document with a "unique identifying number."  It maintains that using bates stamps would have required "countless hours" which would be "redundant, time consuming, and costly."[54]

On December 21, 2018, UUIC sent a letter to AKH referencing its earlier request for a written proposal for imaging the Schaeper computer.  It complained that instead of receiving a written proposal, it received the flash drive, and UUIC explained its concerns about lack of organization and bates stamps.  Then, on January 7, 2019, AKH sent UUIC another flash drive with approximately 700 documents from the Schaeper computer that were initially withheld for privilege review.  AKH's attorneys reviewed those documents and ultimately decided to produce them, along with a privilege log.  Along with this new flash drive, AKH sent a letter that explained for the first time its production protocol for the Schaeper computer.  UUIC contends

---

[52]According to UUIC, this volume is more than the total number of documents produced in this six-year-old lawsuit thus far.

[53]Doc. 610-12 ¶ 10.

[54]*Id.* at 25.

that within the 700 documents produced in January are four emails that should have been produced earlier in the litigation but were not.[55]

### 2. Ruling

UUIC seeks sanctions for the November "document dump" of disorganized, unstamped documents, and because AKH improperly withheld the four documents referenced in its briefing, and likely other documents, from its earlier productions. The Court addresses each in turn.

### a. Overbroad Production

The November production issue is emblematic of the breakdown in civility and communication between counsel in this years-long, contentious case. The basis for this sanctions request is AKH's response to a broad discovery request by UUIC that contained a contentious reference to Mr. Andonian's deposition testimony that UUIC "can have" the Schaeper computer. UUIC did not bring this motion based on a failure to supplement earlier requests, pointing the Court to specific older RFPs that were not supplemented. Instead, UUIC seeks sanctions based on AKH's too-literal response to its July 2018 RFP. While the Court understands that UUIC followed up the RFP with an informal request for a written protocol that would tailor the scope of the production and control costs, this request was not made part of the RFP for which this Court considers Rule 37 sanctions. AKH's failure to submit a written protocol that was informally requested by UUIC and is not otherwise required by a Court order or discovery request, while unprofessional, is not sanctionable under the federal rules.

AKH never explains its refusal to submit a written proposal to tailor the production, nor is there any indication that it attempted to discuss a protocol for searching and producing the Schaeper computer's contents before November. Of course, working with UUIC on such a

---

[55]Docs. 602-23, 615-5, 615-6, 615-8.

protocol would have undoubtedly saved it time and money. And it likely would have prevented this issue from culminating in a motion for sanctions. Instead, AKH states: "AKH is unaware of any rule of discovery which requires a producing party to get the approval of the requesting party before producing documents."[56] It repeatedly emphasizes the broad nature of the discovery request and insists it was required to take it literally, ignoring all subsequent attempts to narrow the request.

While AKH's decision to take literally UUIC's broad request for the entire Schaeper computer appears intended to impose an unnecessary burden on UUIC in searching for relevant documents, it is not sanctionable under Rule 37. Its production was responsive to the broad request drafted by UUIC. Moreover, AKH insists that it had an organizational protocol for these tens of thousands of documents, and offers its attorney's declaration in support. Its search tool placed each of the 68,000 documents in one of six folders, and each document included a cover sheet with a unique identifier and the location of the document on the computer's hard drive. Within each folder, the search tool organized the documents alphabetically. UUIC points the Court to no authority, or protocol issued in this case, that required AKH to organize the documents differently. Further, UUIC does not contend that the documents are unsearchable, only that it is unable to *sort* them by sender or date.[57]

While the Court finds no violation of Rule 37(b) or (c), it takes this opportunity to highlight a different discovery provision that Judge Gale has repeatedly flagged for the parties in past scheduling orders.[58] Fed. R. Civ. P. 26(g) provides:

---

[56]Doc. 610 at 22.

[57]Given that the documents were converted to .pdf format—the format UUIC had previously claimed was its preference—the Court is skeptical that these documents are not searchable.

[58]*See, e.g.*, Doc. 574 at 6 ¶ m ("Accordingly, the parties are respectfully reminded that this court plans to strictly enforce the certification requirements of Fed. R. Civ. P. 26(g)").

(g) Signing Disclosures and Discovery Requests, Responses, and
Objections.

(1) Signature Required; Effect of Signature. Every disclosure
under Rule 26(a)(1) or (a)(3) and every discovery request,
response, or objection must be signed by at least one attorney
of record in the attorney's own name--or by the party personally, if
unrepresented--and must state the signer's address, e-mail address,
and telephone number.  By signing, an attorney or party certifies
that to the best of the person's knowledge, information, and belief
formed after a reasonable inquiry:

(A) with respect to a disclosure, it is complete and correct as of the
time it is made; and

(B) with respect to a discovery request, response, or objection, it is:

(i) consistent with these rules and warranted by existing law or by
a nonfrivolous argument for extending, modifying, or reversing
existing law, or for establishing new law;

(ii) not interposed for any improper purpose, such as to harass,
cause unnecessary delay, or needlessly increase the cost of
litigation; and

(iii) neither unreasonable nor unduly burdensome or expensive,
considering the needs of the case, prior discovery in the case, the
amount in controversy, and the importance of the issues at stake in
the action.

. . . .

(3) Sanction for Improper Certification.  If a certification violates
this rule without substantial justification, the court, on motion or
on its own, must impose an appropriate sanction on the signer, the
party on whose behalf the signer was acting, or both.  The sanction
may include an order to pay the reasonable expenses, including
attorney's fees, caused by the violation.

In the seminal case of *Mancia v. Mayflower Textile Services Co.*, Judge Paul Grimm explained

the important "take away points" of the rule, which include an intent:

to impose an "affirmative duty" on counsel to behave responsibly
during discovery, and to ensure that it is conducted in a way that is
consistent "with the spirit and purposes" of the discovery rules,

which are contained in Rules 26 through 37. It cannot seriously be disputed that compliance with the "spirit and purposes" of these discovery rules requires cooperation by counsel to identify and fulfill legitimate discovery needs, yet avoid seeking discovery the cost and burden of which is disproportionally large to what is at stake in the litigation. Counsel cannot "behave responsively" during discovery unless they do both, which requires cooperation rather than contrariety, communication rather than confrontation.[59]

Both counsel's behavior in discovering the Schaeper computer contents failed to comply with the sprit and purposes of the discovery rules by embracing contrariety and confrontation instead of communication and a serious commitment to "fulfill legitimate discovery needs, yet avoid seeking discovery the cost and burden of which is disproportionally large to what is at stake in the litigation."[60] UUIC should have narrowly and respectfully tailored its RFP from the outset. It also could have proposed a more cooperative approach to narrow the scope of its request rather than demanding a written product from AKH. AKH should have met and conferred with UUIC to narrow the scope of its production when UUIC made clear that was its intent. And it should have communicated its image and search protocol to UUIC earlier than January. Counsel is reminded of the Court's tool in Rule 26(g); sanctions for improper certifications on the signer do not require a motion. While the Court refrains from imposing sanctions at this time, it notes that neither party has completely clean hands on this particular issue. An earlier review by counsel of this rule and *Mancia* should have guided the parties to a more responsible resolution of this issue. It certainly would have saved the parties' time and money and conserved judicial resources.

---

[59]253 F.R.D. 354, 357–58 (D. Md. 2008) (citation omitted).

[60]*Id.*

### b.     Allegedly Withheld Documents

UUIC also seeks sanctions based on four documents it discovered in the supplemental January production because they were responsive to prior discovery requests but not previously produced.[61] UUIC does not provide the Court with the earlier RFPs to which these documents are responsive, nor does it provide the Court with any evidence other than AKH's prior litigation conduct to support its assertion that AKH withheld these emails from earlier productions. AKH responds that one of the four emails cited by UUIC was previously withheld because it was privileged. It decided after conducting the more recent privilege review to waive the privilege as to that document and therefore produced it. AKH further argues that because it used a forensic accountant to image and search for responsive documents, it was able to access a larger universe of responsive documents from the laptop compared to its earlier efforts to search for Mr. Schaeper's emails. The Court agrees that there is no evidence that AKH willfully withheld documents that it should have produced earlier.

The Court is also unpersuaded by UUIC's bald assertion that "AKH admits it withheld certain documents earlier in the case on the basis of privilege but now says it is electing to produce (700!) privileged non-bates-number documents that allegedly support AKH's defenses."[62] AKH's brief makes no such assertion. AKH contends that one email relied on by UUIC in its briefing that was not previously produced, was withheld on the basis of privilege. It did not assert that all 700 documents produced in January were privileged; it asserted that those documents were initially flagged as possibly privileged, and upon a privilege review were determined to be subject to production. In addition to this flash drive of 700 documents, AKH

---

[61]Docs. 602-22; 615-5, 615-6, 615-8.

[62]Doc. 615 at 13.

produced a privilege log.  Both parties would be well-served by confining their arguments to particulars and refraining from general allegations that are not supported by the record.

In sum, the Court does not find that UUIC has demonstrated that sanctions are warranted on the basis that AKH previously withheld emails with an intent to conceal.

## III.    UUIC's Request for Dispositive Sanctions

The Court has determined that sanctions are appropriate for the first two discovery violations raised in UUIC's motion.  In addition to or instead of the sanctions already discussed for each of these violations, UUIC seeks the following dispositive sanctions: (1) an entry of judgment in favor of UUIC "on all issues"; or (2) striking Counter-Defendants' pleadings in response to the fraudulent transfer and alter-ego liability claims; or (3) dismissing AKH's offensive claims against UUIC.

Under Rule 37(b), the Court may "impose the sanction of dismissal with prejudice because of abusive litigation practices."[63]  The Court may also strike pleadings in whole or in part, or enter default judgment against the offending party.[64]  Although UUIC did not demonstrate that Rule 37(b) applied based on the violation of a court order, Rule 37(c)(1) allows the Court to utilize the list of sanctions in Rule 37(b), including dismissal, for Rule 37(c) violations.  Dismissal or default sanctions must be based on "'willfulness, bad faith, or [some] fault' rather than just a simple 'inability to comply.'"[65]  The Court considers the following criteria to determine whether the sanction of dismissal or default is warranted:

> (1) the degree of actual prejudice to the defendant; (2) the amount of interference with the judicial process; (3) the culpability of the litigant; (4) whether the court warned the party in advance that

---

[63]*Lee v. Max Int'l, LLC*, 638 F.3d 1318, 1321 (10th Cir. 2011); Fed. R. Civ. P. 37(b)(2)(A)(v).

[64]Fed. R. Civ. P. 37(b)(2)(A)(iii), (vi).

[65]*Lee*, 638 F.3d at 1321 (quoting *Archibeque v. Atchison, Topeka & Santa Fe Ry.*, 70 F.3d 1172, 1174 (10th Cir. 1995)).

<blockquote>dismissal of the action would be a likely sanction for non-compliance; and (5) the efficacy of lesser sanctions.[66]</blockquote>

These factors are "non-exclusive" and are to be considered "guide posts the district court may wish to 'consider' in the exercise of what must always remain a discretionary function."[67]

As described with respect to the Court's rulings on each of the first two discovery violations at issue in this Order, UUIC has suffered actual prejudice, and the Court expended significant judicial resources resolving these matters. Moreover, the Court has found AKH acted in bad faith by withholding discovery. Although the Court has repeatedly warned AKH that it risks an imposition of sanctions stiffer than fees and adverse inferences if it continues to engage in sanctionable conduct, it has not explicitly warned AKH or the other counter-defendants that dismissal would result from noncompliance given the absence of a prior court order compelling this production.

Most importantly, the Court has determined that lesser sanctions are appropriate. In both instances, this Court found proportional and appropriate adverse inference instructions and monetary sanctions intended to reimburse UUIC for its time and effort spent pursuing discovery that ultimately was either unnecessary or created inconsistencies in the record with no time remaining to resolve. These lesser sanctions are sufficient to compensate UUIC for the actual prejudice it suffered due to the discovery violations. The Court declines to exercise its discretion to impose dispositive sanctions.

---

[66] *Ehrenhaus v. Reynolds*, 965 F.2d 916, 921 (10th Cir. 1992).

[67] *Lee*, 638 F.3d at 1323 (quoting *Ehrenhaus*, 965 F.3d at 921).

## IV. Conclusion

Given the history of discovery misconduct by AKH in this matter, and the many Orders entered by Judge Gale and the undersigned, the Court summarizes below the adverse inference instructions ordered to date:

- An instruction providing:

  The Defendant requested the production of documents relevant to the issues in this case which Plaintiff has placed in the custody of a third party. In violation of this Court's rules and Orders, Plaintiff wilfully refused to disclose those documents. You are instructed to assume that those documents, if produced, would have been favorable to Defendant's claims in this case and adverse to Plaintiff's claims.[68]

- An instruction that for purposes of punitive damages, the jury may draw a negative inference from the fact that AKH withheld or obfuscated information, and that it moved or transferred all its assets out of AKH to avoid liability or a damages award in this case.[69] Also, when determining punitive damages, fraudulent conveyance, and alter-ego liability, the jury may infer from AKH's changed responses regarding asset ownership that it sought to conceal assets from UUIC in order to avoid a judgment, and then changed its position when claims of fraudulent conveyance and alter-ego liability were added to the case.

- If the jury finds in favor of UUIC on its fraud claims, and if it finds in favor of UUIC on the alter ego-claim, an instruction that in setting the amount of punitive damages against AKH, the jury may consider the combined net worth of all Counter-Defendants.[70]

---

[68]Doc. 375 at 14, adopted by Doc. 400 at 8.

[69]Doc. 514 at 16.

[70]*Id.*

- An instruction providing that the Counter-Defendants wilfully failed to timely disclose check registers and deposit lists until January 2019.

- An instruction that when determining punitive damages, fraudulent conveyance, and alter ego liability, any inconsistencies in the check registers and deposit lists provided by AKH may be resolved in UUIC's favor.

- An instruction that AKH wilfully failed to timely disclose that it owned the DTC domain until January 2019.[71]

The parties have been mired in amendments to the pleadings and discovery disputes for the better part of six years.  In less than two short weeks, dispositive motions are due, and this case should pivot away from discovery towards obtaining a final decision on the merits.  The Court intends for this Order to mark the end of the bickering and failure to communicate between counsel that characterized the discovery phase of this litigation.  It must also end the obfuscation and abusive litigation practices by AKH and the Counter-Defendants, who are now forewarned that dismissal with prejudice may be the Court's next recourse for such conduct.

It is imperative that the relationship between counsel improve so that the many complex and difficult claims and defenses at issue in this case can be presented in an efficient, clear, and organized manner to the Court, and ultimately to a jury.  The parties and counsel are once again encouraged to conduct themselves in a manner that will further the Fed. R. Civ. P. 1 objectives of securing a "just, speedy, and inexpensive determination" of this action.  While these objectives clearly have not been met so far in this matter, the Court is convinced that all parties

---

[71]The Court expects that UUIC will include these instructions in the set of proposed instructions it submits before trial, and does not intend to suggest that the Court's exact language in this Order is set in stone.

and attorneys can make a greater effort to push this case forward on schedule and can facilitate a just end to this dispute.

**IT IS THEREFORE ORDERED BY THE COURT** that UUIC's Motion for Sanctions (Doc. 601) is **granted in part and denied in part**.  The motion is granted as to the first two discovery issues raised by UUIC and denied as to the third.  The Court grants UUIC's request for monetary sanctions and adverse inference instructions set forth above, and denies UUIC's request for dispositive sanctions.  AKH is assessed the fees incurred by UUIC in hiring an expert to review the bank statements and canceled check documents in 2016.  AKH is further assessed the reasonable attorneys' fees and costs UUIC expended in litigating this motion for sanctions.  UUIC shall submit to the Court an application for expert and attorney fees by no later than April 29, 2019.  The parties shall follow the procedure in D. Kan. Rule 54.2, including the consultation requirement in Rule 54.2(a).

**IT IS SO ORDERED.**

Dated: March 19, 2019

s/ Julie A. Robinson
JULIE A. ROBINSON
CHIEF UNITED STATES DISTRICT JUDGE