## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

AKH COMPANY, INC.,

      Plaintiff,

      v.

UNIVERSAL UNDERWRITERS
INSURANCE CO.,

      Defendant,

and

UNIVERSAL UNDERWRITERS
INSURANCE CO.,

      Counter-Claimant

      v.

AKH COMPANY, INC., ANDONIAN
ENTERPRISES, INC., 55, INC.,
TIRENETWORK GROUP, INC., TRADE CO,
LLC, ANDY ANDONIAN, AND HRATCH
ANDONIAN,

      Counter-Defendants.

Case No. 13-2003-JAR -KGG

## MEMORANDUM AND ORDER

      This is a commercial liability insurance coverage dispute filed by AKH Company, Inc.

("AKH") against its insurance carrier, Universal Underwriters Insurance Company ("UUIC"),

arising out of an underlying trademark infringement action between AKH and Reinalt-Thomas

Corporation d/b/a Discount Tire ("RT") that UUIC defended and settled under a reservation of

rights ("RT litigation"). UUIC counterclaimed, and both parties amended to assert various tort

and contract theories. In 2018, the Court allowed UUIC leave to amend to add two counterclaims against AKH and several new parties for alter ego liability and fraudulent transfer.[1] The new claims were based on allegations that after this lawsuit was filed, AKH diverted its assets to these related parties to avoid any potential judgment in this case. AKH alleges five claims against UUIC in contract and tort; UUIC alleges 13 counterclaims against AKH in contract and tort, in addition to its fraudulent transfer and alter ego liability claims against AKH and the new Counter-Defendants.

Before the Court are the parties' cross-motions for summary judgment (Docs. 638, 632, 634). AKH moves for summary judgment on AKH Counts I–III, and on all of UUIC's counterclaim counts. UUIC moves for summary judgment on all remaining AKH counts,[2] and on UUIC Counts VI, XII, XIV, and XV. AKH and the other Counter-Defendants move for partial summary judgment on UUIC Counts XIV and XV. These motions are fully briefed and the Court is prepared to rule. As described more fully below, the Court grants in part and denies in part AKH and UUIC's cross-motions for summary judgment. AKH's motion is denied on AKH Counts I–III, as well as on UUIC Counts I–IV, and VII–XV. AKH's motion is granted as to UUIC Counts V and VI. UUIC's motion is granted as to all remaining AKH claims— Counts I–IV and VI—and is otherwise denied. The Counter-Defendants' motion for partial summary judgment is denied.

## I.  Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.[3] In

---

[1]Doc. 515.

[2]The Court previously granted UUIC's motion to dismiss AKH Count IV for negligence. Doc. 280.

[3]Fed. R. Civ. P. 56(a); *see also Grynberg v. Total*, 538 F.3d 1336, 1346 (10th Cir. 2008).

applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[4] "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the nonmoving party, is such that a reasonable jury could return a verdict for the nonmoving party."[5] A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[6] An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."[7]

To prevail on a motion for summary judgment on a claim upon which the moving party also bears the burden of proof at trial, the moving party must demonstrate "no reasonable trier of fact could find other than for the moving party."[8] The facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."[9] Rule 56(c)(4) provides that opposing affidavits must be made on personal knowledge and shall set forth such facts as would be admissible in evidence.[10] The non-moving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation.[11] "Where, as here, the parties file cross-motions for summary judgment, we are

---

[4]*City of Harriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[5]*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[6]*Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[7]*Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[8]*Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015).

[9]*Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000).

[10]Fed. R. Civ. P. 56(c)(4).

[11]*Id.*; *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citation omitted).

entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts."[12]

Finally, summary judgment is not a "disfavored procedural shortcut;" on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[13] In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[14]

## II.    Uncontroverted Facts

The following material facts are either stipulated, uncontroverted, or viewed in the light most favorable to the nonmoving party.[15]

AKH operates under the name "Discount Tire Centers," selling and installing tires through its retail garages in California and on its Internet website. AKH registered the domain name www.discounttires.com on July 20, 1997. AKH operated its www.discounttires.com website from AKH's office located in California from July 1, 1997 to at least May 1, 2009.

---

[12]*James Barlow Family Ltd. P'ship v. David M Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir. 1997) (citation omitted).

[13]*Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[14]*Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir. 1988).

[15]The Court does not consider facts presented by the parties that the record does not support or that are not relevant to the legal issues presented. Nor does the Court consider legal arguments included in the parties' statements of fact.

As the Court advised the parties at the Pretrial Conference, it typically rules on summary judgment motions 60 days or more before trial. The Court set deadlines and page limits with the hopes of meeting this deadline. But these briefs neither presented a "concise" universe of disputed facts for the Court's consideration, nor a true clash of arguments, spread out over nine lengthy briefs. The amount of work required to distill more than 500 pages of briefing rendered the Court's 60-day deadline impossible to meet. The irony is that the truly disputed facts in this matter did not require the volume of work generated by this contentious lawsuit. Had the parties ever heeded the Court's warnings and guidance over the last six years to move this case along under the guideposts of Fed. R. Civ. P. 1, the Court is certain that this case would have reached a final conclusion years ago.

UUIC, AKH's insurance company during the time frame at issue in this lawsuit, is a subsidiary of Zurich American Insurance Company ("Zurich").

### *The Policy*

UUIC issued a commercial liability policy ("the Policy") to AKH for the coverage period of May 1, 2007 to May 1, 2008. The Policy was renewed for five consecutive one-year periods from May 1, 2008 to May 1, 2013. The Policy provides that UUIC will defend and indemnify AKH against a covered "SUIT," subject to its terms, conditions, provisions, and exclusions. The Policy includes Garage Unicover Coverage Part 500 (Edition 3-98) ("1998 Garage Coverage"). The 1998 Garage Coverage provides coverage for "DAMAGES" because of "INJURY" caused by an "OCCURRENCE" arising out of "GARAGE OPERATIONS."[16] "In addition to our limits for INJURY . . ., WE will also pay: (a) all costs and expenses in defending an INSURED, and interest on that part of the judgment covered by this Coverage Part within OUR limits, that accrues after entry of any judgment in any SUIT WE defend, but only until WE have paid, offered to pay or deposited in court that part of the judgment that is within OUR limit."[17]

The Policy also includes Umbrella Coverage Part 980 (Edition 3-98) ("1998 Umbrella Coverage"). The 1998 Umbrella Coverage provides coverage for a "LOSS" in excess of any "UNDERLYING INSURANCE."[18] The Umbrella Coverage provides that "WE WILL ALSO PAY – If there is no UNDERLYING INSURANCE or any other insurance available to an INSURED, and coverage is afforded by this Coverage Part (except for the INSURED'S

---

[16]Doc. 675-6 at 49. The Court cites to the summary judgment record by reference to the ECF document and attachment number. Citation to the parties' exhibit markings is impractical and confusing given their inexplicable decision to use the same numerical naming convention for exhibits attached to briefs on the same pending motion.

[17]*Id.* at 56–57.

[18]*Id.* at 85.

retention) WE will pay, in addition to OUR limit: (a) all costs and expenses in defending an INSURED, and interest on that part of the judgment covered by this Coverage Part within OUR limits, that accrues after entry of any judgment in any SUIT WE defend, but only until WE have paid, offered to pay or deposited in court that part of the judgment that is within OUR limit."[19]

The Policy further provides: "Each INSURED must cooperate and assist US in the investigation, settlement, defense, enforcement of contribution or indemnification,"[20] and states that the insurer has "no duty to provide coverage under any Coverage Part unless [the insured has] fully complied with all Conditions applicable to that Coverage Part."[21]

The Unicover General Conditions section states

> CHANGES – The only way this policy can be changed is OUR issuing an endorsement(s) or substituting the declarations. They must be signed by one of OUR representatives when required by law. Nothing else will change this policy, waive any of its terms, or stop US from asserting any of OUR rights, not even notice to or knowledge learned by one of OUR representatives.[22]

The Policy's limits of liability are $5 million.

### *The RT Litigation and Tender*

On May 14, 2010, RT filed suit against AKH in the United States District Court for the District of Arizona ("RT action"). RT's action alleged claims of trademark infringement, trademark dilution and false designation of origin as to the "DISCOUNT TIRE" mark under the Lanham Act, a violation of the Anticybersquatting Consumer Protection Act ("ACPA"), and Arizona state law claims for trademark infringement, dilution, and unfair competition. On

---

[19]*Id.* at 92–93

[20]*Id.* at 93.

[21]*Id.* at 16.

[22]*Id.* at 16–17.

6

October 22, 2010, AKH filed its own complaint against RT in the United States District Court for the Central District of California ("AKH action"). AKH's action alleged claims for breach of contract and declaratory relief related to a 1991 Settlement Agreement between AKH and RT relating to the use of the "DISCOUNT TIRE" mark. AKH also alleged claims for unfair competition, and trademark infringement under state and federal law. On February 9, 2011, the two matters were consolidated in the Central District of California ("RT litigation").

During the RT litigation, CEO Michael Schaeper, Hratch Andonian, Sergio Andonian, and Andy Andonian were all executives of AKH authorized to act on its behalf.

AKH tendered to UUIC its defense and indemnity of RT's First Amended Complaint on December 9, 2011. By letters dated January 5, 2012 and February 29, 2012, UUIC agreed to defend AKH as to RT's claims against AKH, subject to a reservation of rights. On January 5, 2012, Jena Palmer on behalf of UUIC sent AKH the first Reservation of Rights letter. She confirmed receipt of the RT action filed in the United States District Court for the District of Arizona. Palmer summarized the claims alleged by RT against AKH in that lawsuit, and the applicable policy language during the coverage period. Palmer indicated that UUIC was "providing coverage for this suit . . . under a reservation of rights," because it believed the claims were not covered by the Policy. Palmer's letter relayed that AKH "may want to employ your own attorney to participate in the defense of this matter. . . . However, this Company will not be responsible for any services incurred by your attorney."[23]

UUIC initially assigned the law firm Gordon & Rees to defend AKH as panel counsel, but AKH strongly urged UUIC to permit the law firm of Paul Hastings LLP, its counsel of choice, to continue as counsel to AKH instead. AKH had retained Paul Hastings to defend it

---

[23]Doc. 639-11.

several months before AKH tendered the RT action. Paul Hastings was authorized to act on AKH's behalf. At some point before July 5, 2011, AKH and Paul Hastings entered into a contingency fee agreement. The terms of that agreement were revised after July 2011. RT was represented by Ballard Spahr LLP, and Gallagher & Kennedy, P.A. in the RT litigation.

On February 1, 2011, Palmer emailed Hratch Andonian, one of AKH's owners, to confirm their phone conversation from the day before, during which "you agreed to pay the difference of your attorney's rate, and the attorney we've hired to represent you. Also, if you would please provide a budget through trial from your attorney, I would appreciate it and will elevate your request."[24] Schaeper sent Palmer an email on February 9, 2012, thanking Palmer for her voice message that she had received the Paul Hastings Budget, and asking her to forward him a copy of the Zurich Reporting Guidelines to provide to Paul Hastings. He stated, "[w]e look forward to receiving formal final approval of Paul Hastings as soon as possible."[25] Palmer sent Hratch Andonian and Schaeper the billing guidelines and Zurich rates in a February 10, 2012 email, and explained that if Paul Hastings agreed to these billing rates and guidelines, UUIC would allow Paul Hastings to defend AKH.[26] The rates Palmer sent on February 10, 2012 are: $ for partners, $ for associates, $ for junior associates, and $ for paralegals. These are identical to the rates that UUIC would have paid Gordon & Rees, a Zurich panel firm, to handle the same case in California. AKH agreed that Paul Hastings would comply with the Zurich Reporting Guidelines.

---

[24]Doc. 639-12 at 7.

[25]*Id.* at 6.

[26]Doc. 643-1.

On February 29, 2012, Stephanie Cole on behalf of UUIC sent AKH the second Reservation of Rights letter. In that letter, Cole informed AKH that she had taken over handling AKH's claim from Palmer, and was supplementing Palmer's January 5 letter.

> This letter specifically addresses Universal's insurance coverage obligations to AKH company, Inc. arising from the First Amended Complaint filed in the United States District Court, District of Arizona entitled The Reinalt-Thomas Corporation d/b/a Discount Tire, a Michigan corporation vs. AKH company, Inc., a California corporation (Complaint) which was transferred to the United States District Court for the Central District of California and which has now been consolidated with AKH Company, Inc. v. The Reinalt-Thomas Corporation DBA Discount Tire, Southern California Discount Tire Company, Inc (Reinalt) filed in the United States District Court Central District of California.[27]

Cole's letter also notified AKH that UUIC agreed to "pay for AKH's choice of counsel instead of assigning provided that AKH's choice of counsel agrees to abide by the terms of California Civil Code section 2860 and complies with Universal's defense counsel guidelines and billing rates, which were forwarded to you on 2/10/12."[28] As with the first Reservation of Rights letter, Cole's letter explained that UUIC would provide AKH with a defense in the RT action, subject to a "complete reservation of rights," on the basis of the timing of the allegedly wrongful conduct, and the fact that certain claims may not be covered by the terms of the Policy. UUIC specifically invoked its right to "initiate a separate action to determine our duty to defend or indemnify you. . . [and to] reclaim any amounts paid as defense expenses for any amounts that are not reasonable or that can be attributed to liability that is not potentially covered."[29]

---

[27]Doc. 635-4 at 2.

[28]*Id.*

[29]*Id.* at 7.

***Cost-Sharing Agreement***

After Cole took over the claim on behalf of UUIC, she exchanged several emails with

Paul Hastings attorneys Kimberly Kepler and Glenn Dassoff about how to segregate and account

for Paul Hastings' fees incurred in the AKH action, given that the two actions were consolidated

and Paul Hastings represented AKH in both actions.[30]  UUIC asked Paul Hastings to segregate

its bills between the two actions.  But Paul Hastings instead proposed a "50/50 split" between

AKH and UUIC of the legal fees and costs incurred in RT litigation, believing that arrangement

may require UUIC to pay a greater share of the costs than if the firm segregated out defense

costs.  AKH authorized Paul Hastings to negotiate this arrangement on its behalf.  On March 14,

2012, Kepler relayed to Cole that Schaeper and Hratch Andonian believed that they had

previously reached an agreement with Palmer that Paul Hastings would submit to the UUIC

billing guidelines and panel rates with the understanding that UUIC would "be paying without

apportionment," and forwarded the emails between Palmer and Schaeper where Palmer sent the

billing guidelines and panel rates to Schaeper.  Kepler asked Cole to allow Paul Hastings to

submit

> 100% of its billed hours to Zurich, in accordance with Zurich's
> Guidelines, and Zurich will pay Paul Hastings directly for those
> hours, albeit at the previously-agreed upon rates.  We of course
> understand that Zurich will reserve any rights that it has to later
> seek reimbursement of fees paid as they may relate solely to non-
> covered work.[31]

The following day, Cole responded to Kepler and disagreed with her characterization of

AKH's previous agreement with Palmer based on the referenced emails.  "No where in the

emails did Jena Palmer ever agree to pay AKH's attorneys' fees to prosecute the claim against

---

[30]Doc. 639-12.

[31]*Id.* at 4.

Reinalt."[32]  Cole stated that UUIC only agreed to defend AKH in the RT action "subject to our

Reservation."[33]  Cole advised Kepler that since Paul Hastings did not agree on the 50/50 split, it

should separate out its expenses for prosecuting AKH's claims against RT.

On March 24, 2012, Kepler replied to Cole's email that her prior email "did not intend to

reject the 50/50 split that you had agreed was a reasonable way to resolve any issues related to

prosecution vs. defense." Kepler continued,

> Given Zurich's position that it will not pay for prosecution of
> AKH's claims against Reinalt, we still feel that the 50/50 split is
> the best way to address that position.  The prosecution and defense
> of the claims in this consolidated case are so closely related that
> our tasks related to each are  overlapping and intertwined.
> Logistically, I believe it would be a practical impossibility to split
> our tasks between two separate billing numbers and realistically,
> an attempt to do so would likely result in roughly a 50/50 situation,
> with layers of complication and distraction for each time keeper
> added to the mix.  In light of this, I would respectfully request that
> we return to the agreement that Zurich will pay its rates for 50% of
> the hours that Paul Hastings bills in connection with this case to
> address the prosecution/defense concerns.[34]

After this email, Cole and Kepler exchange several other emails confirming that they were in

agreement on a "50/50 split."  As part of an email string discussing expert fees in April 2012,

Kepler inserted that AKH does not "waive any rights our clients would otherwise have to

reevaluate any divisions of payments at a later date."[35]  Cole responded as follows:

> The only reservation on the split was my reservation on the Buss.
> If you are no longer in agreement with the 50/50 split (without
> reservation) let me know now.  I consider your email below a
> showing that there is no agreement.  I will no longer pay 50/50 on
> the bills.  Please separate and bill separately.[36]

---

[32]*Id.* at 2.

[33]*Id.*

[34]*Id.*

[35]Doc. 675-30 at 3.

[36]*Id.* at 2.

Kepler immediately replied, "I'm sorry, that is just our standard language, we are still in agreement with the 50/50 split."[37] The parties stipulated in the Pretrial Order that they agreed to a 50/50 split of the bills, legal fees, and costs submitted in the RT litigation.

Separately, AKH voluntarily agreed to pay Paul Hastings: (1) the difference between Paul Hastings' full rates and the panel counsel rates paid by UUIC; and (2) any fees or expenses written off by UUIC under its billing guidelines. AKH stopped appealing UUIC's write-offs after a few months.

### Paul Hastings' 2012 Status Reports

Paul Hastings was required to submit periodic status reports to UUIC about the RT action. Kepler drafted the first status report on behalf of Paul Hastings, and sent it to UUIC on March 24, 2012, copying Andy Andonian, Hratch Andonian, and Schaeper. Kepler estimated RT's likelihood of success on its claims against AKH as follows: 50% on the federal trademark infringement of common law trademark and false designation of origin claims, 50% on the federal trademark infringement of a registered trademark claim, 80% on the ACPA claim, 90% on the federal trademark dilution claim, 50% on the Arizona common law trademark infringement claim, 90% on the Arizona trademark dilution claim, and 70% on the Arizona unfair competition claim. On each of these claims, Kepler estimated $3,500,000 in possible damages. Kepler advised UUIC that the parties had engaged in preliminary settlement discussions, but "[c]omments from Reinalt-Thomas's counsel suggest that Reinalt-Thomas will not be willing to pay much, if any, money to settle the case."[38] She anticipated filing summary judgment motions after the close of fact discovery.

---

[37]*Id.*

[38]Doc. 639-14.

Kepler sent Cole another update on September 4, 2012, after fact discovery closed.
Kepler stated that both parties intended to move for summary judgment, advising that "Paul
Hastings believes that the chance of success on its motion for summary judgment are reasonably
good," and adjusted her likelihood of success projections from the March 24 initial report.
Kepler estimated that AKH's likelihood of success on RT's registered trademark claim was now
60%, on the ACPA claim was now 50%, and on the dilution claim was now 50%. Kepler also
summarized RT's damages expert's alternative damages calculations, and adjusted her previous
damages estimate of $3.5 million down to $2.1 million. Kepler advised that the parties were
planning to participate in court-ordered mediation in the coming weeks.

### *September 2012 Mediation*

Kepler contacted Cole by email the next day, September 5, advising that the parties had
scheduled mediation for September 21, 2012, and asked whether someone from UUIC could join
in person or by phone that day. Cole responded that she was unavailable that day, and "[g]iven
the complex nature of this case no one else will be available for the mediation. Any contribution
by this company would be minimal given the coverage position."[39] Kepler understood from her
communications with Cole, that Cole █████████████████████████████████████
████████████████████████████████████████████[40]

The mediation proceeded on September 21, 2012, without UUIC. RT made AKH a
settlement offer that involved, *inter alia*, UUIC paying RT $1 million, with AKH giving up all
rights to use the Discount Tire Centers name. On September 26, 2012, Kepler emailed Cole to
advise her of RT's offer. She explained that the offer was "completely unreasonable and

---

[39]Doc. 639-22.

[40]Doc. 644-1 at 62:3–6.

untenable . . . . [that] is not even on the table even assuming that RT would have a complete win at trial."[41] Cole responded, asking why RT was making a demand against UUIC, and asking for details about RT and AKH's demands at the mediation. Kepler responded to her question about UUIC: "they are aware that Zurich is involved and they may have believed that such a demand is not as offensive to the clients as taking money directly out of their own pockets would be. That is speculation, RT didn't say why they did it that way."[42]

### Settlement Discussions in October and November 2012

After the failed mediation, principals at AKH and RT continued to have periodic discussions about settlement, often without counsel. They exchanged communications regarding a "settlement structure" and engaged in at least one conference call to further discuss settlement. AKH proposed a settlement at that time by which RT would pay it an amount depending on the outcome of other motions.

In mid-October 2012, AKH retained Gauntlett & Associates ("Gauntlett") as its coverage counsel in the RT litigation. Paul Hastings and Gauntlett were both authorized to communicate on behalf of AKH with UUIC or its counsel about settlement.

On October 19, 2012, both parties' summary judgment motions were denied in the RT litigation. James Lowe, a Gauntlett attorney, wrote Cole advising her about the summary judgment rulings. Schaeper, Dassoff, Kepler, and David Gauntlett were copied on the letter. The subject line of the letter referenced the AKH action as the lead case in the consolidated RT litigation. Lowe advised in his letter that RT "finally appears to have some serious interest in a settlement discussion that could result in a resolution. Therefore we will seek information for

---

[41]Doc. 644-6.

[42]*Id.*

14

Zurich's evaluation and then expect to seek settlement authority from you concerning this case."[43] Lowe also indicated that he wanted to "resolve any disputes about reimbursement of defense expenses and expedite regular payment," adding "AKH does now and always has reserved all its rights concerning insurance coverage including defense and coverage for the above suit, rates and amounts paid by Zurich for defense of this suit, settlement, indemnification, identification and allocation of defense expenditures, settlement and indemnity, and any other issues."[44]

At some point in November 2012, RT proposed to purchase AKH's trademarks for $8 million, but AKH rejected this offer as too low. By late November, AKH and RT had agreed to a high-level framework for settlement whereby RT would provide a net payout to AKH of $8 million, with a potential "contribution" from UUIC.[45] Despite this framework, AKH wanted more than $8 million in the settlement, so it took steps to seek contribution from UUIC to increase its recovery.

During the course of settlement discussions, Gauntlett advised Paul Hastings and AKH that they would need a formal demand letter from RT to present to UUIC. After communications with counsel and preparing a script, AKH executives spoke directly to RT executives to request a "demand" that could be provided to UUIC. On November 14, 2012, RT complied, issuing a written demand for $20 million to AKH. AKH did not provide this demand letter to UUIC, but did send it to counsel at Gauntlett and Paul Hastings, asking if it should ask

---

[43]Doc. 639-24 at 1.

[44]*Id.* at 2.

[45]Doc. 675-11 at 98:3–99:24.

RT for more information, and advising that "R-T is willing to provide any additional information and/or supporting documentation you deem worthwhile to submit to our insurance provider."[46]

In response to RT's demand letter, AKH and its counsel discussed having Paul Hastings go to RT's counsel and ask for a new letter by phone because "we need more to send to Zurich."[47] Gauntlett and Paul Hastings attorneys agreed that the letter did not contain ████████ ████████████████████████.[48] Dassoff initially expressed hesitation that "any changes to RT's discussion of potential punitive damages will appear collusive when the carrier [UUIC] conducts discovery and sees there was a significant softening in RT's position. I will ask, as you suggest, if the discussion can be a little more 'theoretical.'"[49] After AKH's counsel spoke to RT's counsel, AKH's counsel reported that "[t]here is great concern about possible exposure to Zurich for 'collusion' (i.e. that Zurich might later come back against RT and claim that it deliberately misled the carrier w/ its demand at the same time it was well into negotiations to pay $8MM to AKH)."[50] RT agreed to AKH's request for a new communication for UUIC's benefit.

On November 20, 2012, Lowe sent Cole an email attaching three documents: (1) a November 20, 2012 ten-page letter from Lowe to Cole evaluating a possible settlement with RT, and requesting settlement authority; (2) a November 19, 2012 letter from Ballard Spahr to Dassoff, providing RT's "position regarding damages on its claims that have recently withstood . . . [AKH's] summary judgment motion"; and (3) a November 19, 2012 letter from Dassoff to Cole with a subject heading next to the consolidated case name of "Analysis of Settlement as an

---

[46]Doc. 635-22 at 1.

[47]Doc. 635-23 at 14.

[48]Doc. 644-1 at 98:2–11.

[49]Doc. 635-23 at 8.

[50]*Id.*

Alternative to Trial and of Reinalt-Thomas's November 19, 2012 Settlement Demand."[51] Schaeper was copied on this email, and the Lowe and Dassoff letters. Andy Andonian, Hratch Andonian, and Sergio Andonian were also copied on the Dassoff letter.

RT intended its letter from Ballard and Spahr to be a recitation of RT's potential request for damages at trial and AKH's potential exposure, not a formal settlement demand. Yet, the cover email from Lowe referred to the communication from RT as a "settlement demand of $20 million."[52] The letters from Paul Hastings and Gauntlett recommended that UUIC pay the "settlement demand." And Lowe requested that UUIC authorize a settlement offer for AKH of $15 million "as a response to Reinalt-Thomas's demand."[53] Dassoff's letter to Cole advised: "I disagree with several of the claims made in [RT's] demand letter, but, on the whole, I believe it is a reasonable calculation of what a jury could award [RT] at trial."[54] He proceeded to explain the basis for this conclusion by itemizing the range of possible damages as between $1.4 million and $90 million. In light of this range, Dassoff concluded that $20 million was a "reasonable calculation of what a jury might determine."[55]

On November 27, 2012, attorneys from Ballard Spahr sent Dassoff a Draft Settlement Agreement and Mutual Release "for review and feedback."[56] The draft was a single global settlement agreement for the consolidated RT litigation. In the "Payment" section of the draft, it provided that RT would pay AKH $8 million, but left blank which portions of that amount would be paid by RT to AKH to settle "the AKH Lawsuit," and which portion would be paid to transfer

---

[51]Doc. 680-12.

[52]*Id.*

[53]*Id.* at 11.

[54]*Id.* at 16.

[55]*Id.* at 17.

[56]Doc. 679-1.

the discounttires.com domain name. This document was not provided to UUIC during the underlying litigation; it was provided for the first time during discovery in this litigation. Kepler testified during her deposition that █████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████[57]

On November 28, 2012, Gauntlett and Paul Hastings attorneys exchanged emails about the draft, on which Andy Andonian was copied. Gauntlett recommended that the RT action be addressed in an agreement that does not reference the AKH action, "or the parties' settlement or business issues."[58] Dassoff responded that it would be difficult to persuade AKH and RT to agree to the two separate agreements. Further, "given the direction from AKH to complete this settlement as soon as possible, I am concerned that taking this approach could significantly delay completion of the settlement and payment by RT to AKH."[59]

On December 2, 2012, Cole requested further information from Kepler and Dassoff about Dassoff's November 19 letter and RT's $20 million settlement demand, explicitly asking for "more details regarding the complete settlement demand and the recommended settlement."[60] Dassoff and Gauntlett attorneys discussed how to address her questions. On December 4, 2012, Dassoff sent Cole another email summarizing a phone conversation with her the day before. He

---

[57]Doc. 713-1 at 169:1–11.

[58]Doc. 675-70 at 4.

[59]*Id.*

[60]Doc. 675-9.

discussed the impact of the summary judgment rulings on his firm's assessment of damages

exposure and likelihood of success at trial. Furthermore, he stated:

> As a matter of general practice, we have recommended to AKH
> that they speak to their insurance broker regarding putting other
> potential insurance carriers on notice. However, as we have
> emphasized, we are not coverage counsel and we do not offer any
> opinions related to these issues. Further, we have been instructed
> by our clients that we are not to discuss any monetary terms of the
> settlement of AKH's claims against [RT] with Zurich and that your
> inquiries on these issues should be directed to the Gauntlett firm.
> Given Zurich's refusal to pay any fees associated with the
> prosecution of AKH's claims, it should not come as a surprise that
> our clients would consider such terms of no moment to Zurich, as
> Zurich cannot dictate to its insured how to resolve its business
> disputes.[61]

Dassoff concluded by stating that it was "imperative that a prompt response be given to [RT]"

and asking UUIC for $5 million in settlement authority "to avoid losing this opportunity for

settlement."[62] AKH was copied on this letter.

By letters dated December 11, 2012 and December 12, 2012, Gauntlett advised UUIC of

the following: (1) UUIC's demand to see a draft of the settlement terms was "improper" because

Universal was not entitled to know how the parties are resolving their "business issues"; (2)

"[a]s no money has yet been offered regarding [RT's] claims, [Universal] can have no legitimate

objection to the continued exploration of this settlement opportunity"; and (3) AKH believed that

securing authority for $5 million may be sufficient to settle the case if it is communicated

promptly to RT.[63]

---

[61]Doc. 635-25 at 4.

[62]*Id.* at 5.

[63]Doc. 627 at 7 ¶ 18.

On December 11, 2012, Gauntlett sent UUIC counsel a letter with the subject line, "$5 Million Settlement Authority—The Time for Delay is Over."[64] The letter advised UUIC that RT demanded that the "matter be resolved by close of business tomorrow or any proposal to settle RT's action against AKH will be withdrawn and the matter will proceed to trial."[65] AKH executives reviewed this letter before it was sent to UUIC. Yet, RT never set a "drop-dead" date for its settlement offer.[66] AKH and its counsel proposed a year-end resolution for the consolidated underlying lawsuits. RT understood that its deal with AKH would "blow up if we couldn't close it by year end because of tax considerations specific to AKH."[67]

On December 13, 2012, UUIC offered the policy limits of $5,000.000 to RT in settlement, subject to a complete reservation of rights. In its lengthy letter offering policy limits, and outlining the reason for its reservation of rights, UUIC noted its surprise at RT's settlement demand and "the urgency of accepting it," and "reiterate[d] its request that AKH apprise it of all the settlement terms, including all non-monetary terms being discussed."[68]

The parties in the underlying RT litigation drafted a separate settlement agreement for each lawsuit. On the same day that UUIC sent its letter offering policy limits and requesting more information about the settlement, AKH's counsel discussed with one another and with AKH executives' potential revisions to the two settlement agreements, and how much of the settlement agreements to share with UUIC. The Gauntlett firm took the position that the

---

[64]Doc. 635-76.

[65]*Id.*

[66]Doc. 635-19 at 132:14–133:1.

[67]Doc. 675-11 at 210:14–24.

[68]Doc. 635-31 at 14.

settlement agreement for the RT action should not reference the settlement agreement for the

AKH action, but Dassoff replied:

> We can ask again, but at this point it is pretty clear that RT is going
> to insist that some language be included in the RT agreement
> referencing the separate AKH agreement. Inclusion of these
> recitals in our next draft to RT will also likely delay finalizing the
> agreements as we go back and forth w/RT's attorneys on the issue.
> Given the commitment by Zurich to fund the $5 million, isn't it
> more likely than not that Zurich will still pay that amount when
> they see the references to the AKH agreement (and we continue to
> refuse to let them see this other settlement agreement that has RT
> paying AKH $13 million)?[69]

Jesse Abrams, a Gauntlett attorney, disagreed with Dassoff, explaining:

> If that integration is present, it will be extremely difficult to avoid
> giving both agreements to Universal. Once they see all dynamics
> of both deals they may raise a number of issues, possibly arguing
> that their $5 million is unnecessary and that they granted the
> authority based on a misperception of the deals taken together.[70]

Dassoff responded that the Gauntlett attorneys should "be prepared for the likelihood that they

will reject our demands to remove this language," out of a "largely unfounded concern about

being accused later on of collusion by Zurich."[71]

Also on December 13, Schaeper wrote to Gauntlett: "[M]ajor congratulations to everyone

at Gauntlett and Associates for this excellent news and accomplishment."[72]  Schaeper wrote

separately to Paul Hastings: "[Y]our direct involvement with Zurich/Universal and their

attorneys has resulted in a very favorable (and unanticipated) quick response.  A big 'thank you'

to you on all counts."[73]

---

[69]Doc. 643-10 at 3.

[70]*Id.* at 2.

[71]*Id.*

[72]Doc. 635-33 at 3.

[73]Doc. 635-34 at 2.

On December 17, 2012, Gauntlett sent UUIC a letter explaining that before UUIC extended $5 million in settlement authority, the parties had not agreed on an amount to be paid, and were instead addressing other business issues. "We are now negotiating a dollar figure with [RT] and believe we can settle if we can secure $5 million from Universal well in advance of year's end. . . . this offer will remain open until 12:00 pm (noon) PST on Wednesday, December 19, 2012 . . . .[74] Schaeper was copied on this letter. In another letter dated December 17, 2012, Gauntlet sent UUIC counsel a response to UUIC's December 13 letter, informing UUIC that its "quest for information unrelated to its defense duty is improper," and argued that AKH need not disclose the parties' resolution of "business disputes" in order to fulfill its duty to cooperate.[75]

### *Receipt and Execution of Settlement Agreements*

AKH provided drafts of both settlement agreements to UUIC on December 20, 2012—one week after UUIC had committed to paying its $5 million policy limits to RT to settle RT's claims against AKH, but before it tendered payment. In her email sending the drafts, Kepler told UUIC counsel that she had "been informed that these drafts need to be communicated to you immediately so as to fund the settlement in this calendar year."[76] UUIC responded on December 20 that it would need to review the final versions before issuing the settlement check. RT wanted UUIC to sign the settlement agreement. RT's attorneys

> also suggested that the 5 million-dollar payment [] simply flow directly to the insured, to AKH, and clearly spell out the participation of the carrier and further to expressly state that the carrier was aware of the second agreement and the other side of the settlement that R-T was paying AKH 8 million dollars so that the

---

[74]Doc. 639-37.

[75]Doc. 675-61.

[76]Doc. 639-39.

> carrier had a full understanding what was happening in the
> settlement to decide what to put into the settlement.[77]

On December 21, 2012, UUIC counsel Karen Bizzini provided some comments to the draft

agreement to settle the RT action, advised that RT would not sign the agreement, and asked that

references to the insurer be removed as it is not a party to the lawsuit. Bizzini confirmed that

UUIC's $5 million was to be paid in settlement of RT's action, noted that she did not "anticipate

further communications with UUIC until after Christmas," and stated that if she received

comments from her client about the settlement agreement draft before then, she would let AKH

know.[78] Kepler responded that in lieu of UUIC's signature, RT would like a confirming note

that UUIC has had an opportunity to review the settlement documents, and asked if that would

be possible. Bizzini responded, "Yes."[79]

 AKH sent counsel for UUIC the final unsigned settlement agreements for both lawsuits

on December 22, 2012. On December 24, 2012, AKH again provided UUIC with the final

settlement agreements and a draft escrow agreement. The settlement agreements were signed by

AKH on December 23, 2012, and by RT on December 24, 2012. The Settlement Agreement for

the RT Action provided, among other things, that AKH would pay RT $5 million, and that UUIC

and the parties "agree to the establishment of an escrow for the receipt and distribution of

settlement funds to the parties and to further facilitate a comprehensive settlement that involves

both this Agreement and the separate terms and conditions of the AKH Agreement."[80] The RT

Agreement also provides that "[t]o the best of AKH's knowledge, Universal is fully informed

---

[77]Doc. 675-11 at 153:20–154:3.

[78]Doc. 675-63.

[79]Doc. 672-59.

[80]Doc. 680-15 at 18.

that RT is receiving $5,000,000 in connection with the Settlement Payment herein and AKH is receiving $13,000,000 in connection with the Settlement Payment pursuant to the AKH Agreement."[81] However, neither of the settlement agreements nor the escrow agreement directly states that UUIC's money was being used to compensate AKH, that AKH was using the $5 million to maximize its own recovery, that UUIC's money was only necessary because AKH wanted to increase its recovery beyond what RT was willing to pay, or that RT had agreed to pay only $8 million and accept nothing in return, among other facts.

Having received no confirmation of review yet from UUIC, Kepler wrote Bizzini again on December 27, asking for written confirmation that she received the documents sent on December 24. Later on December 27, Bizzini, responded to Kepler's email as follows:

> As I advised you on Friday 12/21, no one representing Universal, including my firm as its coverage counsel, was available to review or respond to communications concerning this matter between 12/22 and 12/26. Accordingly, no one representing Universal reviewed the final versions of the RT Lawsuit Agreement and AKH Lawsuit Agreement that you sent, nor any version of the Escrow Agreement prior to the parties' execution of these agreements on 12/24. No one representing Universal was ever given an opportunity to read the Escrow Agreement until after it was already executed.[82]

Bizzini identified problems with the documents, reminded Kepler that UUIC agreed to the settlement under reservation of its right to seek reimbursement of the indemnity payment, and relayed that UUIC "takes no position concerning any of the provisions of the three agreements signed by RT and AKH on 12/24. As we previously advised, Universal assumes that the Paul

---

[81]*Id.* at 23–24.

[82]Doc. 675-14.

Hastings law firm as appointed defense counsel for AKH fully assisted AKH in negotiating, drafting and executing these three agreements."[83]

UUIC issued the $5 million settlement check later on December 27, 2012; Paul Hastings received it on December 31, 2012. In connection with the settlement of the RT litigation, the following payments were made via escrow: (1) RT issued $5 million to AKH and AKH issued $5 million to RT on December 26, 2012, to support dismissal of the consolidated underlying lawsuits; (2) RT paid the Confidential Settlement Amount to AKH on December 28, 2012, to purchase certain domain rights; and (3) Universal issued a check to RT for $5 million and, upon receipt, RT wired that $5 million to AKH on January 4, 2013. RT, following receipt of the $5 million settlement sum from Universal, paid AKH a total of $13 million.

Paul Hastings was paid a contingency fee based on AKH's recovery of $8 million.

In total, UUIC paid $805,383.08 in attorneys' fees, costs, and expenses connected to defending the RT action. AKH maintains that the total amount of reasonable and necessary defense costs incurred is $2,671,601.74.

On January 2, 2013, AKH filed this coverage action against Universal. On February 12, 2013, UUIC filed its answer and counterclaim seeking reimbursement.

### *AKH's Asset Transfers*

Andy Andonian and Hratch Andonian are the sole owners of AKH, with ownership percentages of 55% and 45%, respectively. In 2011 and 2012, AKH owned and operated 41 retail stores under the name Discount Tire Centers. Prior to 2013, AKH considered making corporate changes to its entity, including the possibility of splitting the business between the Andonian brothers. Schaeper testified that when he met with the Andonians in 2010 and

---

[83] *Id.*

discussed working for AKH, the Andonians told him they were interested in "succession planning" for their sons, which would involve splitting AKH. Despite these conversations, in 2012 the brothers discussed going their separate ways, and communicated that intent to their accountant, Darryl Whitehead. They began to discuss with Whitehead how to value AKH for that purpose. In 2012, AKH decided not to sell, split, or transfer any assets because of the ongoing RT litigation.

The parties present several conflicting valuations of AKH prior to its sale of assets in 2013. On March 16, 2013, Whitehead prepared a report for AKH with a valuation of the company as of December 31, 2012. Using a capitalized cash flow method, based on the assumptions outlined in the report, Whitehead determined that AKH had a fair market value of $13 million. In the summer of 2013, AKH rejected a third-party offer from Empirical Group of $17 million to purchase stores and the Discount Tire Centers trade name because AKH believed the offer was too low. In connection with that negotiation, AKH presented to Empirical Schaeper's EBTDA[84] valuation of AKH as of July 1, 2013, of $20 million not including the wholesale and ecommerce divisions.[85] Hratch and Andy told Empirical that the "price tag for all of the stores with the trade name including licensees [was] between 25 million to 30 million."[86] In August 2013, Andy Andonian believed a reasonable value for AKH was $25-30 million. UUIC's expert valued AKH at $29 million as of December 31, 2012.

On July 21, 2013, Hratch Andonian asked AKH's CFO Rene Peth what liabilities would be left in the event of a wind-down of AKH, "excluding Zurich's 5.0 Million." Peth's response

---

[84]Earnings before interest, taxes, depreciation, and amortization ("EBITDA") is one measure often used as a multiple in the market approach to valuation, according to AKH's expert. Doc. 664-1 at 23.

[85]AKH's rebuttal expert Larry Johnson opines Schaeper's valuation should have excluded "reasonable adjustments," which would result in a valuation of $14.54 million. Doc. 664-1 at 26–27.

[86]Doc. 635-39 at 123:7–124:20.

characterized the "$5,000,000 Zurich Payment" as an "Accrued Expense."[87] Peth testified that an accrued expense "would be something that you would be relatively certain would happen. . . . [I]t's incurred. It's just you haven't either received a bill for it yet or you haven't paid the bill for it."[88] Whitehead considered the $5 million indemnity payment to be deferred revenue in AKH's 2015 tax return.

Beginning in August 2013, AKH began selling or transferring most, if not all of its assets. Pep Boys purchased 18 Discount Tire Center stores from AKH for approximately $10.7 million under an asset purchase agreement dated August 16, 2013. Approximately $███████ of that purchase price was for goodwill and the balance was for tangible assets. Andy and Hratch Andonian received personal distributions of approximately $█████████.

On August 30, 2013, AKH executed a Plan of Conversion, by which it converted into an entity called "AKH Company, LLC," organized under Nevada law. AKH Company, LLC was created in part for tax reasons. Hratch and Andy Andonian then began creating new business entities and sold or transferred AKH's assets to those entities.

TradeCo, LLC ("TradeCo") was formed on September 10, 2013; Andy and Hratch Andonian were the sole members, with interests of 55% and 45% respectively. Also on September 10, 2013, AKH transferred ownership of the "Discount Tire Centers" trademark to TradeCo for zero consideration. Currently, Andy Andonian is the sole owner of TradeCo.[89] TradeCo receives licensing and management fees from each Discount Tire Centers licensees and franchisees in amounts between $1000 and $1500 per month. TradeCo's address is 1160 N. Anaheim Boulevard. Its profits since 2015 are more than $345,000 per year.

---

[87]Doc. 643-13.

[88]Doc. 635-38 at 179:15–180:8.

[89]Doc. 635-39 at 174:2–8.

55, Inc. is a California corporation created on August 5, 2013. It is owned by Hratch Andonian and located at 3685 Motor Avenue in Los Angeles, California. Under an October 1, 2013 asset purchase agreement, AKH sold two Discount Tire Centers stores to 55, Inc. for a purchase price of $115,721. The purchase price was the net book value of the fixed assets but did not include tire inventory. AKH's financial obligation under the asset purchase agreement was reduced by tire rebates and adjustments such as returns and warranties credited to AKH for inventory purchased by 55, Inc. In total, 55, Inc. paid to AKH $125,000.[90] AKH and 55, Inc. were represented by the same counsel in preparing the asset purchase agreement. A bill of sale dated September 30, 2013, shows that AKH sold to 55, Inc. tire inventory, other resale inventory, equipment, and "other assets" for a total consideration of $347,250.00.[91] The price of these goods was based on net book value. 55, Inc. pays a monthly licensing fee to TradeCo to use the Discount Tire Centers name on the two stores it purchased from AKH. It also operates four other stores not purchased from AKH, and not operating under the Discount Tire Centers name. AKH and 55, Inc. have separate bank accounts. 55 Inc. uses a different point-of-sale system than AKH and has its own computer network. It keeps its books, records, and assets separate from AKH. It has a separate payroll system and its own insurance policy. Hratch Andonian testified that as part of his 45% interest in AKH, he received the two Discount Tire Centers stores now owned by 55, Inc., which were valued at $1.75 million.

Andonian Enterprises, Inc. ("AEI") is a California corporation created on September 10, 2013, with its principal place of business in California. It is owned by Andy Andonian and

---

[90]AKH asserts that 55, Inc. paid "a total of $396,311.08 to AKH, of which at least $125,000 was for the purchase of fixed assets and inventory." Doc. 680 ¶ 80. But AKH cites no evidence that supports the first part of this factual assertion, at least not without a witness to explain the referenced financial documents.

[91]Doc. 672-22.

located at 1160 N. Anaheim Boulevard in Anaheim, California. AKH sold AEI its remaining 23 Discount Tire Center stores under an asset purchase agreement dated October 1, 2013, for a purchase price of $1,146,021. This purchase price was set by Andy and Hratch Andonian and reflected the book value of the purchased assets. The purchase price does not include amounts attributable to the value of inventory associated with the stores even though the agreement indicates that the inventory was transferred to AEI as part of the sale. AKH's financial obligation under the asset purchase agreement was reduced by tire rebates and adjustments such as returns and warranties credited to AKH for inventory purchased by AEI. AEI also paid AKH for inventory. AKH does not know how much AEI actually paid to receive these stores.[92] AKH and AEI were represented by the same counsel in preparing the asset purchase agreement. Andy Andonian gave a portion of his Pep Boys distribution to AEI to fund its purchase of AKH's assets. The stores purchased from AKH by Andonian Enterprises, Inc. operate under the Discount Tire Centers name and AEI pays a licensing fee to TradeCo.

TireNetwork Group ("TNG") is a California corporation with its principal place of business in California. It is owned by Andy Andonian and is located at 1160 N. Anaheim Boulevard in Anaheim, California. AKH transferred its wholesale and ecommerce business to TNG under an asset purchase agreement executed in December 2012. Under the agreement, the parties had until May of 2013 to agree on the values for these parts of AKH's business. The purchase price was listed in the agreement as $2,165,897. This amount was set by the Andonians and reflected an amount less than the book value of the assets and the replacement value of the inventory. The Andonians decided to deduct approximately $90,000 from the book

---

[92] AKH submits several exhibits in support of its claim that it paid $2,023,767.91, but none of the cited-to exhibits support this number. In contrast, Hratch Andonian clearly testified by deposition that AKH did not know how much AEI actually paid to receive the stores. Doc. 635-50 at 42:24–46:2.

value calculated by Peth when they set the purchase price. TNG did not actually pay AKH the full amount set forth in the asset purchase agreement; AKH wrote off hundreds of thousands of dollars.[93] Andy Andonian personally loaned money to TNG to fund its purchase of AKH's assets.

Banking records produced by the Counter-Defendants show millions of dollars flowing among the parties. After the transfers outlined above, there was a transition period whereby AKH continued to purchase tire inventory from parties with whom it had existing relationships on behalf of AEI, TNG, and 55, Inc. AKH then received rebates and credits for these purchases, which it used to reduce these parties' financial obligations under the asset purchase agreements. Also during this period, AKH paid utilities, administrative expenses, payroll, and insurance for 55, Inc., TNG, and AEI, and those entities paid some of AKH's debts and obligations. For several months after the transfers, AEI did not have a depository bank account for its central California stores, so store deposits for those stores were made into AKH's Bank of America account and transferred to AEI's US Bank account. In 2013, AEI made a tax payment on behalf of AKH, for which it was eventually reimbursed.

The Andonian brothers loaned money to AKH over the years; often these loans did not carry interest rates. In one instance prior to the transfers outlined above, Hratch Andonian obtained a person loan from AKH President Michael Schaeper to support AKH's operations. The loan was repaid with interest.

At the end of 2012, AKH's sales were over $███ annually and it had over $██ ███ in reported assets. Its net income that year was $███. At the end of 2013, AKH

---

[93] AKH submits several exhibits in support of its claim that it paid $2,154,672.08, but none of the cited-to exhibits supports this number, at least not without a witness to explain them.

listed approximately $■ in cash as an asset in its tax return; at the end of 2014, AKH

listed less than $■ cash in its tax return. AKH currently has no revenue. According to Hratch

Andonian, AKH "just manage[s] the day-to-day, some of the legal matters, obviously. The tax

returns and—and if there are any other things—it's on hold because of all this situation right

now. We're not really doing much other than trying to manage it right now."[94] AKH depends

on gifts and loans from its owners to manage expenses. Currently, Andy and Hratch Andonian

borrow money from third parties other than banks, who will not loan directly to AKH. Then,

they infuse that money into AKH for it to pay debts, and the Andonians repay lenders with

personal funds.

    In contrast, AEI, TNG, and 55, Inc. garnered substantial assets and sales after they were

created. In 2013, TNG reported $■ in sales and $■ in assets, with a net

income of $■. 55, Inc. reported $■ in sales and $■ in assets, with a net

income of ■. AEI reported $■ in sales and over $■ in assets, with a net

income of ■. By 2016, those assets and sales were substantially higher. TNG

reported $■ in sales and $■ in assets, with $■ in net income. 55, Inc.

reported $■ in sales and $■ in assets, with ■ in net income. AEI

reported $■ in sales and $■ in assets, with ■ in net income.

    After the transfers, AKH employees became employees of 55, Inc. and AEI under the

terms of the asset purchase agreements. Some AEI employees are also TNG employees. RT

owns the domain name www.discounttires.com. The Discount Tire Centers trademark is owned

by TradeCo; RT rescinded a May 2013 offer to buy the trademark. In January 2019, Andy

Andonian testified that AKH owns the domain name www.discounttirecenters.com. Prior to his

---

[94]Doc. 643-4 at 31:15–20.

testimony, Hratch Andonian had testified that AEI owned that domain name; therefore, UUIC learned for the first time that AKH owned this asset in January 2019.[95]

## III.    Discussion

### A.    Insurance Claims

In Counts I through III of its Amended Complaint, AKH seeks declarations that Universal breached its duties to defend and settle the RT action, which collectively amount to a breach of the duty of good faith and fair dealing.  UUIC responds that it did not breach its duties to defend and settle, and that AKH breached its duty to cooperate under both the insurance contract and Cal. Civ. Code § 2860(d), extinguishing its duty to defend and providing a right to reimbursement of the settlement funds and defense costs.

Under a prior Order of this Court, and as stipulated by the parties, California law applies to the claims and defense raised on these issues.[96]  The Court begins its analysis by considering Universal's duty to defend in the RT litigation.

### 1.    UUIC's Duty to Defend

An insurer has a duty to defend "in any action brought *against* the insured seeking damages for any covered claim."[97]  The duty applies to claims that are potentially covered by the policy, "in light of the facts alleged or otherwise disclosed," and "arises as soon as tender is made."[98]  The Supreme Court of California has held that in a "mixed action," where "some of the claims are at least potentially covered and the others are not . . . . the insurer has a duty to defend

---

[95]The Court has already rejected AKH's argument that Hratch Andonian's testimony is not binding on the company in a March 19, 2019 Memorandum and Order.  Doc. 628 at 15–21.  The Court found his March 2017 testimony was false, and that he was designated under Rule 30(b)(6) to talk about AKH's assets.  The Court imposed an adverse inference instruction as a sanction for that conduct.  *Id.* at 20.

[96]Docs. 277 & 627 at 3–5.

[97]*Buss v. Superior Court*, 939 P.2d 766, 773 (Cal. 1997) (emphasis added).

[98]*Id.*

the action in its entirety."[99] This duty "implies the prophylactic duty to defend 'entirely,' without pausing to parse among potentially covered and clearly uncovered claims."[100] "To defend meaningfully, the insurer must defend immediately. To defend immediately, it must defend entirely."[101] It is uncontroverted that UUIC had a duty to defend AKH in the action filed against it by RT.

The duty to defend includes "providing competent counsel and paying all reasonable and necessary costs."[102] AKH argues that UUIC failed to provide a complete and meaningful defense by insisting on allocation between the two lawsuits at billing requirements far below Paul Hastings' customary rates. AKH's arguments in favor of this position misapprehend governing law, and ignore important uncontroverted facts in this case.

### a. Mixed Actions

AKH first suggests that the "mixed action" rule announced in *Buss* applies to the consolidated RT litigation, requiring UUIC to pay for all charges by Paul Hastings upon tender of the defense. UUIC responds that *Buss* does not apply to consolidated cases that include defensive and affirmative claims; it only applies to actions against the insured that include both claims that are potentially covered and those that are not. Moreover, UUIC argues that the parties reached agreements that govern UUIC's payment of the costs of AKH's defense: (1) UUIC's February 12, 2012 Reservation of Rights letter agreed to pay AKH's chosen counsel provided that counsel agrees to abide by the terms of Cal. Civ. Code § 2860 and comply with

---

[99]*Id.* 774–75 (citations omitted).

[100]*Scottsdale Ins. Co. v. MV Transp.*, 115 P.3d 460, 468–69 (Cal. 2005) (citing *Buss*, 939 P.2d at 775).

[101]*Buss*, 939 P.2d at 775 (citations omitted).

[102]*Wallis v. Centennial Ins. Co.*, 982 F. Supp. 2d 1114, 1121 (E.D. Cal. 2013); *see also Aerojet-General Corp. v. Transport Indem. Co.*, 17 Cal. 4th 38, 57–58 (Cal. 1997).

UUIC's defense counsel guidelines and billing rates; and (2) the parties separately agreed that AKH would pay for 50% of Paul Hastings' work on the consolidated action.

The Court agrees with UUIC that the *Buss* court's discussion of "mixed actions" does not apply to separate actions that are not tendered. "Mixed actions" are actions where some *claims* are potentially covered by the insurance policy and some are not.[103] *Buss* makes clear that the duty to defend arises as soon as tender is made. "[T]he duty to defend goes to any *action seeking damages* for any covered claim."[104] It is uncontroverted that the only "action" tendered to UUIC was RT's action against AKH. Because AKH's lawsuit against RT was an affirmative action and was not part of the tender, there is no genuine issue of material fact that UUIC had no duty to "defend" in that affirmative action despite the fact that it was consolidated with RT's action against AKH.

AKH insists that where the insured's lawyers' duties defending against a lawsuit are intertwined with its duties prosecuting an affirmative action, the duty to defend requires the insurer to fund the entire dispute, without allocating between the covered and uncovered actions. The Court has reviewed the many cases AKH cites for this proposition and finds that they are inapposite or distinguishable. None of these cases hold that the duty to defend includes the duty to pay costs to prosecute an action by the insured. Instead, the cited-to cases deal with the burden of proof that applies to determine reimbursable defense costs *after* it is determined that the insurer breached the duty to defend.

For example, in *California v. Pacific Indemnity Co.*, the California Court of Appeals considered whether the insurer bore the burden of proving the amount of costs incurred in

---

[103]*Buss*, 939 P.2d at 774.

[104]*Id.* (emphasis added).

defense of an action where the insured was entitled to defense fees and the attorneys were unable to separate out from their records time spent on the defense and time spent prosecuting related claims.[105] The court held that the insured must prove the existence of the amount of the expense, and the insurer must demonstrate that the cost is unreasonable.[106] The insured in that case met its burden by "provid[ing] testimony that the work was all related to the defense. Pacific Indemnity has provided no evidence to rebut that claim."[107] The appellate court did not hold that Pacific Indemnity breached the duty to defend by declining to pay the costs of prosecuting an affirmative lawsuit. It merely sets forth the relative burdens of proof on the amount of defense fees owed where a duty to defend is breached and some of the costs are intertwined with the costs of prosecuting an affirmative lawsuit.[108]

Likewise, in *United Coastal Insurance Co. v. Strategic Organizational Systems International, Inc.*, the insurer conceded that some of the claims against the insured were potentially covered by the policy, yet it paid none of the insured's defense costs, instead arguing that it had no duty to defend, and that the insured must show that its defense costs are traceable to potentially covered claims.[109] In arguing that the insured had a duty to allocate, United Coastal contended that placing an allocation burden on it would unfairly subsidize the insured's

---

[105] 63 Cal. App. 4th 1535, 1548–49 (1998). The *Pacific Indemnity* court rejected a different argument by the insurer under *Buss*: that defense costs should be apportioned based on the coverage period. *Id.* at 1548. The Court of Appeals held that under *Buss*, the insurer was obligated to pay for the entire period, subject to reimbursement. *Id.* at 1548; *see also United Coastal Ins. Co. v. Strategic Organizational Sys. Int'l, Inc.*, No. 90-16340, 1992 WL 103710, at *6 (9th Cir. May 13, 1992) (affirming, in pre-*Buss* decision, district court's decision that insured does not have a duty to allocate or segregate defense costs between covered and noncovered claims).

[106] *Pac. Indem.*, 63 Cal. 4th at 1549.

[107] *Id.*

[108] *Id.* at 1548–49; *accord KLA-Tencor Corp. v. Travelers Indem. Co.*, No. C-02-05641, 2004 WL 1737297, at *4 (N.D. Cal. Aug. 4, 2004) (applying relative burdens of proof on the amount of costs incurred in defending counterclaim actions against insured after a threshold finding was already made that the insurer had a duty to defend yet refused to pay *any* defense costs).

[109] 1992 WL 103710, at *5.

costs in prosecuting a cross-appeal in the underlying case.[110] The court rejected that argument

because "[c]osts exclusively attributable to these other lawsuit [were] expressly excluded from

reimbursement," and to the extent expenses for defense and prosecution overlapped, that "mere

fortuity" did not alone relieve the insurer of its duty to pay those costs.[111] Of course here, UUIC

did not decline to pay all defense costs, only those associated with the affirmative suit.

One case relied on by AKH is directly on point, however, it stands for the opposite

proposition. In *Larkin v. ITT Hartford*, Judge Breyer explained that the issue of whether there is

a duty to defend a suit prosecuted by the insured is a separate question from whether costs and

attorneys' fees prosecuting such action are recoverable as part of defense costs in a related

action:

> The Court finds that Hartford did not have a duty to fund the
> prosecution of the Larkin action. Plaintiffs have not cited a single
> case in which an insurer was held to have a duty to fund the
> prosecution of a separate action for damages in which the insured
> is a plaintiff. The Court declines to extend California law to create
> a duty to pay litigation expenses incurred in prosecuting an action
> for damages on the ground that a finding in favor of the plaintiff in
> that damages action might be used by the plaintiff to successfully
> defend a separate lawsuit.[112]

Similarly, in this case, UUIC's duty to defend is a separate question from the appropriate

allocation of fees between the defensive and affirmative action. In order to demonstrate that

certain costs and attorneys' fees incurred during the insured's prosecution of a related action may

be recoverable if they did "double duty" for the defense, the insured must, *inter alia*, identify

---

[110]*Id.* at *6.

[111]*Id.*

[112]No. C 96-1575 CRB, 1999 WL 459351, at *6 (N.D. Cal. June 29, 1999).

such costs and submit evidence that they were "reasonable and necessary to the defense."[113] This showing includes:

> (1) that the costs and fees sought are associated with actions conducted within the temporal limits of [UUIC's] duty to defend, i.e., between tender of the defense and conclusion of the action; (2) the actions taken amount to a reasonable and necessary effort to avoid or at least minimize liability; and (3) the actions taken are reasonable and necessary for that purpose.[114]

AKH does not identify which fees UUIC failed to pay that were reasonable and necessary to the defense. To the extent AKH suggests that UUIC had a duty to fund the entire consolidated action up front, its position is not supported by California law. UUIC was not required to prophylactically "assume expenses alleged by its insured to be 'reasonable and necessary' to minimize liability in a covered action."[115] Other than its proffered expert, Andre Jardini, AKH has come forward with no evidence that the entirety or majority of Paul Hastings' fees were reasonable and necessary to the defense of the RT action other than conclusory assertions. And the Court has excluded Jardini's expert opinion on this point because his opinion that virtually all of Paul Hastings' work on the two lawsuits should be attributed to the defense relies on faulty methodology and assumptions. Namely, his opinion is limited to fees he determined were "reasonable" under a different standard that the one set out above. Conclusory assertions that Paul Hastings' work on the affirmative lawsuit was reasonable and necessary to the defense are not sufficient to defeat summary judgment on that point.

---

[113]*Id.* at *7 (applying and distinguishing *Aerojet-Gen. Corp. v. Transp. Indem. Co.*, 948 P.2d 909, 922 (Cal. 1997)).

[114]*Kia-Tencor Corp. v. Traveler's Indem. Co.*, No. C-02-05641 RMW, 2004 WL 1737297, at *4 (N.D. Cal. Aug. 4, 2004).

[115]*NextG Networks, Inc. v. OneBeacon Am. Ins. Co.*, No. 11-CV-05318-RMW, 2012 WL 3017689, at *5 (N.D. Cal. July 23, 2012).

AKH also fails to consistently relay its position on which fees are properly attributable to the defense. Its expert opines that almost all fees, $1,866,218.88 (all but 4% of the total fees submitted), incurred by Paul Hastings should have been paid by UUIC.[116] But in its reply to UUIC's motion for summary judgment, AKH contends that "AKH is not owed for every fee that was affirmative in nature, but where the fees were both defensive and affirmative, those are considered defensive fees and should have been paid by Universal."[117] Later, AKH concedes that UUIC does not have a duty to fund the affirmative lawsuit, but argues "that does not mean Universal did not have a duty to pay for *some* of those costs where they are properly characterized as defense costs."[118] Despite Jardini's opinion, AKH never submits on summary judgment how much of Paul Hastings' fees were "reasonable and necessary" to the defense of the RT action. In fact, it explicitly disclaims that there is a need to reach that question, arguing that it "rather seeks a declaration that Universal breached its duty to defend AKH, with the exact amount of damages Universal caused subject to proof at trial."[119]

To be sure, determining whether UUIC breached a duty to defend is the first order of business. The Court has determined that it did not. For AKH to prevail on summary judgment, the Court must agree that UUIC was required to fund the entire consolidated litigation and seek reimbursement and allocation at a later time. This position is not well taken.

> In the general case, it is the insured that must carry the burden of proof on the existence, amount, and reasonableness and necessity of . . . defense costs, and it must do so by the preponderance of the evidence."[120] It is only in exceptional cases "wherein the insurer has breached its duty to defend, [where] the insured . . . must carry

---

[116]*See also* Pretrial Order, Doc. 627 at 67.

[117]Doc. 713 at 56.

[118]*Id.* at 57 (emphasis added).

[119]*Id.* at 62.

[120]*Aerojet-General Corp. v. Transport Indem. Co.*, 948 P.2d 909, 924 (Cal. 1997).

> the burden of proof on the existence and amount of the site investigation expenses, which are then presumed to be reasonable and necessary as defense costs, and it is the insurer that must carry the burden of proof that they are in fact unreasonable or unnecessary.[121]

Either way, the insured has a burden to at least identify the existence and amount of such expenses. AKH wholly fails to do so, and its argument that this matter should be left for trial is unavailing in the face of UUIC's motion for summary judgment pointing to a lack of evidence that the more than $800,000 in fees it paid under the cost-sharing agreement and billing guidelines were insufficient to meet the reasonable and necessary mandate in the governing statute and case law.

The statute requires that "[a]ny dispute concerning attorney's fees ... shall be resolved by final and binding arbitration by a single neutral arbitrator selected by the parties to the dispute."[122] California case law identifies two limited circumstances where an insurer may forfeit the right to arbitrate the issue of attorney's fees: (1) where the insurer fails to pay at all; and (2) where the insurer improperly refuses to accept tender of the defense.[123] Neither situation applies here given that UUIC agreed to defend and has paid more than $800,000 in defense costs. Once a trial court makes preliminary decisions about whether the insurer has a duty to defend, or has violated the covenant of good faith and fair dealing, the parties are required to arbitrate any

---

[121]*Id.*

[122]Cal. Civ. Code § 2860. *San Diego Navy Federal Credit Union v. Cumis Ins.*, 208 Cal. Rptr. 494 (Cal. 1984) acknowledged an insurer's duty to appoint independent counsel under certain circumstances. The case was superseded by statute, so the duty is now governed by Cal. Civil Code § 2860, commonly referred to as the *Cumis* statute.

[123]*Wallis v. Centennial Ins. Co.*, 982 F. Supp. 2d 1114, 1121–22 (E.D. Cal. 2013) (citing *Seagate Tech. LLC v. Nat'l Union Fire Ins. Co.*, 717 F. Supp. 2d 1013, 1017 (N.D. Cal. 2010); *Concept Enters., Inc. v. Hartford Ins. Co.*, No. CV007267NM(JWJX), 2001 WL 3405685, at *4 (C.D. Cal. May 22, 2001); *Atmel Corp. v. St. Paul Fire & Marine*, 426 F. Supp. 2d 1039, 1047 (N.D. Cal. 2005); *Janopaul + Block Cos. v. Superior Court*, 133 Cal. Rptr. 3d 380 (Cal. Ct. App. 2011)).

dispute over the amount of defense costs.[124]  Now that the Court has ruled on the scope of

UUIC's duty to defend and on the parties' claims of breach of the covenant of good faith and fair

dealing, any remaining dispute as to the amount of fees owed to AKH by UUIC is subject to

mandatory arbitration.

AKH is simply wrong on the law that UUIC's duty to defend required it to pay the costs

of the entire consolidated RT litigation up front.  UUIC's duty to defend only reached claims

potentially covered by the Policy that were in fact tendered.  It had a duty to defend AKH in the

RT action and nothing more.  To the extent some costs did "double duty" because they were

incurred for work spent on both actions, AKH fails to come forward with admissible evidence

that the remaining costs billed by Paul Hastings were reasonable and necessary to the defense.

### b.    Cost-Sharing Agreement

AKH's claim that UUIC's duty to defend required it to pay for virtually all hours

expended on the consolidated RT litigation ignores the key fact that the parties reached a

separate allocation agreement that, along with UUIC's agreement to defend under a reservation

of rights, governed the scope of UUIC's duty to fund the consolidated RT litigation.

Prior to Cole's February 29, 2012 Reservation of Rights letter, executives at AKH

provided information to Palmer by email to convince UUIC to approve Paul Hastings'

representation of AKH in the RT Action.[125]  Palmer explained to Hratch Andonian and Schaeper

in a February 10, 2012 email that if Paul Hastings agreed to UUIC's billing rates, UUIC would

allow Paul Hastings to defend AKH.[126]  In the February 29, 2012 Reservation of Rights letter,

Cole informed AKH that she had taken over handling AKH's claim from Palmer, and

---

[124]*Janopaul + Block Cos*, 133 Cal. Rptr. 3d at 387–88.

[125]Doc. 643-1.

[126]*Id.*

supplemented Palmer's January 5 letter by agreeing to "pay for AKH's choice of counsel instead of assigning provided that AKH's choice of counsel agrees to abide by the terms of California Civil Code section 2860 and complies with Universal's defense counsel guidelines and billing rates, which were forwarded to you on 2/10/12."[127]  Paul Hastings was AKH's counsel of choice—AKH retained Paul Hastings before it tendered the RT lawsuit to UUIC.  And the uncontroverted facts show that AKH continued to retain Paul Hastings after it received UUIC's February 29, 2012 letter.  There is no evidence that AKH rejected UUIC's demand that Paul Hastings agree to abide by UUIC's billing guidelines and rates in exchange for UUIC funding defense costs for AKH's counsel of choice.  In fact, AKH executives received the governing billing rates and guidelines prior to Cole's February 29 Reservation of Rights letter.

After the February 29, 2012 letter, Cole advised Paul Hastings attorneys Kepler and Dassoff by email that UUIC would agree to split 50/50 the attorneys' fees, "subject to this company's prior Reservation of Rights letters," which included the condition that UUIC would pay AKH's choice of counsel at UUIC's billing rates.  Initially, Kepler balked at this proposal, arguing that Palmer had not previously advised AKH executives that the Paul Hastings' work would be subject to apportionment; they believed from their conversations with Palmer that UUIC would pay 100% of Paul Hastings' billed hours under UUIC's billing guidelines and rates. Kepler proposed to Cole in her email that the parties proceed based on the AKH executives' understanding of the agreement.  But Cole replied on March 16, 2012, that "[n]o where in the emails did Jena Palmer ever agree to pay AKH's attorney's fees to prosecute the claim against Reinalt.  The only thing that Zurich agreed to was to allow AKH to use Paul Hastings to defend

---

[127]Doc. 635-4.

AKH in this case subject to our Reservation."[128]  Since Paul Hastings did not agree to the 50/50 split, Cole asked Kepler to "separate their expenses for prosecution of the claim against Reinalt and for the defense of the claim by Reinalt.  Zurich will not agree to pay for the prosecution of AKH's claim against Reinalt."[129]  Kepler responded on March 24, 2012, explaining that it would be a "practical impossibility to split our tasks between two separate billing numbers . . . I respectfully request that we return to the agreement that Zurich will pay its rates for 50% of the hours that Paul Hastings bills in connection with this case to address the prosecution/defense concerns."[130]

As supported by this email correspondence, the parties stipulate that Paul Hastings proposed a "50/50 split" between AKH and Universal of the legal fees and costs incurred in RT litigation, and that they "agreed to a '50/50 split' between AKH and Universal of the bills submitted in the Consolidated Underlying Action."[131]  It is uncontroverted that AKH authorized Paul Hastings to negotiate the 50/50 split.  It is also uncontroverted that AKH agreed to pay the difference between Paul Hastings' full rates and the panel counsel rates paid by UUIC, and for any expenses written off by UUIC under its billing guidelines.

Now, AKH appears to disavow this stipulation by arguing that the 50/50 cost-sharing agreement is unenforceable because it (1) breaches the terms of the insurance policy and Reservation of Rights letters; and (2) lacks consideration.  AKH characterizes the 50/50 split as "nothing more than an improper bid to force its insured to pay for a significant part of its own

---

[128]Doc. 672-3 at 2.

[129]*Id.* at 3.

[130]*Id.* at 2.

[131]Doc. 627 at 15 ¶¶ 83–84.

defense."[132] The Court rejects AKH's contention that the cost-sharing agreement is unenforceable.

First, the Court disagrees with AKH that the cost-sharing agreement breached the Policy provision that obligates UUIC to pay for "all costs and expenses in defending" AKH, and the obligation set forth in its Reservation of Rights letter that it would provide a "complete and unconditional defense." The cost-sharing agreement did not violate the Policy for the same reasons explained above: UUIC had no duty under the Policy to pay for *any* costs expended on prosecuting the AKH claim. It only had a duty to defend in the RT action. Although UUIC gave AKH the option of segregating its expenses and paying only those expenses attributable to the RT action, AKH's attorneys proposed and ultimately agreed to a 50/50 split based on their assertions that segregating out the billing records would be impractical and cumbersome. The fact that UUIC entered into an agreement with AKH to pay for half of Paul Hastings' work, and to subject that work to its own billing guidelines and rates, does not contravene the plain language of the Policy or the Reservation of Rights letters obligating it to provide a full defense.

AKH next argues that UUIC did not abide by the Policy provisions that govern changes to the Policy when the parties entered into the cost-sharing agreement. This provision only applies, however, if there is a change to the Policy. As stated above, the Court finds no genuine issue of material fact about whether UUIC breached its duty to defend by declining to fund the consolidated lawsuit. The cost-sharing agreement was a side agreement entered into by the parties to resolve the practical difficulty of segregating Paul Hastings' bills between the two lawsuits. It was Paul Hastings that suggested the 50/50 split, after UUIC repeatedly gave it the option of segregating fees. This agreement was a method devised by the parties to allocate

---

[132]Doc. 674 at 107.

attorneys' fees and expenses properly attributable to the claim for which UUIC agreed to defend; it did not modify the insurance contract.[133]

Finally, AKH argues without adequate explanation that the cost-sharing agreement lacked consideration, asserting that "AKH took what it could get from Universal while continuing to protest that it was entitled to more."[134] But the consideration was that UUIC permitted Paul Hastings to continue as AKH's chosen counsel without segregating its work on the two lawsuits. The act of segregating, in the words of Paul Hastings' counsel, would add "layers of complication and distraction for each time keeper added to the mix."[135] The cost-sharing agreement saved Paul Hastings' time segregating its work, and "realistically . . . would likely result in roughly a 50/50 situation."[136] The alternative—that Paul Hastings would segregate its work before submitting it to UUIC for reimbursement—was not appealing to AKH, and UUIC went beyond its obligation under the contract to provide a defense to AKH in the RT suit by allowing it to split its costs by half on the consolidated lawsuit, part of which UUIC had no duty to defend.[137] It is uncontroverted that AKH authorized Paul Hastings to negotiate this agreement, which is the type of agreement explicitly contemplated under the *Cumis* statute.[138] For all of these reasons, the Court finds that as a matter of law, the cost-sharing agreement was enforceable

---

[133]*Cf. Buss v. Superior Court*, 939 P.2d 766, 776 (Cal. 1997) (explaining that an insurer cannot seek reimbursement for defense costs for claims that are potentially covered unless, *inter alia*, there was "a separate contract supported by separate consideration. Such a contract would supersede the policy pro tanto.").

[134]Doc. 680 at 111.

[135]Doc. 672-3 at 2.

[136]*Id.*

[137]*Endurance Am. Specialty Co. v. Lance-Kashian & Co.*, No. CV F10-1284 LJO BAM, 2011 WL 5417103, at *17 (E.D. Cal. Nov. 8, 2011) (quoting *O'Byrne v. Santa Monica-UCLA Med. Ctr.*, 114 Cal. Rptr. 2d 575 (Cal. Ct. App. 2001); *Asmus v. Pac. Bell*, 999 P.2d 71 (Cal. 2000)).

[138]Cal. Civ. Code § 2860(c) ("This subdivision does not invalidate other different or additional policy provisions pertaining to attorney's fees or providing for methods of settlement of disputes concerning those fees.").

### c. Failure to Provide Independent Counsel

AKH argues that UUIC did not provide it with independent counsel, violating its duty to defend. But the Court has already ruled on this issue and found that UUIC complied with any duty it may have had to appoint independent counsel under the *Cumis* statute, Cal. Civ. Code § 2860.[139] The Court declines to revisit this ruling and finds no genuine issue of material fact about whether UUIC breached the duty to defend by failing to provide AKH with independent counsel.

### d. Use of Billing Guidelines and Panel Rates

Finally, AKH maintains that UUIC breached its duty to defend by relying on billing guidelines and unreasonable hourly rates to reduce its counsel's fees and unreasonably delay payment. According to AKH, these practices in conjunction with UUIC's knowledge that AKH agreed to pay the remainder of Paul Hastings' fees, amounted to UUIC not funding a complete and meaningful defense.

In order to show that UUIC's billing guidelines breached its duty to defend, AKH must demonstrate that the guidelines were "unreasonable or unnecessary," or that Paul Hastings' attorneys were "precluded from engaging in any specific discovery, hiring of expert witnesses, conducting research, or pursuing any other litigation tactic."[140] AKH has come forward with no admissible evidence demonstrating the unreasonableness of the guidelines, or any specific efforts precluded by their application to this matter. As this Court already noted in a 2015 order granting UUIC's partial motion for summary judgment that it fulfilled its duty to provide AKH

---

[139]Doc. 280 at 16–20.

[140]*Wallis v. Con'l Ins. Co.*, 982 F. Supp. 2d 1114, 1123 n.4 (E.D. Cal. 2013).

with independent counsel, there was "no evidence that UUIC's billing guidelines implicated any of Paul Hastings' strategic decisions in the underlying suit. And there is no evidence to suggest that Paul Hastings did not owe its primary obligation to AKH in its defense of the underlying litigation."[141] AKH argues that this ruling is not binding because it was from an earlier summary judgment record, but UUIC is correct that the Court did not simply deny AKH's motion for partial summary judgment on this issue; it granted UUIC's motion for partial summary judgment.

And on this current record, AKH fails to come forward with further evidence to support this claim. AKH fails to demonstrate that UUIC breached its duty to defend by refusing payment for fees in excess of what it deemed reasonable and necessary, particularly in the face of its payment to Paul Hastings of $805,383.08 in defense costs and fees. UUIC was "entitled to refuse to pay any amounts in excess of what is required under section 2860 or which are not reasonable and necessary for Plaintiffs' defense in the underlying action."[142] As discussed in the Court's *Daubert* ruling, the only evidence in support of AKH's contention that UUIC failed to pay all reasonable and necessary fees in the RT action is Jardini's report and testimony, which must be excluded based on an unreliable methodology, and faulty legal and factual assumptions.

As for Paul Hastings' hourly rates, under the *Cumis* statute UUIC was required to pay Paul Hastings "only those fees equivalent 'to the rates which are actually paid by the insurer to attorneys retained by it in the ordinary course of business in the defense of similar actions in the community where the claim arose or is being defended.'"[143] It is uncontroverted that UUIC paid

---

[141]Doc. 280 at 18 (footnote omitted).

[142]*Fontana Union Water Co. v. Arch Ins. Co.*, No. EDCV 16-59-VAP(KKx), 2016 WL 9045966, at *5 (C.D. Cal. Apr. 13, 2016).

[143]*Wallis v. Continental Ins. Co.*, 982 F. Supp. 2d 1114, 1121 (E.D. Cal. 2013) (quoting Cal. Civ. Code § 2860(c)).

Paul Hastings the same rates it would have paid its panel counsel, Gordon & Rees, to handle the case, therefore it met its statutory duty to pay AKH's attorneys panel rates.[144] Moreover, as set forth above, the statute mandates that any remaining claim by AKH that UUIC failed to properly allocate all reasonable and necessary defense costs is subject to arbitration.

In sum, the Court grants UUIC's motion for summary judgment on AKH's claim that it breached its duty to defend in the RT Action by failing to pay all, or nearly all, of Paul Hastings' fees and expenses incurred during the consolidated RT litigation (AKH Count I). UUIC provided an immediate and complete defense upon tender of the RT action. It had no duty to fund AKH's affirmative lawsuit against RT and the cost-sharing agreement was enforceable. To the extent certain additional defense amounts should have been paid under the governing agreements and *Cumis* statute, that question is subject to mandatory arbitration. Therefore the Court denies AKH's motion for summary judgment on UUIC's Count XI. Although the Court finds that the cost-sharing agreement was enforceable, it grants AKH's motion for summary judgment on UUIC's Count VI for breach of the cost-sharing agreement because as a matter of law, AKH did not breach this e-mail contract merely by challenging its enforceability in this litigation. The uncontroverted facts show that AKH performed under the cost-sharing agreement by accepting payment under the 50/50 split; it only later challenged the agreement's enforceability. The fact that the Court disagrees with AKH's position does not render the taking of that position a separate breach.

---

[144]*Michael Taylor Designs, Inc. v. Travelers Prop. Cas. Co.*, 761 F. Supp. 2d 904, 913 (N.D. Cal. 2011) (discussing Cal. Civ. Code § 2860(c)).

## 2. UUIC's Duty to Settle

The parties cross-move for summary judgment on AKH's Count II for a declaratory judgment that UUIC breached its duty to settle the RT action under the Policy. UUIC's motion for summary judgment is granted and AKH's motion for summary judgment is denied. AKH's claim is based on UUIC's stated intention at the time of settlement that it would seek reimbursement of the settlement payment in its entirety. Under California law, "[a]n insurer does not breach any duty to the insured merely by reserving its rights under the policy."[145]

> If an insurer could not unilaterally reserve its right to later assert noncoverage of any settled claim, it would have no practical avenue of recourse other than to settle and forgo reimbursement. An insured's mere objection to a reservation of right would create coverage contrary to the parties' agreement in the insurance policy and violate basic notions of fairness.[146]

AKH argues that because UUIC seeks reimbursement for defense costs that are potentially covered by the policy, it is entitled to a judicial declaration that UUIC was duty-bound to pay the settlement in the RT litigation. This argument lacks merit. First, this position is entirely dependent upon AKH prevailing on Count I. For the reasons explained above, UUIC's motion for summary judgment is granted and AKH's is denied on that claim. Second, UUIC's reimbursement claims are based on its position that none of the claims in the RT litigation are potentially covered by the Policy due to AKH's breach of the cooperation clause, or in the alternative, because several other Policy exclusions apply. UUIC reserved its right to

---

[145]*Fuller-Austin Insulation Co. v. Highlands Ins. Co.*, 38 Cal. Rptr. 3d 716, 738 (Cal. Ct. App. 2006) (citing *Prichard v. Liberty Mut. Ins. Co.*, 101 Cal. Rptr. 2d 298, 310 (Cal. Ct. App. 2000)); *see also Weber Distrib., LLC v. RSUI Indem. Co.*, No. LA CV 17-09238 JAK (AGRx), 2018 WL 5274615, at 12–13 (C.D. Cal. Aug. 2, 2018) ("A cause of action for bad faith refusal to settle arises only after a judgment has been rendered in excess of the policy limits . . . . Until judgment is actually entered, the mere possibility or probability of an excess judgment does not render the refusal to settle actionable." (quoting *Safeco Ins. Co. v. Superior Court*, 71 Cal. App. 4th 782, 788 (Cal. Ct. App. 1999)).

[146]*Blue Ridge Ins. Co. v. Jacobsen*, 22 P.3d 313, 321 (Cal. 2001).

bring these claims when it agreed to defend AKH, and again when it agreed to extend its liability limits for settlement. California law is clear that reserving the right to reimbursement, in itself, breaches neither the insurer's duty to defend nor its duty to settle, therefore summary judgment is granted in favor of UUIC and denied to AKH on AKH Count II.

### 3. The Parties' Duty of Good Faith and Fair Dealing

Both parties allege claims for breach of the covenant of good faith and fair dealing in their performance under the contract (AKH Count III, UUIC Count VII). The parties cross-move for summary judgment on AKH's Count III; AKH moves for summary judgment on UUIC Count VII. The duty of good faith and fair dealing is implied in every contract, including insurance contracts.[147] It extends to both the insured and the insurer.[148] "However, while a breach of the covenant by an insurer results in an action which sounds both in tort and contract, the same is not true when an insured breaches the covenant."[149]

An insured may have a claim sounding in tort against its insurer for breaching the covenant. The insured's cause of action has two elements: (1) benefits were due under the policy that were withheld; and (2) the reason for withholding benefits was unreasonable, in bad faith, or without proper cause.[150] Such a "bad faith" claim under California law turns on the reasonableness of denying coverage, "a court can conclude as a matter of law that an insurer's denial of a claim is not unreasonable, so long as there existed a genuine issue as to the insurer's liability. An insurer is liable for breach of the implied covenant of good faith and fair dealing if it acted unreasonably in denying coverage."[151] The Court has found no genuine issue of material

---

[147]*Lennar Mare Island, LLC v. Steadfast Ins. Co.*, 139 F. Supp. 3d 1141, 1162 (E.D. Cal. 2015).

[148]*Cal. Fair Plan Ass'n v. Politi*, 220 Cal. Rptr. 243, 246 (Cal. Ct. App. 1990).

[149]*Id.*

[150]*Larkin v. ITT Hartford*, No. C 96-1575 CRB, 1999 WL 459351, at *9 (N.D. Cal. June 29, 1999).

[151]*Guebara v. Allstate Ins. Co.*, 237 F.3d 987, 992 (9th Cir. 2001) (quoting *Lunsford v. Am. Guarantee &*

fact about whether UUIC breached its duties to defend or settle under the insurance contract—it neither breached its duty to defend nor its duty to settle.[152]  Therefore, as a matter of law, UUIC did not act unreasonably in denying coverage for litigating the AKH action, for allocating the fees between the two actions under the parties' cost-sharing agreement, or by imposing its billing guidelines and rates on Paul Hastings.  Therefore, the Court must grant UUIC's motion for summary judgment on AKH's claim for breach of the duty of good faith and fair dealing and deny AKH's motion on the same.

Although AKH moves for summary judgment on UUIC's Count VII for breach of the covenant of good faith and fair dealing, it provides no argument or evidence specific to this claim in its moving papers.  Thus, the Court denies AKH's motion for summary judgment on UUIC's Count VII.

### 4.    UUIC's Right to Reimbursement

AKH moves for summary judgment on UUIC's counterclaims for reimbursement (UUIC Counts I–IV).  An insurer has a "quasi-contractual right to seek reimbursement of settlement payments made for claims not covered by the policy."[153]  To perfect a right to reimbursement, the

> insurer must provide the insured with: (1) a timely and express reservation of rights; (2) an express notification of the insurer's intent to accept a proposed settlement offer; and (3) an express offer that the insured may assume its own defense when the insurer and insured disagree whether to accept the proposed settlement.  If

---

*Liab. Ins. Co.*, 18 F.3d 653, 656 (9th Cir. 1984)).

[152]*See Larkin*, 1999 WL 459351, at *10 ("an insurer generally does not act in bad faith if there exists a genuine dispute as to the insurer's duty to defend."); *see also Century Sur. Co. v. 350 W.A., LLC*, No. 05-CV-1548-L(BGS), 2011 WL 4506981, at *9–10 (S.D. Cal. Sept. 29, 2011) (where the insurer is not liable under the insurance policy, insured "cannot bring a claim for breach of contract or breach of the implied covenant of good faith and fair dealing arising out of those insurance policies.")).

[153]*Burlington Ins. Co. v. Devdhara*, No. C 09-00421 SBA, 2010 WL 3749301, at *7 (N.D. Cal. Sept. 23, 2010) (citing *Blue Ridge Ins. Co. v. Jacobsen*, 22 P.3d 313, 321 (Cal. 2001)).

these requirements are met, the insurer has an implied-in-law right to reimbursement for reasonable settlement payments on non-covered claims, even over the insured's objection.[154]

There is no dispute that UUIC perfected its right to reimbursement of the settlement payment. It provided AKH with a timely and express reservation of rights, and expressly notified AKH in its December 11, 2012 letter of its intent to accept the proposed settlement subject to a complete reservation of rights. That letter set forth the grounds upon which UUIC asserted that the settlement pertained to uncovered claims.

Also, under California law, "[a]s to claims that are not even potentially covered . . . the insurer may indeed seek reimbursement for defense costs."[155] To prevail on its claim of equitable reimbursement, UUIC must demonstrate that "(1) [it] agreed to immediately defend [AKH] in the [underlying] action in its entirety; (2) [it] paid money to defend claims against [AKH] 'that are not even potentially covered' under the insurance policies; and (3) [it] reserved [its] right to seek reimbursement."[156] As the Court has already determined, there is no genuine issue of material fact that UUIC agreed to immediately and completely defend AKH in the RT action. There is also no genuine issue of material fact that UUIC reserved its right to seek reimbursement. The issue on summary judgment is whether the claims upon which UUIC paid money to indemnify and defend were potentially covered under the Policy. Although UUIC asserts that several policy exclusions apply to the RT action, it asks that the Court first address its claim that AKH breached the Policy's cooperation clause, which caused UUIC substantial prejudice and therefore extinguished its duty to defend and indemnify in the RT action.

---

[154] *Id.* (citing *Blue Ridge*, 22 P.3d at 320–21).

[155] *James River Ins. Co. v. Medolac Labs.*, 290 F. Supp. 3d 956, 972 (C.D. Cal. 2018).

[156] *Travelers Indem. Co. v. Centex Homes*, No. 1:14-cv-217-LJO-GSA, 2014 WL 3778269, at *2 (E.D. Cal. July 30, 2014) (quoting *Buss v. Superior Court*, 939 P.2d 766, 774–76 (Cal. 1997)).

### a. Breach of Policy's Cooperation Clause

The Policy's cooperation clause required AKH to "cooperate and assist [UUIC] in the investigation, settlement, defense, enforcement of contribution or indemnification."[157] Cooperation clauses such as this "enable insurers to 'possess [themselves] of all knowledge . . . in regards to facts, material to [their] rights, to enable [them] to decide upon [their] obligations, and to protect [themselves] against false claims."[158] UUIC argues that the uncontroverted facts show that AKH breached this duty in the following ways, which means there was "no potential for coverage:" (1) providing Universal with inaccurate information about the merits of the case and the value of RT's claims against AKH; (2) concealing and actively misrepresenting the content of settlement negotiations between AKH and RT; (3) concealing the terms of the ultimate settlement; (4) colluding with RT to package misleading information to use in pressuring UUIC to commit to pay its policy limits; (5) failing to report RT's concerns about collusion; (6) refusing to provide information to UUIC, even when directly asked; and (7) pressuring UUIC to commit Policy limits toward a settlement whose proceeds were actually being directed to AKH.

### i. UUIC's Breach of Contract Counterclaim

It is undisputed that AKH had a duty to cooperate with UUIC under the Policy. If the insured breaches that duty, "the insurer may enjoy a defense in an action under that policy."[159] The insurer's performance under the insurance contract will be "excused if its ability to provide a

---

[157]Doc. 675-6 at 93.

[158]*Weber Distrib., LLC v. RSUI Indem. Co.*, No. LA CV 17-09238 JAK (AGRx), 2018 WL 5274615, at *20 (C.D. Cal. Aug. 2, 2018) (quoting *Truck Ins. Exch. v. Unigard Ins. Co.*, 94 Cal. Rptr. 2d 516, 523 (Cal. Ct. App. 2000) (citations omitted)).

[159]*Lennar Mare Island, LLC v. Steadfast Ins. Co.*, 139 F. Supp. 3d 1141, 1160 (E.D. Cal. 2015).

defense has been substantially prejudiced."[160] This Court follows the sound reasoning of the

Eastern District of California's decision in *Lennar Mare Island, LLC v. Steadfast Insurance Co.*,

construing California law as allowing an insurer to assert a defense, but not an affirmative breach

of contract claim, based on a breach by the insured of a cooperation clause.[161] This requires the

Court to grant AKH's motion for summary judgment on Count VI of the Counterclaim, and deny

UUIC's motion on the same. However, the Court considers UUIC's claim that AKH breached

the cooperation clause as part of its equitable reimbursement claim, which requires UUIC to

demonstrate that the RT action was not even potentially covered by the policy.[162]

### ii.    Breach

ʻAKH argues that the uncontroverted facts show it did not violate the cooperation clause

because UUIC knew of the terms of the settlement, and received drafts of the settlement and

escrow agreements prior to paying its policy limits. But the Court finds there is a genuine issue

of material fact about whether AKH breached the Policy's cooperation provision. A reasonable

jury could read the email correspondence between the parties in the underlying litigation from

November and December 2012 and conclude that AKH withheld material information from

UUIC about the terms of and lead-up to the settlement, provided UUIC with misleading or false

information, colluded with RT to obtain UUIC's policy limits to bolster the settlement amount,

and/or misrepresented to UUIC that RT had set a deadline for its settlement offer. And it is

uncontroverted that UUIC was not provided with the escrow agreement—the document setting

---

[160]*Truck Ins. Exch.*, 94 Cal. Rptr. 2d at 523.

[161]139 F. Supp. 3d at 1160–62.

[162]UUIC only moves for summary judgment on its breach of contract counterclaim; it does not move on its reimbursement claim.

forth the logistics of the wire transfers and settlement payments—prior to execution of the settlement and escrow agreements.

Moreover, whether UUIC received the settlement agreements before they were executed does not address UUIC's contention that AKH failed to cooperate long before the final settlement agreements were drafted and sent—UUIC maintains that AKH failed to provide it with information about the failed mediation, withheld material information about the parties' earlier settlement negotiations, and misled UUIC about several material terms of the settlement agreements before they were reduced to final writings. Although UUIC issued its settlement check on December 27, 2012, after having received and read the final agreements, the agreements themselves were executed before UUIC was able to review and confirm its acquiescence to the agreements. Such facts could allow a reasonable jury to find that AKH failed to cooperate with UUIC in the settlement of the underlying litigation.

### iii.    Litigation Privilege

AKH argues that the litigation privilege shields "many, if not all, of the statements Universal contends breached the cooperation clause."[163]  Under Cal. Civil Code § 47(b): "A privileged publication or broadcast is one made . . . . (b) In any (1) legislative proceeding, (2) judicial proceeding, (3) in any other official proceeding authorized by law, or (4) in the initiation or course of any other proceeding authorized by law." The Court holds that the litigation privilege does not apply to shield AKH from a finding that it breached the cooperation clause of the Policy for two reasons. First, UUIC advances at least seven ways in which AKH breached the cooperation clause, yet AKH makes no effort to identify which "statements" are covered by the litigation privilege. Assuming, without deciding, that AKH preserved its litigation privilege

---

[163]Doc. 680 at 102.

assertion as to the UUIC's cooperation clause claim,[164] its failure to specify how and when the litigation privilege applies is fatal given that it is the party asserting the privilege.

Second, and most importantly, the litigation privilege applies to immunize certain statements from *tort* liability.[165] Whether the privilege applies in the context of a contract claim "turns on whether its application furthers the policies underlying the privilege. . . . [T]he purpose of the litigation privilege is to ensure free access to the courts, promote complete and truthful testimony, encourage zealous advocacy, give finality to judgments, and avoid unending litigation."[166] AKH makes no attempt to argue that the policies underlying the litigation privilege are advanced by its application to UUIC's claims for reimbursement based on an alleged violation of the Policy's cooperation clause.

UUIC's claim is based on the failure to notify UUIC of the settlement negotiations that preceded AKH's November 19, 2012 packet, wherein AKH informed UUIC that RT demanded $20 million in settlement, and its request that UUIC extend its policy limits based on that demand. It is also based on AKH's failure to answer questions and provide information about the failed mediation and settlement negotiations that preceded and followed AKH's request for UUIC to extend its policy limits.[167] It is also based on its contention that AKH colluded with RT

---

[164]UUIC correctly points out that this defense was not raised in the Pretrial Order, and is therefore subject to waiver. "Claims, issues, defenses, or theories of damages not included in the pretrial order are waived." *Zenith Petroleum Corp. v. Steerman*, 656 F. App'x 885, 887 (10th Cir. 2016) (quoting *Cortez v. Wal-Mart Stores, Inc.*, 460 F.3d 1268, 1276–77 (10th Cir. 2006)).

[165]*See, e.g., Home Ins. Co. v. Zurich Ins. Co.*, 116 Cal. Rptr. 2d 583, 587 (Cal. Ct. App. 2002) ("Although originally enacted with reference to defamation actions alone, the privilege has been extended to *any* communication, whether or not it is a publication, and to *all* torts other than malicious prosecution." (citations omitted) (emphasis in original)).

[166]*T.T. ex rel. Susan T. v. County of Marin*, No. C 12-2349 WHA, 2013 WL 308908, at *6 (N.D. Cal. Jan. 25, 2013) (quoting *Wentland v. Wass*, 25 Cal. Rptr. 3d 109, 115 (Cal. Ct. App. 2006)). The Court also notes that under California law the "litigation privilege does not apply to an equitable action to set aside a settlement agreement for extrinsic fraud." *Home Ins.*, 116 Cal. Rptr. 2d at 590.

[167]*Travelers Cas. Ins. Co. v. Visemer De Gelt, LLC*, No. 13-2054-GW (JCX), 2013 WL 12210106, at *11 (C.D. Cal. Sept. 23, 2013) (citing *Stacy & Witbeck, Inc. v. City & County of San Francisco*, 47 Cal. App[. 4th 1, 8

to extract UUIC's policy limits, even though the parties intended that AKH would be the sole recipient of a monetary settlement under either settlement agreement. Because the cooperation clause was a promise between AKH and UUIC separate from the RT litigation, the Court finds that the litigation privilege does not apply to insulate AKH from its conduct in that underlying litigation. "This breach was not simply a communication, but also wrongful conduct or performance under the contract . . . . Application of the litigation privilege in this case does not encourage finality and avoid litigation."[168] Moreover, these parties were not adverse in the underlying litigation. Theoretically, they had a shared interest in reducing AKH's liability exposure. The Court concludes that the litigation privilege does not apply to UUIC's claim that AKH breached the cooperation clause of the insurance contract.

### iv.    Substantial Prejudice

Finally, AKH argues that to the extent it breached the Policy's cooperation clause, it did not cause UUIC substantial prejudice in its ability to provide a defense. AKH contends that UUIC's knowledge of RT's transfer of the $5 million to AKH should not have impacted its decision to extend its policy limits. Moreover, AKH argues that UUIC issued the indemnity payment after reviewing the settlement and escrow agreements, which should have made clear that although UUIC was paying RT $5 million, RT would be paying AKH $13 million.

The burden of proving substantial prejudice is on the insurer.[169] "To establish actual prejudice, the insurer must show a substantial likelihood that, with timely notice, and notwithstanding [any] denial of coverage or reservation of rights, it would have settled the claim

---

(1996)).

[168]*Wentland*, 25 Cal. Rptr. at 116.

[169]*Hall v. Travelers Ins. Cos.*, 93 Cal. Rptr. 159, 162 (Cal. Ct. App. 1971).

for less or taken steps that would have reduced or eliminated the insured's liability."[170]  There is sufficient evidence on which a reasonable jury could find that UUIC was substantially prejudiced in its defense by AKH's failure to cooperate in the settlement of the RT action.  UUIC claims that AKH's collusion with RT to present a false settlement demand of $20 million, as well as AKH's misrepresentations and omissions, caused it to make a rushed decision to extend its policy limits, without full knowledge that its payment would flow to AKH rather than RT. Notably, AKH failed to notify UUIC of the November 27 settlement demand by RT of $8 million.  A reasonable jury could conclude that UUIC would not have extended its policy limits to settle had it known the true nature of the settlement's structure by which AKH would owe RT no cash payment, that RT had revised its $20 million demand to settle the consolidated action, and that it was AKH and not RT demanding a settlement by the end of the calendar year.[171]

### b.  Other Policy Exclusions

In addition to AKH's breach of the Policy's cooperation clause, UUIC maintains that the First Injurious Offense and Intentional Conduct exclusions apply to the claims alleged in the RT action.  The Court need not address these exclusions on summary judgment given its ruling that AKH's motion for summary judgment on the reimbursement claims should be denied due to a triable issue of whether AKH breached the Policy's cooperation clause.

---

[170]*Belz v. Clarendon Am. Ins. Co.*, 69 Cal. Rptr. 3d 864, 873–74 (Cal. Ct. App. 2007) (quoting *Shell Oil Co. v. Winterthur Swiss Ins. Co.*, 15 Cal. Rptr. 2d 815 (Cal. Ct. App. 1993)); *see also Hall v. Travelers Ins. Cos.*, 93 Cal. Rptr. at 162.

[171]AKH argues that UUIC executives John Mahoney and Gregory Bruning testified that they were not rushed into the decision granting settlement reserve authority.  But Mahoney testified that he has no recollection of granting settlement authority in this case.  Similarly, Bruning did not recall one way or another whether he felt rushed.  Bruning's testimony actually supports UUIC's position that the decision to grant settlement authority was based on Paul Hastings' representations about AKH's liability exposure.  He testified that he agreed with the decision to extend settlement authority "[b]ecause the insured's attorney was advising us that there was up to a $40 million exposure and that they believed they had liability, and they wanted the case resolved for the 5 million and to cap their exposure." Doc. 644-13 at 45:16–24.

### 5. Breach of Cal. Civil Code § 2860

When an insured submits a third-party insurance claim, the insurer "usually provides a defense to its insured by hiring competent defense counsel, who represents the interests of both the insurer and the insured."[172] In some cases, however, a conflict of interest or a potential conflict of interest between the insurer and the insured requires the insurer to provide independent counsel to the insured, at the insurer's expense, "who then controls the litigation."[173] Cal. Civ. Code § 2860 "codifies and clarifies the *Cumis* doctrine," which "intended to eliminate the ethical dilemmas and temptations that arise along with conflict in joint representation . . . through mandating the insured's right to *Cumis* counsel that represent[s] only the insured."[174]

> [U]nder California law, the insured and its *Cumis* counsel retain full control over the defense of the underlying action—in other words, they control the character of the legal representation and, as a matter of law, they control the character of that representation independent of the views of the carrier who has reserved its rights to deny coverage.[175]

In this case, as part of its agreement to defend under a reservation of rights, UUIC offered to pay for AKH's choice of counsel if its counsel agreed to abide by Cal. Civ. Code § 2860 and comply with UUIC's defense counsel guidelines and billing rates. AKH and Paul Hastings agreed. Cal. Civ. Code § 2860 therefore applies to AKH, and to Paul Hastings in its capacity as independent defense counsel in the RT action. UUIC brings a counterclaim against AKH for breach of its duties under this provision and both parties move for summary judgment.

---

[172]*Assurance Co. of Am. v. Haven*, 38 Cal. Rptr. 2d 25, 29 (Cal. Ct. App. 1995).

[173]*Id.* (citing Cal. Civ. Code § 2860).

[174]*Id.* at 29–31 (quoting *Emp'rs Ins. of Wausau v. Albert D. Seeno Constr.*, 692 F. Supp. 1150, 1158 (N.D. Cal. 1988)); *see also San Diego Fed. Credit Union v. Cumis Ins. Soc'y, Inc.*, 208 Cal. Rptr. 494 (Cal. Ct. App. 1984).

[175]*First Pac. Networks, Inc. v. Atl. Mut. Ins. Co.*, 163 F.R.D. 574, 580 (N.D. Cal. 1995).

AKH argues that because Paul Hastings was appointed as independent counsel, UUIC no longer controlled the defense and AKH was permitted to withhold certain information from UUIC during the settlement negotiation period. It repeatedly and generically refers to "business issues" about which UUIC was not entitled to know. Although eventually the parties decided to execute separate settlement agreements for the two lawsuits to assuage RT's concern about the appearance of collusion, the agreements cross-referenced one another. Eventually, AKH produced to UUIC the settlement agreements for both actions, so it is difficult to discern AKH's argument on summary judgment that UUIC was not entitled to understand the basic terms of these cross-referenced settlement agreements before deciding whether to extend policy limits as part of the settlement.

AKH also fails to acknowledge that the statute governing independent *Cumis* counsel explicitly provides that it does not "relieve the insured of his or her duty to cooperate with the insurer under the terms of the insurance contract."[176] Additionally, the statute requires that independent counsel "shall . . . disclose to the insurer all information concerning the action except privileged materials relevant to coverage disputes, and timely to inform and consult with the insurer on all matters relating to the action."[177] As part of this statutory duty, *Cumis* counsel must provide "the insurer with his legal assessment of whether or not to settle an underlying lawsuit."[178]

---

[176]Cal. Civ. Code § 2860(d).

[177]*Id.*

[178]*Fid. Nat'l Fin., Inc. v. Nat'l Union Fire Ins. Co.*, No. 09-CV-140-GPC-KSC, 2014 WL 1393743, at *7 (S.D. Cal. Apr. 9, 2014) (citing *First Pac. Networks, Inc. v. Atl. Mut. Ins. Co.*, 163 F.R.D. 574, 580 (N.D. Cal. 1995)).

To be sure, AKH and Paul Hastings were not required to make UUIC privy to all communications between one another to fulfill their cooperation duties under the statute.[179] But UUIC does not claim that AKH wrongfully withheld such communications. UUIC claims that AKH violated the statute by failing to cooperate with the settlement of the RT action, which was negotiated as part of a global settlement that involved the affirmative lawsuit. When viewed in the light most favorable to UUIC, AKH and RT agreed to a high-level settlement framework that involved an $8 million payment to AKH in exchange for AKH giving up certain intellectual property and business rights. This amount was too low for AKH, and AKH had tax reasons for insisting on a settlement deadline by the end of the year. But AKH did not disclose either of these considerations to UUIC. Instead, AKH asked RT to produce an inflated demand letter that would help it extract a settlement payment from UUIC. UUIC relied on the demand letter in conjunction with Paul Hastings' strong recommendation that it was a reasonable settlement demand, in order to extend the $5 million policy limit and cap AKH's liability exposure. UUIC also expedited its decision on the request for settlement authority based on Paul Hastings' representations that RT had set a firm deadline on the settlement offer.

The crux of UUIC's cooperation claim is that AKH and its *Cumis* counsel colluded with RT to present a false settlement demand, settlement evaluation, and deadline to UUIC in order to convince UUIC to extend its policy limits to bolster RT's bottom line settlement offer of $8 million, and to do so quickly. A reasonable jury could find in favor of UUIC on this claim from the evidence submitted on summary judgment.

On the other hand, a reasonable jury could find in favor of AKH and conclude that UUIC had before it sufficient evidence to discern the true nature of the settlement, and opt not to issue

---

[179] *Id.*

the check. Although the settlement and escrow agreements were executed before UUIC could review and sign off on them on December 27, 2012, a reasonable jury could find that UUIC reviewed them before issuing the settlement check. The agreements conveyed the flow of money: $5 million would be paid to RT by UUIC on behalf of AKH; $13 million would be paid to AKH by RT. Despite its concerns and its knowledge that AKH and RT executed the agreements before receiving confirmation from UUIC, UUIC proceeded to issue the settlement check. Viewing the evidence in the light most favorable to AKH, a reasonable jury could conclude that UUIC planned to pay the indemnity under a full reservation of rights to seek reimbursement regardless of whether it approved of the final agreements because it believed that the Policy did not cover the RT action. If the jury so concludes, it could determine that Paul Hastings provided UUIC with enough information to determine whether to settle the matter, in fulfillment of its duties under the statute. As such, this claim should be submitted to the jury and summary judgment is denied.

### B. Tort Claims

AKH and UUIC allege claims against one another for fraud and negligent misrepresentation. The elements required under California law to prove fraud are: (1) misrepresentation (false representation, concealment, or nondisclosure); (2) defendant's knowledge of the statement's falsity; (3) intent to defraud; (4) justifiable reliance, and (5) damages.[180] To establish negligent misrepresentation, a plaintiff must show: "(1) the misrepresentation of a past or existing material fact, (2) without reasonable ground for believing

---

[180]*Flaxel v. Johnson*, 541 F. Supp. 2d 1127, 1145 (S.D. Cal. 2008) (quoting *Hunter v. Up-Right, Inc.*, 864 P.2d 88, 93 (Cal. 1993)); *Copart, Inc. v. Sparta Consulting, Inc.*, 277 F. Supp. 3d 1127, 1148 (E.D. Cal. 2017) (quoting *Engalia v. Permanente Med. Grp., Inc.*, 938 P.2d 903, 917 (Cal. 1997)).

it to be true, (3) with intent to induce another's reliance on the fact misrepresented, (4) justifiable

reliance on the misrepresentation, and (5) resulting damage."[181]

### 1. AKH's Motion For Summary Judgment on UUIC Counts VIII, IX, X, and XIII

In the Pretrial Order, UUIC alleges that AKH and its agents mispresented the following

facts to UUIC: (1) RT was demanding $20 million to settle its infringement claims against AKH;

(2) AKH believed that $20 million was a reasonable settlement value for RT's claims; (3)

AKH's defense counsel believed that $20 million was a reasonable settlement value for the case;

(4) RT had issued a time-limited demand with a deadline of December 13, 2012; (5) the policy

limits paid by Universal would be used to protect AKH, compensate RT, and resolve RT's

trademark infringement claims against AKH; (6) that settlement needed to occur immediately

upon AKH's demands or Universal would be exposing AKH to significant damage and injury;

(7) RT was pushing for settlement immediately and demanding settlement within days of the

demands being conveyed to Universal and that RT was demanding that settlement be completed

in any event not later than the end of 2012; and (8) the potential exposure for the underlying

action was at or above policy limits.

UUIC alleges that AKH fraudulently concealed the following information: (1) RT had

proposed a global settlement in November 2012 by which Universal would not pay any money;

(2) RT was not seeking any money from Universal as consideration to dismiss its claims against

AKH; (3) it was AKH's idea, not RT's, to prepare the "demand" and revise it to be more

persuasive to Universal; (4) Universal's $5 million policy limits, which it paid directly to RT,

were then immediately transferred to AKH upon receipt by RT; (5) AKH and RT had fully

---

[181] *UMG Recordings, Inc. v. Global Eagle Enter., Inc.*, 117 F. Supp. 3d 1092, 1111 (C.D. Cal. 2015). (quoting *Apollo Capital Fund, LLC v. Roth Capital Partners, LLC*, 70 Cal. Rptr. 3d 199 (Cal. Ct. App. 2007)). The parties stipulate that California law applies to these claims.

executed settlement documents prior to Universal's payment; (6) AKH had signed the settlement

agreements before they were presented to Universal as "final" drafts; (7) RT and AKH had filed

stipulations of dismissal of the consolidated underlying lawsuits prior to Universal's payment;

(8) AKH and RT had been engaged in settlement discussions from September to December

2012; (9) AKH and RT had agreed to final settlement amounts before Universal tendered its

policy limits upon AKH's demand; (10) RT and its counsel raised concerns to AKH and its

agents in December 2012 regarding whether Universal was being properly informed as to the

terms and progression of settlement, whether Universal had agreed to the settlement structure,

and whether the settlement structure was appropriate; (11) AKH excluded Universal from

settlement discussions and communications regarding settlement structure and amounts; (12) RT

issued a "settlement demand" to AKH on November 14, 2012; (13) AKH solicited RT to prepare

a revised "demand" and provided RT with language for the "demand" that it believed would be

persuasive to Universal so that Universal would contribute money that could be recovered by

AKH (and not to resolve RT's claims against AKH); (14) AKH's counsel and RT separately

raised concerns about whether their conduct constituted "collusion" against Universal; (15) RT

raised concerns regarding whether it could be liable to Universal for "aiding and abetting"

AKH's conduct; (16) AKH communicated to a third party that AKH had "negotiated a verbal

settlement" with RT on December 12, 2012 (the same day it told Universal that if Universal did

not commit funds by the next business day, all settlement opportunities would disappear); (17)

AKH and RT had agreed to a "framework" for settlement in November 2012; and (18) AKH did

not provide Universal with basic information sufficient for it to make a fully informed decision

on the reasonableness of the settlement or of AKH's demands for policy limits.

AKH moves for summary judgment on the following grounds: (1) AKH cannot be liable for the tortious conduct of its counsel; (2) AKH was not required to disclose facts to UUIC outside the scope of the defense of the RT action—it was not required to disclose any facts concerning the settlement of the affirmative action, nor was it required to obtain permission from UUIC to settle the affirmative action; (3) UUIC was aware of all underlying facts concerning the settlement before issuing its check, so it cannot demonstrate justifiable reliance; and (4) UUIC did not reasonably rely on AKH's misrepresentations or omissions.

### a. Agency

UUIC maintains that AKH is liable for misrepresentations and omissions by Paul Hastings attorneys during the underlying litigation under several agency principles, including that Paul Hastings had actual or apparent authority to act on behalf of AKH, that AKH ratified Paul Hastings' statements and omissions, and that AKH never withdrew Paul Hastings' authority to make representations on behalf of AKH in the underlying lawsuit. AKH responds that Paul Hastings attorneys were independent contractors, and thus AKH may not be liable for their misrepresentations.

Under California agency law, the relationship between attorney client is one of agent and principal.[182] If the agent commits a tort, the agent may be subject to liability for the wrongful conduct.[183] "Under traditional agency principles, a principal may be liable for the acts of his agent if the principle consents to the 'agent acting on his behalf and subject to his control, and the agent [consents] to act for the principal.'"[184]

---

[182]*Norman v. Berger, Kahn, Shafton, Moss, Figler, Simon & Gladstone*, 131 Cal. Rptr. 2d 777, 788 (Cal. Ct. App. 2003).

[183]*Id.*

[184]*Rose v. Seamless Fin. Corp.*, 916 F. Supp. 2d 1160, 1168–69 (S.D. Cal. 2013) (quoting *Holley v. Crank*, 400 F.3d 667, 673 (9th Cir. 2005)).

AKH cites *Lynn v. Superior Court* for the proposition that an attorney appointed to defend in an insurance case is an independent contractor, and thus vicarious liability upon the principle cannot be imposed.[185] But *Lynn* holds that independent counsel appointed by an insurer to defend its insured is an independent contractor for the insurance company; it does not address the agency relationship between the insured and its appointed counsel.[186] The Court finds no authority to support AKH's assertion that an attorney appointed as independent counsel for the insured, particularly as here, where Paul Hastings was retained long before AKH tendered its defense to UUIC, is considered an independent contractor.

Having determined as a matter of law that AKH's attorneys may have acted as its agents during the underlying litigation, the Court turns to the issue of whether there is sufficient evidence in the record to support AKH's liability for their actions. For AKH to be liable for the conduct of its attorneys, there must be some showing that it directed, advised, consented to, or participated in the attorney's improper conduct.[187] There is a genuine issue of material fact about the extent to which AKH directed, advised, consented to, or participated in the allegedly tortious

---

[185] 225 Cal. Rptr. 427, 349 (Cal. Ct. App. 1986).

[186] *Id.*; *Dorroh v. Deerbrook Ins. Co.*, 223 F. Supp. 3d 1081, 1096 (E.D. Cal. 2016) ("More importantly, because an attorney retained by an insurer to defend its insured is an independent contractor, a liability insurer cannot be held liable for the attorney's tortious conduct.").

[187] *See, e.g.*, *Quigly v. Rosenthal*, 327 F.3d 1044, 1064 n.10 (10th Cir. 2003) (acknowledging that attorneys are both independent contractors and agents); *Oei v. N. Star Capital Acquisitions, LLC*, 486 F. Supp. 2d 1089, 1095 (C.D. Cal. 2006) (explaining that vicarious liability will depend on the nature of the attorneys' actions); *Horwitz v. Holabird & Root*, 816 N.E.2d 272, 279 (Ill. 2004) ("where a plaintiff seeks to hold a client vicariously liable for the attorney's allegedly intentional tortious conduct, a plaintiff must prove facts demonstrating either that the client specifically directed, controlled, or authorized the attorney's precise method of performing the work or that the client subsequently ratified acts performed in the exercise of the attorney's independent judgment. If there is no evidence that the client directed, controlled, authorized, or ratified the attorney's allegedly tortious conduct, no vicarious liability can attach."); *Baglini v. Lauletta*, 768 A.2d 825, 839 (N.J. Super. Ct. App. Div. 2001) (holding client's liability depends on whether they direct, advise, consent to or participate in the attorney's improper conduct); *Lynn v. Superior Court*, 225 Cal. Rptr. 427, 428–29 (Cal. Ct. App. 1986) (explaining that an attorney is an independent contractor in her role as trial counsel where no showing of ratification, endorsement, or approval of the attorney's actions); Restatement (Second) of Agency § 14N cmt. a (1958) (explaining that attorneys can fall into the categories of both independent contractor and agent).

conduct. Specifically, UUIC points to evidence that AKH directed its attorneys to impose an end-of-the-year deadline on the settlement demand from RT, despite the fact that RT had issued no such settlement demand. AKH hoped for a settlement before the end of the year for tax purposes. Moreover, several items of correspondence upon which UUIC's tort claims are based either copy AKH executives, or occurred after counsel consulted with their client. A reasonable jury could conclude from these documents that AKH directed, consented to, or participated in the representations and omissions forming the basis of AKH's tort claims.[188]

### b. Duty to Disclose

AKH argues that UUIC was not entitled to information about the settlement of the AKH action, and therefore it cannot maintain a tort action based on a failure to disclose such information. A legal duty to disclose exists: "(1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material fact."[189] Viewing the facts in the light most favorable to UUIC, there is a genuine issue of material fact as to whether AKH had exclusive knowledge of material facts not known to UUIC, and whether AKH actively concealed material facts. UUIC points to several key facts that led to its decision to extend settlement authority that was not shared by AKH. Moreover, as the Court explained above, under Cal. Civil Code § 2860, AKH and Paul Hastings owed a duty

---

[188] The Court need not reach the facts covered in detail by AKH concerning a separate lawsuit in California UUIC is apparently prosecuting against Paul Hastings in tort. Joint tortfeasors can be held liable for the same claims, and AKH fails to point the Court to rulings in the California action that would collaterally estop UUIC in this action. *See Monster Film Ltd. v. Martinen*, No. 2017 WL 8220213, at *2 (C.D Cal. Mar. 3, 2017) ("Although a less convenient remedy, the joint tortfeasor may bring a separate action against any other joint tortfeasors.").

[189] *In re: First Am. Home Buyers Prot. Corp. Class Action Litig.*, 313 F.R.D. 578, 604 (S.D. Cal. 2016) (citing *Baggett v. Hewlett-Packard Co.*, 582 F. Supp. 2d 1261, 1267–68 (C.D. Cal . 2007)).

to UUIC to disclose to AKH all nonprivileged information concerning the settlement of the RT action. And under Cal. Ins. Code § 332, "Each party to a contract of insurance shall communicate to the other, in good faith, all facts within his knowledge which are or which he believes to be material to the contract and as to which he makes no warranty, and which the other has not the means of ascertaining."

Finally, UUIC's claims are not premised on its failure to disclose facts outside the scope of the RT defense. It is undisputed that prior to late November, the parties in the underlying litigation contemplated a global settlement. Indeed, AKH describes it as a "complicated, intricate global settlement that involved much more than Universal's payment to take its insured out of harm's way."[190] AKH had a duty to communicate the true facts surrounding its settlement with RT that would be material to UUIC's decision to extend settlement authority in the RT action. Because UUIC has identified facts in the record to support a failure to disclose such facts, there is a genuine issue of material fact and summary judgment is not appropriate on this element of UUIC's fraud by omission claim.

### c.    Knowledge of Settlement Terms and Reliance

AKH argues that summary judgment is appropriate on UUIC's tort claims because UUIC received copies of the settlement and escrow agreements before paying the settlement funds, and therefore did not rely on the facts set forth in those documents when deciding whether to settle. The Court considered and rejected this argument in the context of the cooperation clause claim and the Court incorporates by reference its analysis on that claim. As Judge Gale observed earlier in this litigation, when viewed in the light most favorable to UUIC, the evidence shows that "Defendant was under significant pressure from Plaintiff's litigation counsel and Plaintiff's

---

[190]Doc. 644 at 114.

coverage counsel to approve the settlement terms as soon as possible—even though communications involving RT's counsel do not necessarily evidence the same urgency Plaintiff's counsel was attributing to RT."[191]  Moreover, the settlement and escrow agreements do not reveal the true nature of the settlement negotiations, as they did not make clear that UUIC's payment would flow to AKH.  It is undisputed that AKH refused to provide these agreements until after UUIC extended its policy limits.  At this point, UUIC ran the risk of exposing itself to a bad faith claim by AKH if it stopped payment on the settlement check.[192]

UUIC claims that AKH's collusion with RT to present a false settlement demand of $20 million, as well as AKH's misrepresentations and omissions, caused it to make a rushed decision to extend its policy limits, without full knowledge that its payment would flow to AKH rather than RT.  Notably, AKH failed to notify UUIC of the November 27 settlement demand by RT of $8 million.  A reasonable jury could conclude that UUIC would not have extended its policy limits had it known the true nature of the settlement's structure, that RT had revised its $20 million demand to settle the consolidated action, and that it was AKH and not RT demanding a settlement by the end of the calendar year.

Finally, AKH argues that UUIC did not reasonably rely on any of AKH's misrepresentations or omissions, citing to UUIC's executives' testimony that they were not compelled to authorize the settlement payment due to the alleged fraudulent conduct.  But neither Mahoney nor Bruning could recall the specific circumstances surrounding their decision to extend the policy limit for settlement.  Moreover, Bruning testified that he would have relied

---

[191]Doc. 158 at 38–39.

[192]See *Blue Ridge Ins. Co. v. Jacobsen*, 22 P.3d 313, 317–18 (Cal. 2001) (explaining that insurer that "fails to accept a reasonable settlement offer within the policy limits because it does not believe the policy provides coverage, assumes the risk it will be held liable for all resulting damages including a judgment that exceeds the policy limits," but can later seek reimbursement if it later establishes noncoverage under the policy if it reserves its rights to do so at the time of settlement).

on Paul Hastings' legal advice that $20 million was a reasonable settlement demand in making

that decision. Accordingly, there remains a genuine issue of material fact about whether UUIC

incurred damages as a result of the tortious conduct. AKH's motion for summary judgment on

UUIC Counts VIII, IX, X, and XIII is thus denied.

### 2. UUIC's Motion for Summary Judgment on AKH's Counts IV, and VI

In the First Amended Complaint,[193] AKH alleges claims for intentional and negligent

misrepresentation, based on the following false or misleading statements by UUIC: (1) that AKH

was not entitled to select personal counsel to defend it in the underlying action at UUIC's

expense; (2) that its reservation-of-rights letters did not trigger a *Cumis* obligation entitling AKH

to personal counsel pursuant to Cal. Civil Code § 2860; (3) that AKH was not entitled to

personal counsel to defend the underlying action at the carrier's expense; (4) that it was entitled

to assign panel counsel of UUIC's choice to defend AKH in the underlying action and to leave

AKH to its own resources with respect to funding the defense of the underlying action by

personal counsel; (5) that it was entitled to assign the panel firm of Gordon & Rees to defend

AKH in the underlying action; (6) that AKH would have to agree to the terms that UUIC was

willing to offer in return for being permitted to use Paul Hastings as personal counsel; (7) that

AKH was required to accept not 100% of the defense of the claims against it, but only 50%; (8)

that Paul Hastings was not entitled to be compensated for actions undertaken to defend AKH if

those actions were also required to prosecute the affirmative claims by AKH; (9) that Paul

Hastings had to accept a drastically reduced hourly rate of $285, a fraction of Paul Hastings'

---

[193] At this point in the litigation, the Pretrial Order supersedes the pleadings and should control the Court's understanding of the parties' claims in this matter. Fed. R. Civ. P. 16(d). Disappointingly, the parties failed to draft a complete pretrial order in this matter. As but one example, AKH's "Legal Claims" section fails to even mention its tort claims. *See* Doc. 627 at 82–85. Therefore, the Court must reference AKH's November 25, 2014 pleading for a list of alleged misrepresentations.

normal rate and well below the rates that UUIC had agreed to pay to Gordon & Rees; (10) that it was entitled to audit the bills of Paul Hastings to deny payment of any bills that were not consistent with UUIC guidelines for panel counsel; (11) that it was entitled to deny payment for all block billings by Paul Hastings, and assigned its own arbitrary meaning to block billing; (12) that it was entitled to refuse to pay bills for serendipitous reasons, or for no real reason at all, such as without explanation simply because of a choice of words, e.g., the use of words such as "schedule," or "continue preparation" in the bill; (13) that it could defend a case by paying for an estimated 15% of the defense fees; (14) that there was a standard other than reasonableness which governed its responsibility for the payment of the Paul Hastings' bills; (15) that it was fully defending the insured even though it had materially breached every aspect of the defense obligation and left AKH drowning in legal fees; (16) that it did not know the $5,000,000 it agreed to pay in settlement was part of a settlement of the entire trademark dispute as to which AKH was receiving a payment for transfer to RT of trademark rights; (17) that it did not know prior to the issuance of its settlement check the nature of the underlying settlement and did not know that monies paid to RT would "triangle" to AKH; (18) that it would not have issued the check if it had known that $13,000,000 was being paid by RT to AKH; (19) the reasons for its payment of $5,000,000 and that it lacked knowledge regarding the terms of the underlying settlement; (20) that the underlying case had settled prior to its payment of $5,000,000; and (21) that it has certain policy exclusions though these have no possible application.

UUIC asserts three arguments in favor of summary judgment: (1) the alleged misrepresentations made by UUIC in the underlying litigation are nonactionable statements of opinion; (2) there is no evidence that UUIC knew or should have known that the alleged misrepresentations it made in this case are false or that AKH relied on those statements; and (3)

the tort claims are barred because they are based on the same facts pled in support of AKH's breach of the duty of good faith and fair dealing claim. As an initial matter, the Court agrees that the tort claims are duplicative of AKH's good faith and fair dealing claim, which necessarily failed due to the Court's holding that summary judgment is warranted on AKH's claims that UUIC breached its duties to defend and settle the RT action.

Also, as detailed thus far in this opinion, the alleged misrepresentations UUIC made in the underlying case were not false or made recklessly without regard for the truth as a matter of law.[194] As the Court has ruled, there is no genuine issue of material fact that UUIC's positions on coverage in the underlying suit were correct. To the extent AKH challenges the billing practices and allocation in the underlying suit, it must arbitrate that dispute under the dictates of Cal. Civil Code § 2860.

Moreover, the alleged misrepresentations made during the underlying litigation are nonactionable statements of opinion on the law, and about the scope of coverage under the Policy. A misrepresentation of law is not actionable.[195] AKH argues that the "superior knowledge" exception to this rule applies, but the Court disagrees. While it may be true that Cole, as the insurance adjuster assigned to AKH's claim, had superior knowledge about the insurance policy, this would only trigger the exception for statements that "the terms mean something other than what they appear on their face,"[196] or that the insurer's opinion induced the insured into purchasing the policy.[197] Neither situation applies here. AKH seeks to hold UUIC

---

[194]See Engalla v. Permanente Med. Grp., Inc., 938 P.2d 903, 917 (Cal. 1997).

[195]See, e.g., Miller v. City & County of San Francisco, 9 Cal. Rptr. 767, 769 (Cal. Ct. App. 1960); Miller v. Yokohama Tire Corp., 358 F.3d 616, 621 (9th Cir. 2004).

[196]Maraldo v. Life Ins. Co. of the Sw., No. 11-CV-49720YGR, 2012 WL 1094462, at *8 (N.D. Cal. Mar. 30, 2012).

[197]See Galea v. Lincoln Nat'l Corp., No.11-cv-1218-CAB, 2013 WL 12069054, at *4 (S.D. Cal. Oct. 31, 2013).

liable for its coverage decisions and interpretations, not for inducing it into purchasing the Policy

or for interpreting the policy language in a way that was different from the language itself. To

the extent the alleged misrepresentations deal with the cost-sharing agreement, the Court has

already found no genuine issue of fact about whether it was an enforceable agreement entered

into by the parties. There was no superior knowledge on these issues by UUIC, as evidenced by

the fact that AKH retained coverage counsel who argued zealously for a different interpretation

of the policy exclusions at issue, and for a different allocation method than UUIC required in

order to defend.

Next, UUIC moves for summary judgment on the alleged misrepresentations by UUIC

during this lawsuit. The Court agrees with UUIC that AKH has failed to come forward with

evidence that UUIC knew or should have known that these statements were false, or that AKH

reasonably relied on these statements. The Court finds in UUIC's favor on AKH's insurance

claims in this lawsuit and leaves for trial facts relevant to the breach of the cooperation clause

issue. All of the alleged misrepresentations by UUIC are subsumed by these claims and the fact

the UUIC continues to pursue them either as affirmative claims, or defenses to AKH's claims

largely blunts any suggestion by AKH that they were made with knowledge of their falsity, or

reckless disregard for the truth. Indeed, UUIC's point is well taken that if AKH believed

UUIC's litigation positions were made with knowledge of their falsity, sanctions rather than tort

claims would be the appropriate remedy. Similarly, AKH's lack of reliance on these statements

is evidenced by the very existence of this lawsuit, and AKH's legal positions taken therein.

UUIC's motion for summary judgment on AKH's Counts IV and VI are therefore granted.

## C. Universal's Fraudulent Transfer and Alter Ego Claims

UUIC moves for summary judgment on its claims against the Counter-Defendants for fraudulent transfer and alter ego liability. The Counter-Defendants move for summary judgment on three discrete issues: (1) UUIC's fraudulent conveyance claim to the extent it alleges a constructive fraudulent transfer theory based on AKH's insolvency at the time of the transfers; (2) Andy and Hratch Andonian's liability on the fraudulent transfer claim; and (3) the alter ego liability claim against 55, Inc.

### 1. Fraudulent Conveyance Claim

A party can support a claim for fraudulent transfer under California law through evidence of either "actual fraud" or "constructive fraud."[198] UUIC moves for summary judgment on both theories. AKH moves for summary judgment on one of two constructive fraud theories.

#### a. Actual Fraud

For an actual fraud claim under California's Uniform Fraudulent Transfer Act ("UFTA"), a transfer may be voided if a debtor makes the transfer with the intent to hinder, delay, or defraud its creditors.[199] "Intent to defraud in UFTA cases may be decided as a matter of law."[200] Proof of intent to hinder, delay, or defraud can be inferred from the circumstances surrounding the transfers.[201] Courts and parties rely on the UFTA's 11 non-exhaustive factors, referred to by

---

[198]*Hasso v. Hapke*, 173 Cal. Rptr. 3d 356, 369–70 (Cal. Ct. App. 2014).

[199]*Attebury Grain LLC v. Grayn Co.*, 721 F. App'x 669, 671 (9th Cir. 2018) (citing Cal. Civ. Code § 3439.04(a)(1)).

[200]*United States v. 5208 Los Franciscos Way*, 252 F. Supp. 2d 1060, 1064 (E.D. Cal. 2003) (citing *In re Hinsley*, 201 F.3d 638, 643 (5th Cir. 2000)).

[201]*See Filip v. Bucurenchu*, 28 Cal. Rptr. 3d 884, 890 (Cal. Ct. App. 2005).

courts as "badges of fraud," that may serve as evidence from which an inference can be drawn of a party's intent to defraud.[202]

The 11 "badges of fraud" identified by statute are: (1) whether the transfer or obligation was to an insider; (2) whether the debtor retained possession or control of the property transferred after the transfer; (3) whether the transfer or obligation was disclosed or concealed; (4) whether before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) whether the transfer was of substantially all of the debtor's assets; (6) whether the debtor absconded; (7) whether the debtor removed or concealed assets; (8) whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) whether the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) whether the debtor transferred the essential assets of the business to a lienholder who transferred the assets to an insider of the debtor.[203]  There is no minimum number of badges of fraud that must be found in order to prove intentional fraudulent conveyance.[204]  Moreover, "[a] trier of fact is entitled to find actual intent based on the evidence in the case, even if 'no badges of fraud' are present."[205]

UUIC has come forward with evidence to support most of the badges of fraud listed in

---

[202]*5208 Los Franciscos Way*, 252 F. Supp. 2d at 1063–65; *Atterbury Grain*, 721 F. App'x at 670.

[203]Cal. Civ. Code § 3439.04(b).

[204]*United States v. Boyce*, 38 F. Supp. 3d 1135, 1157 (C.D. Cal. 2014), *aff'd*, 683 F. App'x 654 (9th Cir. 2017).

[205]*Id.*

§ 3439.04(b).[206] AKH concedes that it transferred its assets to insiders Andy and Hratch Andonian, who owned both AKH and the related entities. And the Court finds no genuine issue of material fact about whether AKH concealed the relevant transfers and assets from UUIC during the course of discovery in this case,[207] and that the transfers occurred after either UUIC's counterclaims were filed on February 12, 2013, or after UUIC threatened suit in December 2012.[208]

But the Court agrees with the Counter-Defendants that there are genuine issues of material fact on several other badges of fraud. As to retention of possession or control, UUIC points to evidence that the Andonians continue to control and operate the AKH tire business since the transfers by creating new entities owned by each of them, that some of the entities have the same corporate address as AKH, and that AKH paid for certain inventory and expenses after the transfer. AKH submits evidence that the overlap in payments and reimbursements between AKH and the related corporate entities only occurred during a relatively short transition period that lasted into 2014, and points to a lack of evidence that AKH controlled those businesses after 2014. A reasonable jury could find no possession or control after 2014 and determine that this badge of fraud is not present.

There is also a genuine issue of fact as to whether AKH transferred substantially all of its assets. In 2017, Hratch Andonian testified by deposition that AKH no longer owned the Discount Tire Centers domain name. As the Court documented in its recent sanctions order, on

---

[206]There is no evidence that AKH absconded or that it transferred the essential assets of the business to a lienholder who transferred the assets to an insider of the debtor.

[207]*See* Doc. 553 at 9–10 (considering jurisdictional facts both alleged in the Counterclaim, and supported by exhibits submitted by the Counter-Defendants).

[208]Under the statute, this factor applies if the transfer happens after "the debtor has been sued *or* threatened with suit." § 3439.04(b)(4) (emphasis added).

January 22, 2019, Andy Andonian testified by deposition that the domain name is an asset owned by AKH, worth "upwards of $15 million."[209] The Court has imposed an adverse-inference instruction as a sanction for Hratch Andonian's false testimony in 2017. But if the jury believes Andy Andonian's testimony on this point, it would rebut UUIC's contention that AKH transferred substantially all of its assets.

Moreover, there are genuine issues of material fact about whether the consideration AKH received for the assets it transferred was reasonably equivalent to their value. UUIC offers valuation evidence, including expert testimony, to support its contention that AKH accepted far less than the reasonable or fair market value of its assets in the transfers to AEI, 55, Inc., TNG, and Trade Co. UUIC also relies on evidence that Hratch and Andy Andonian valued AKH at $25 million before the transfers yet sold the business for an aggregate amount that was far less. The Counter-Defendants point to Whitehead and Schaeper's lower valuations of between $11.28 and $14.54 million, and submit rebuttal expert testimony supporting their contention that AKH accepted consideration for AKH's assets reasonably equivalent to their value.

Finally, although there is no genuine issue of fact about whether AKH's transfers occurred shortly after a substantial debt—the indemnity payment— was incurred, there are genuine issues of material fact as to whether AKH was insolvent or became insolvent shortly after the transfers were made, as discussed below on the constructive fraud claim.

Because this is a claim for which UUIC bears the burden, it must demonstrate that no reasonable trier of fact could find other than for UUIC. It cannot meet this heavy burden. There is no mathematical formula for applying the badges of fraud, and it is a fact-intensive inquiry. A reasonable jury could rely on AKH's evidence and conclude that the conveyances were not made

---

[209]Doc. 672-34 at 160:8–161:15.

with actual intent to defraud, but instead in furtherance of AKH's longstanding plans to unwind the business and divide it between Hratch and Andy Andonian. Thus, UUIC's motion for summary judgment is denied on the actual fraud theory of its fraudulent conveyance counterclaim.

### b. Constructive Fraud

Constructive fraud can be proved in one of two ways. First, under Cal. Civ. Code § 3439.04(a)(2), a transfer is fraudulent if the debtor made the transfer without receiving reasonably equivalent value in exchange for the transfer and the debtor "[i]ntended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due." Second, under Cal. Civ. Code § 3439.05, a transfer is fraudulent if the debtor made the transfer without receiving reasonably equivalent value in exchange and that the debtor was insolvent at that time or became insolvent as a result of the transfer.[210] UUIC moves for summary judgment under both theories of constructive fraud; AKH moves for summary judgment on the second theory only, arguing that there is no genuine issue of fact that AKH was solvent at the time of and shortly after the relevant transfers.

The Court denies UUIC's motion for summary judgment on the first theory of constructive fraud because, as described above, there is a genuine issue of material fact about whether the transfers were made without receiving reasonably equivalent value in exchange. UUIC does not demonstrate that the jury could only find in its favor on this issue of fact.

The Court denies both parties' summary judgment motions as to the second theory of constructive fraud because there is a genuine issue of material fact about AKH's insolvency at the time of the transfers, or as a result thereof. As an initial matter, the parties dispute the

---

[210]Cal. Civ. Code § 3439.05.

temporal scope of the inquiry for determining insolvency. UUIC asks the Court to look at whether AKH was insolvent after the series of transfers in 2013 that dissipated most or all of its assets. AKH asks the Court to evaluate insolvency after each individual transfer. Under the UFTA, "[a] debtor is insolvent if, at a fair valuation, the sum of the debtor's debts is greater than the sum of the debtor's assets."[211] This is called "the balance sheet test for insolvency."[212] Under the "cash flow test for insolvency"[213] in Cal. Civ. Code § 3439.02(c), "[a] debtor who is generally not paying his or her debts as they become due is presumed to be insolvent." The balance sheet and cash flow tests are alternative tests for insolvency.[214] Neither party sufficiently applies these tests to the facts of the case. Part of the problem in this case is that there are no "balance sheets" upon which the Court can draw conclusive findings about the fair valuation of AKH's assets at the time of, or just after the transfers were completed, to compare to its liabilities.[215] Moreover, due to the commingled nature of the parties' funds just after the transfer, the evidence is less than clear about whether AKH, versus the Andonian brothers or a related entity, paid AKH's debts.

Moreover, AKH ignores the fact that the insolvency inquiry requires the Court to consider the contingent liability of UUIC's $5 million insurance payment. "Debt means liability on a claim," and "claim" in turn means "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed,

---

[211]Cal. Civ. Code § 3439.02(a).

[212]*In re Vill. Concepts, Inc.*, No. EC-15-1186-JuFD, 2015 WL 8030974, at *7 (B.A.P. 9th Cir. Dec. 4, 2015).

[213]*Id.*

[214]*Id.*

[215]AKH submits a balance sheet as of September 30, 2013, *see* Doc. 645-4, but there is no balance sheet in the record following the relevant transfers.

legal, equitable, secured, or unsecured."[216] "[D]isputed or contingent liabilities must be included in calculating total indebtedness for purposes of determining insolvency . . . ."[217] UUIC's insurance claims for reimbursement in this case, asserted for the first time in February 2013, are "claims" for which there is a disputed liability that must be considered under both the balance sheet and cash flow tests. AKH's classification of the insurance payment as "revenue" for tax purposes has no bearing on its definition under the UFTA. Indeed, AKH considered it a debt in 2013 when it was trying to determine the value of the company. Although it is true that UUIC's expert did not opine on the issue of AKH's insolvency, he testified that the transactions showing assets leaving AKH in 2013 left it without the ability to pay its liabilities. And AKH's rebuttal expert's opinion that AKH was not insolvent after the relevant transfers failed to account for the $5 million contingent liability to UUIC when rendering his opinion on insolvency.

UUIC argues that through a series of transactions in 2013, AKH divested itself of assets by which it could satisfy its debts, which include a potential judgment in this case of at least $5 million for return of the indemnity payment. AKH points to evidence that it had approximately $1 million in assets and $455,399 in non-indemnity payment liabilities at the end of 2013, but this evidence would show that its debts (including the indemnity payment) were greater than its assets. Because UUIC's claim is based on a series of transactions, and because the unmatured claim in this case must be considered a debt under the UFTA, a reasonable jury could find that AKH's debts exceeded its liabilities at the end of 2013 after it transferred its assets to the other Counter-Defendants.

---

[216]Cal. Civ. Code § 3439.02(b), (d); *Meija v. Reed*, 74 P.3d 166, 175 (Cal. 2003).

[217]*In re Vill. Concepts*, 2015 WL 8030974, at *9.

On the contrary, notwithstanding AKH's sanctionable conduct, there is evidence that

AKH continues to own the Discount Tire Centers domain name, which Andy Andonian

estimated has a value of $15 million. UUIC points the Court to contrary deposition testimony by

Hratch Andonian and other documentary evidence that the company has no revenue-generating

assets and is dependent on loans and gifts to pay the legal fees in this matter. But if AKH

retained the domain name and it holds the value testified to by Andy Andonian, then none of the

allegedly fraudulent transfers rendered AKH insolvent. For all of these reasons, summary

judgment is not appropriate in favor of either party on the constructive fraud claims.

### c.  Individual Defendants' Liability

Finally, Andy and Hratch Andonian move for summary judgment on the fraudulent

conveyance claim, arguing that they are not "transferees" under the statute. Under the UFTA,

judgment may be entered against "[t]he first transferee or the person for whose benefit the

transfer was made."[218] As one California federal district court has explained, the statute is not

limited to debtors and transferees,

> The two terms, "debtor" and "person for whose benefit the transfer
> was made," are not one and the same. The latter term has broader
> application. In most cases, the only likely beneficiaries of a
> fraudulent transfer are the debtor who avoids his creditors and the
> transferee who receives the assets. That is not so in all cases,
> however, especially where, as here, the debtor is a corporation. It is
> a matter of common sense that the majority shareholder of a
> corporation (Jonathan Weisz) would stand to benefit if the assets of
> his failing business were fraudulently transferred to his father
> (Robert Weisz).[219]

Similarly, UUIC has pointed to evidence in this case that the Andonians stood to benefit

from the fraudulent transfers. When viewed in the light most favorable to UUIC, a reasonable

---

[218]Cal. Civ. Code § 3439.08(b)(1).

[219]*Qwest Comm'cns Corp. v. Wiesz*, 278 F. Supp. 2d 1188, 1191 (C.D. Cal. 2003) (footnote omitted).

jury could conclude from the summary judgment record that the Andonians personally directed

the transfers from a company they wholly owned, to other entities they each wholly owned.

There is also evidence that Andy Andonian used personal funds received as disbursements from

AKH to purchase assets from AKH on behalf of AEI.[220]

The Counter-Defendants' citation to *Richardson v. FDIC* (*In re M. Blackburn Mitchell,*

*Inc.*) is unavailing.[221]  That case explained that under the § 550 of the Bankruptcy Code, the mere

act of causing a debtor to make a fraudulent transfer does not trigger initial transferee liability.[222]

Nonetheless, the UFTA is not limited to initial transferees and UUIC does not contend that the

Andonians are initial transferees under the statute.  "[T]he party who forces a debtor to make a

transfer is almost always 'the entity for whose benefit such transfer was made,' and thus is

generally always subject to [liability]."[223]  For these reasons, the Andonians are not immune

from liability under the statute and the Counter-Defendants' motion for summary judgment in

their favor is denied.

### 2.    Alter Ego Liability

UUIC's moves for summary judgment on its alter ego claim against all Counter-

Defendants and 55, Inc. cross-moves for summary judgment.  "Alter ego is an 'extreme remedy'

and is 'sparingly used.'"[224]  Under California law, the alter ego doctrine applies where (1) there

is unity of interest and ownership such that separate personalities of the corporation and the alter

---

[220]*See Tatung Co. v. Shu Tze Hsu*, 217 F. Supp. 3d 1138, 1175 (C.D. Cal. 2016) (denying summary judgment where the defendants "benefited as a result of their equitable ownership of both the transferor [] and transferee of the . . . Assets.").

[221]164 B.R. 117 (Bankr. N.D. Cal. 1994).

[222]*Id.* at 126.

[223]*Qwest Comm'cns*, 278 F. Supp. 2d at 1192 (quoting *In re Lucas Dallas, Inc.*, 185 B.R. 801, 809 (9th Cir. BAP 1995)).

[224]*Tatung Co.*, 217 F. Supp. 3d at 1175 (quoting *Sonora Diamond Corp. v. Superior Court*, 99 Cal. Rptr. 2d 824, 836 (Cal. Ct. App. 2000)).

egos do not exist, and (2) there would be an inequitable result if the acts in question are treated as those of the corporation alone.[225]

### a. Unity of Interest

In deciding whether there is a unity of interest, the Court considers the following factors: inadequate capitalization, commingling of funds and other assets of the two entities, the holding out by one entity that it is liable for the debts of the other, identical equitable ownership in the two entities, use of the same offices and employees, use of one as a mere conduit for the affairs of the other, disregard of corporate formalities, lack of segregation of corporate records, and identical directors and officers.[226]

These factors cut both ways and do not apply uniformly to all of the Counter-Defendants, as UUIC suggests. For example, while there is evidence that funds were commingled and corporate records shared among the related entities for up to one year after the transfers, there is no evidence that funds were commingled as to all Counter-Defendants after 2014. And although it is uncontroverted that AKH paid for inventory and other debts for the related entities for a period of time after the transfers, there is no conclusive evidence that this continued past this period of transition. Although the related entities are all owned by either Hratch or Andy Andonian, there is not identical equitable ownership between AKH and the related entities—the brothers no longer jointly own any of the Counter-Defendant entities. Although TNG, AEI, and TradeCo have the same address as AKH, 55, Inc. has a separate address. There is evidence that some employees left AKH to work for one of the related entities, and that AEI and TNG share employees, but there is no evidence that AKH currently shares employees with the related

---

[225]*Robbins v. Blecher*, 60 Cal. Rptr. 2d 815, 818 (Cal. Ct. App. 1997).

[226]*Tatung Co.*, 217 F. Supp. 3d at 1176 (quoting *Virtualmagic Asia, Inc. v. Fil–Cartoons, Inc.*, 121 Cal. Rptr. 2d 1, 13 (2002)).

entities, with the exception of Andy and Hratch Andonian. There is no evidence that the entities have identical directors and officers. In sum, the evidence is controverted as to the presence of these factors for all of the Counter-Defendants.

As with the fraudulent conveyance claims, UUIC cannot meet its heavy burden as the moving party that also bears the burden of proof at trial to show that a reasonable jury could only find in its favor on this prong of the alter ego test as to all Counter-Defendants. On the other hand, a reasonable jury could find in favor of UUIC as to its claim against 55, Inc. given evidence of financial commingling, and inconsistent banking records that do not explain the flow of money between the entities. There is also evidence that, at least for a period of time, AKH incurred debts and obligations on behalf of 55, Inc. The entities share at least one employee and officer—Hratch Andonian. For all of these reasons, the Court finds genuine issues of material fact about whether AKH and the Counter-Defendants have a unity of interest.

### b. Inequitable Result

To establish the second prong of the alter ego test, UUIC must come forward with "direct evidence of specific manipulative conduct,"[227] that "must include 'some conduct amounting to bad faith' which would make it inequitable for the 'equitable owner of a corporation to hide behind its corporate veil.'"[228] "California courts have rejected the view that the potential difficulty a plaintiff faces collecting a judgment is an inequitable result that warrants application of the alter ego doctrine."[229]

---

[227] *Id.* (quoting *Inst. of Veterinary Pathology, Inc. v. Cal. Health Labs, Inc.*, 172 Cal. Rptr. 74, 78 (Cal. Ct. Ap. 1981)).

[228] *Id.* (quoting *Roman Catholic Archbishop v. Superior Court*, 93 Cal. Rptr. 338, 342 (Cal. Ct. App. 1971)).

[229] *Neilson v. Union Bank of Cal., N.A.*, 290 F. Supp. 2d 1101, 1117 (C.D. Cal. 2003) (collecting cases).

As discussed on the fraudulent conveyance claims, there is a genuine issue of material fact about whether AKH fraudulently conveyed AKH's assets to the Counter-Defendants—all entities created and controlled by Hratch and Andy Andonian. The same evidence relied on by the parties to show the badges of fraud on those claims may be used to support the inequitable result prong of UUIC's alter ego claims. UUIC's claim goes beyond asserting that UUIC's difficulty in collecting a judgment in this case meets the inequitable result prong of the alter ego test. For the reasons already explained, there is a genuine issue of material fact about whether the Counter-Defendants acted in bad faith in 2013, after the counterclaim was filed, when most of AKH's assets were transferred to new entities created by AKH's owners Hratch and Andy Andonian. Accordingly, summary judgment must be denied on UUIC's Count XV.

**IT IS THEREFORE ORDERED BY THE COURT** AKH's Motion for Summary Judgment (Doc. 638) is **denied on AKH Counts I–III, and on UUIC Counts I–IV, and VII–XV. AKH's motion is granted as to UUIC Counts V and VI**. UUIC's Motion for Summary Judgment (Doc. 634) is **granted as to AKH Counts I–IV and VI, and otherwise denied**. The Counter-Defendants' Motion for Partial Summary Judgment (Doc. 632) is **denied**.

In light of the Court's careful attention to the voluminous briefs already on file and the impending trial date, the filing of any motions to reconsider this order is discouraged.

**IT IS SO ORDERED.**

Dated: October 7, 2019

s/ Julie A. Robinson
JULIE A. ROBINSON
CHIEF UNITED STATES DISTRICT JUDGE